UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

RIGER MAYANDEUNAS,

                              Plaintiff,

                                                        9:18-cv-1161
v.                                                      (GTS/TWD)

C.O. BIGELOW, et al.,

                              Defendants.

——————————————————————————

APPEARANCES:                                  OF COUNSEL:

RIGER MAYANDEUNAS
15-R-1240
Plaintiff, *pro se*
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. LETITIA JAMES                            KONSTANDINOS D. LERIS, ESQ.
New York State Attorney General               Asst. Attorney General
The Capitol
Albany, NY 12224
Attorney for Defendants

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        This matter has been referred to the Court for a report and recommendation by the

Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Northern District of New York Local Rule ("L.R.") 72.3(c).  On September 26, 2018, *pro se*

Plaintiff Riger Mayandeunas, an inmate in custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42

U.S.C. § 1983.  (Dkt. No. 1.)  The claims remaining after *sua sponte* review of the amended complaint under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A are: (1) Eighth Amendment excessive force claims against Defendants Bigelow, Fuller, Burgo, and Maurer; and (2) Eighth Amendment failure to protect claims against Defendants Harriman and Dixon.  (Dkt. Nos. 9, 12.) Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in lieu of answering Plaintiff's amended complaint.  (Dkt. No. 14; *see also* Dkt. No. 26.)  Defendants seeks summary judgment on the ground Plaintiff failed to exhaust his administrative remedies before filing his complaint.  (Dkt. No. 14-9.)  Plaintiff has filed responsive papers.  (Dkt. No. 27.)  For the reasons that follow, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied.

## II.    BACKGROUND AND CONTENTIONS

Plaintiff claims that on January 14, 2018, at approximately 8:45 p.m., he was assaulted by corrections officers Bigelow, Fuller, Burgo, and Mauer in front of the medication window at the Clinton Correctional Facility ("Clinton C.F.") Annex.  (Dkt. No. 9 at 5.[1])  Bigelow sprayed pepper spray in Plaintiff's eyes and then Bigelow, Fuller, Burgo, and Maurer punched and kicked Plaintiff.  *Id.* at 6-7,  9-10.  Plaintiff claims Dixon, a sergeant, and Harriman, a nurse administrator, were present during the assault and failed to intervene.  *Id.*  Plaintiff lost consciousness, suffered a fractured jaw, two black eyes, swollen eye sockets, lost a tooth, and has headaches.  *Id*. at 7-8.

On January 21, 2018, Plaintiff wrote a grievance concerning the January 14, 2018, incident.  (Dkt. Nos. 14-2 at ¶ 16; 14-4; 27-1 at ¶ 7.)  Plaintiff's grievance (CLA-07875-18) was

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

filed with the inmate grievance office at Clinton C.F. on January 23, 2018.  (Dkt. Nos. 14-2 at ¶ 17.)  According to Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton C.F., Plaintiff's grievance was forwarded directly to the Superintendent as it "concerned harassment by an officer."  *Id*. at ¶ 18.  On March 16, 2018, the Superintendent denied the grievance.  (Dkt. No. 14-5 at 1.)  Plaintiff's appeal to grievance CLA-07875-18 was filed with the Central Office Review Committee ("CORC") on April 13, 2018.  (Dkt. No. 14-7 at 1.)

According to Rachel Seguin, the Assistant Director of the IGP for DOCCS and custodian of records maintained by CORC, as of September 26, 2018, the date Plaintiff's original complaint was filed, CORC had not yet issued a response to grievance CLA-07875-18.  (Dkt. No. 14-6 at ¶ 15.[2])  Further, she declares that as of February 1, 2019, the date she signed her declaration submitted in support of Defendants' motion, Plaintiff's grievance appeal was still pending a CORC disposition.  *Id*.

Defendants contend summary judgment is warranted because Plaintiff failed to exhaust his administrative remedies before commencing this action.  (Dkt. No. 14-9.)  In response, Plaintiff argues his administrative remedies were unavailable because he did not timely receive a response from CORC on his grievance appeal either through "manipulation of delay tactics or otherwise," which prompted him to commence this action.  (Dkt. No. 27-1 at ¶¶ 4, 13-17.)  In their reply, Defendants highlight that Plaintiff commenced this action on September 26, 2018, only four months and thirteen days after a decision by CORC was due per directive 4040 and, in similar situations, courts in the Second Circuit have held CORC's delay in responding to an

---

[2]  Rachel Seguin notes a review of CORC records reveals CORC had not received any correspondence from Plaintiff requesting the status of grievance CLA-07875-18.  (Dkt. No. 14-6 at ¶ 16.)  In response, Plaintiff asserts he is "not mandated to submit correspondence requesting the status of his appeal" and, in any event, declares that on June 13, 2018, he wrote a letter to the Superintendent "inquiring about his appeal to no avail."  (Dkt. No. 27-1 at ¶¶ 12, 13.)

appeal did not constitute "unavailability" such that the plaintiff should be excused from exhausting.  (Dkt. No. 33.)

## III.  LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted).  A plaintiff's verified complaint is to be

treated as an affidavit.[3]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citation and quotation marks omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id.* (citation and quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[4]  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is

---

[3]  The Court finds Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury.  (Dkt. No. 9 at 11.)

[4]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(A)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has responded to Defendants' motion for summary judgment, he has failed to do so in the manner required under L.R. 7.1(a)(3).[5]  (Dkt. No. 27.)

Where a party has failed to respond to the movant's statement of material facts as required by L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant if proceeding *pro se*,

---

[5]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]  Under L.R. 7.1(a)(3), "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

has been specifically advised of the possible consequences of failing to respond to the motion.[7] *Champion*, 76 F.3d at 486.

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V. EXHAUSTION OF ADMINISTRAIVE REMEDIES

### A. Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that

---

[7]  Plaintiff was provided with the requisite notification.  (Dkt. No. 15.)

exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (quotation marks omitted). In New York State prisons, DOCCS has a well-established three-step IGP. 7 N.Y.C.R.R. § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

There are special procedures that may be used when, as in this case, the relevant grievance is code 49 involving staff misconduct. *Id*. § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id*. § 701.8(f). If the grievant wishes to appeal a decision by the superintendent to CORC, he must file a notice of decision to appeal with the IGP clerk at the bottom of the superintendent's decision within seven days of receipt of the decision. *Id*. § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is a "next step" in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps

that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotations marks and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

In *Williams*, the plaintiff inmate had been transferred to a new facility after an unsuccessful attempt to file a grievance. 829 F.3d at 123. The plaintiff never received a response to the grievance and failed to appeal to the next step as instructed in 7 N.Y.C.R.R. § 701.6(g)(2). The Second Circuit, citing *Ross*, reversed the dismissal of the action by the district court for failure to exhaust on unavailability grounds finding that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed," and "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. Plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *See Jones*, 549 U.S. at 216.

**B.    Analysis**

It is undisputed that on January 21, 2018, Plaintiff wrote a grievance concerning the January 14, 2018, incident. (Dkt. No. 14-8 at ¶¶ 8, 9.) His grievance was filed with the IGP clerk on January 23, 2018, and forwarded to the superintendent for a response. *Id*. at ¶¶ 10, 11. The Superintendent denied the grievance on March 16, 2019. *Id*. at ¶ 12. Plaintiff's appeal to CORC was received on April 13, 2018. *Id*. at ¶ 13.

It is also undisputed that CORC had not rendered a decision when Plaintiff's original complaint was received for filing in this action on September 26, 2018, nor had CORC rendered a decision by February 1, 2019, when Rachel Seguin signed her declaration in support of Defendants' motion for summary judgment. *Id*. at ¶¶ 14, 15. Moreover, there is no indication that CORC has ever addressed grievance CLA-07875-18, even to the present day.

11

Based upon the foregoing, the Court finds Defendants have satisfied their burden of demonstrating Plaintiff failed to exhaust his administrative remedies prior to commencing this action.  The question remains, however, whether exhaustion under the IGP was unavailable to Plaintiff under *Ross* and *Williams* where Plaintiff waited one hundred thirty-six (136) days beyond the thirty day deadline for CORC to issue its decision under the IGP to commence this action.

Courts within the Second Circuit are split regarding whether a failure by CORC to timely respond to an appeal constitutes unavailability excusing a failure to exhaust.  *Compare Berkley v. Ware*, No. 9:16-CV-1326 (LEK)(CFH), 2018 WL 3736791, at *6 (N.D.N.Y. July 6, 2018) (finding five month delay by CORC in rendering decision on appeal did not excuse Plaintiff from exhaustion requirement); *Staples v. Patane*, No. 9:17-cv-0703 (TJM/TWD), 2018 WL 7361009, at * (N.D.N.Y. Dec. 7, 2018) (finding ten month delay by CORC in issuing decision did not render administrative remedies unavailable), *report-recommendation adopted by* 2019 WL 757937 (Feb. 20, 2019), *with Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance, . . . such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA); *Rossi v. Fischer*, No. 13-CV-3167 (PKC) (DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) (where CORC did not decide appeal until more than four months after it was filed, court found administrative remedies were not available to the plaintiff and denied dismissal for failure to exhaust).

However, a number of the more recent district courts deciding the issue of availability of exhaustion when CORC has failed to render a timely decision have considered the issue under

*Ross* and *Williams* and concluded that exhaustion was unavailable to inmates in various instances where CORC had failed to decide an appeal in a timely manner under the regulations.[8]

In *Rodriguez v. Reppert*, No. 14-CV-671-RJA-MJR, 2016 WL 6993383, at *2-3 (W.D.N.Y. Nov. 11, 2016), the plaintiff filed his complaint two weeks before CORC issued its decision nearly two months after DOCCS regulations had required it to do so. The district court relied on *Williams* in finding that exhaustion had been unavailable to the plaintiff. The district court explained that while 7 N.Y.C.R.R. § 701.6(g)(2) authorizes an inmate to appeal to the next level when a lower level had not issued a timely determination under the IGP, "CORC'S failure to timely decide any appeal is fundamentally different than, for instance, a superintendent's failure to timely decide an appeal, because the CORC decision is the final step in the DOCCS' internal grievance program" and "a prisoner whose CORC appeal was not timely decided has no other administrative body to which he can appeal." *Id.* at *3.

In *High v. Switz*, No. 9:17-CV-1067(LEK/DJS), 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), *report-recommendation adopted* by 2018 WL 3730175 (N.D.N.Y. Aug 6, 2018), the

---

[8] In *Monroe v. Kocienski*, No. 9:17-CV-1050 (GTS/DEP), 2019 WL 409412, at *4 (N.D.N.Y. Feb. 1, 2019), the court noted "it is disturbed at seeing a delay of longer than a year (specifically, one year, one month, 19 days) with regard to a CORC decision. The Court wonders what the rule would be were CORC (for whatever reason) to fail to *ever* render a decision: at what point in time would the inmate obtain the right to sue? DOCCS would do well to amend 7 N.Y.C.R.R. § 701.5(d)(2)(i),(ii) so as to specify a date after which the inmate may sue, lest the courts effectively do so for it." *Id.* at 4 (emphasis in original). There, however, the court determined it need not wrestle with this "thorny issue" because the delay between the date on which a decision by CORC was due and the date on which the plaintiff signed and thus filed his original complaint was only thirty-seven (37) days, which was significantly shorter than the eighty (80) day waiting period previous found to be insufficient (to warrant suit) by the Second Circuit. *Id.* (citing *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 F. App'x 668, 670 (2d Cir. 2017) (finding that "Gizewski [made] no persuasive argument that administrative remedies were unavailable" where he filed his appeal to CORC on November 12, 2013, and had not yet received a decision from CORC by the time he filed his complaint eighty (80) days later, on January 31, 2014)).

court found plaintiff had taken all the steps he could to fulfill the last step of the appeal process. The plaintiff had filed his appeal with CORC on February 6, 2017, and had heard nothing from CORC as of August 25, 2017, when he wrote to CORC asserting that CORC had exceeded the time frame for deciding the appeal, and that he had therefore exhausted his administrative remedies and intended to file a claim in court. *Switz*, 2018 WL 3736794, at *3. The court, relying on *Ross* and *Williams*, found that exhaustion was unavailable, noting that "while the regulations at the preliminary stages [of the IGP] contemplate a next step for a grievant to take in the event he does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, 'the regulations give no guidance whatsoever' regarding what a grievant should do in this circumstance." *Id*. at *5 (quoting *Williams*, 829 F.3d at 126).

In *Bell v. Napoli*, No. 9:17-CV-850 (ATB), 2018 WL 6506072, at *4-5 (N.D.N.Y. Dec. 11, 2018), CORC received the plaintiff's appeal on May 26, 2017, and a decision should have been rendered by June 26, 2017. Plaintiff waited from June 26, 2017, to August 4, 2017, with no decision from CORC before commencing his lawsuit. *Id*. at *5. The court noted that "the regulations contain[ed] no instructions on how an inmate should proceed if the CORC continue[d] to ignore him after he [had] been informed that his appeal was 'received.'"[9] Finding that administrative exhaustion had been unavailable to the plaintiff under *Williams*, the Court explained:

> The "next step" after the CORC may be a federal action.
> However, if the "next step" language does not apply to the

---

[9] The court properly distinguished *Gizewski*, 692 F. App'x 668, *supra*, in which the plaintiff did not receive notice of filing of his appeal from CORC due to a clerical error and failed to take further action under 7 N.Y.C.R.R. § 701.5(d)(3) when he did not receive the written notice within forty-five days of filing his appeal. *Bell*, 2018 WL 6506072, at *5. In this case, it is undisputed CORC received Plaintiff's appeal on April 13, 2018. (Dkt. No. 14-8 at ¶ 13.)

> CORC's decision, an inmate who never receives a decision from
> the CORC, after the appeal is filed, will be unable to exhaust
> administrative remedies.  In addition by ignoring an inmate's
> appeal, as it appears to have done in this case, the CORC could
> delay a plaintiff's exhaustion indefinitely, making the remedy
> "unavailable" by thwarting plaintiff's attempt to exhaust.

*Id.* at *7.

The Court finds the decisions in *Rodriguez*, *High*, and *Bell*, which rely significantly on *Williams*, to be well-reasoned and applicable to the issue of the availability of exhaustion in this case.  Therefore, based on this record, the Court concludes exhaustion was unavailable to Plaintiff and recommends that Defendant's motion for summary judgment on exhaustion grounds be denied.[10]

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment for failure to exhaust administrative remedies (Dkt. No. 14) be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the

---

[10] The Court has considered Plaintiff's "suggestion" that Defendants should be "sanctioned" in accordance with Rule 56(h) of the Federal Rule of Civil Procedure and, for the reasons set forth in Defendants' reply, finds the argument to be meritless.  (*See* Dkt. Nos. 27-1 at ¶ 17; 33 at 3.)

[11] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: May 21, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Smith v. Collins, S.D.N.Y., October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]   Given my duty to liberally construe a *pro se*
      plaintiff's civil rights complaint, I construe Plaintiff's
      Amended Complaint as including a claim that
      various Defendants violated Plaintiff's rights under
      the Fourth Amendment to be free from unreasonable
      searches and seizures. See *Phillips v. Girdich,* 408
      F.3d 124, 130 (2d Cir.2005) ("We leave it for the
      district court to determine what other claims, if any,
      [the plaintiff] has raised. In so doing, the court's
      imagination should be limited only by [the plaintiff's]
      factual allegations, not by the legal claims set out
      in his pleadings.") [citations omitted]. *(See also*
      Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
      Defendants Woods and Holt "violat[ed] plaintiff's

4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]   A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) *("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").*

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

[6]    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P.* 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

[7]    *Fed.R.Civ.P.* 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8]    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9]    *See Fed.R.Civ.P.* 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10]    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11     *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

  *4  Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12]  However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12     (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13     *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff **"stuck with them** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

2006 WL 1133247

was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"]*; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents **being in my possession ...** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]     (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]     (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube".])

[16]     (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]     (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]     (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]     (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21  (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. 22

22  (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. 23  In pertinent part, the letter stated,

23  (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already took both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. 24

24  (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. 25

25  (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6**  8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. 26  In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." 27  In addition, the last page of the letter states:

26  (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]        (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

[28]        (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]        (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

[30]        (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]        (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

[32]        (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]        (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

[34]        (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryptic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35]        (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]   (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]   (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]   (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]   (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]   (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]   (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who

2006 WL 1133247

found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]   (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]   (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]   (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]   (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

2006 WL 1133247

family member without the consent or approval of the Superintendent or his designee. [51]

49      (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

50      (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

51      (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

52      (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53      (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54      (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11

[Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

55      (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56      (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

57      (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (*Id.*)

59    (*Id.*)


### Meetings Between Defendants
### Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)


### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty

right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See *Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. See *Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

2006 WL 1133247

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]     *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy

Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]     (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]     (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]     (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week

prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as suggesting that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific

paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) See Clissuras v. CUNY, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole factual basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

76    (See Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due

process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

[79]    *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

[80]    *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

## C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established

2006 WL 1133247

a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation
Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from

available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

[85] "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86] (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87] *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at \*11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at \*4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88] (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

[89] (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

2006 WL 1133247

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

[90] (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91] (*See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

[92] (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93] (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first

requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94] (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95] *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any

evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was exposed to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96] (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97] *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98] (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the

allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99] *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naprxon (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100] (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 36 of 126
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

101   (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution,

then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 37 of 126
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]   (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d

Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that he told her that the matter was not grievable. [105]

[104]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities

in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[107] Indeed, he had filed grievances immediately before and during this very time period.[108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]  (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]  (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]  (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

*17  In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-

time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, inter alia, Heck v. Humphrey, 512 U .S. 477 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of his confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109]  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986); Ciaprazi v. Goord, 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely … upon the lack of evidentiary support for plaintiff's retaliation claims … is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]  See Griffin v. Selsky, 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); McNair v. Jones, 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); Dawes v. Dibiase, 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111     (See, e.g., Dkt. No. 5, ¶ 18 [Am. Compl., containing
        sworn allegation that Plaintiff was sentenced to three
        months loss of good-time credits]; Dkt. No. 42,
        Part 1 [Plf.'s Response to Belarge Aff., admitting
        Defendants' assertion that the discretionary review
        of Plaintiff's disciplinary sentence did not affect
        Plaintiff's loss of good-time credits]; Dkt. No. 38,
        Part 4 at 32 [Plf.'s Motion for Summary judgment,
        attaching disciplinary hearing decision, showing
        sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s
        Response, arguing that "even though plaintiff's good
        time was not reversed, expunged, or declared invalid,
        that by itself does not make plaintiff's claims 'not
        cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth
Amendment due process claim be dismissed.

   F. Whether Plaintiff Has Failed to Establish (or Even
   State) a Claim for Conspiracy
In their memorandum of law, Defendants argue that
Plaintiff has failed to establish (or even state) a claim
for conspiracy because (1) such a claim falls not under
42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies
specifically to conspiracies, (2) to succeed on a conspiracy
claim under 42 U.S.C. § 1985, Plaintiff must allege
and show "a meeting of the minds," and (3) Plaintiff
has not alleged and shown such a meeting of the
minds but has offered mere speculative and conclusory
allegations of conspiracy, see, e.g., Dkt. No. 5, ¶¶ 21-22
(Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem.
of Law].) Liberally construed, Plaintiff's response argues
that the evidence does establish such a meeting of the
minds because (1) in their affidavits, Defendants Woods,
Antonelli, and Belarge all swear that they met to plan a
strategy regarding Plaintiff, and (2) that strategy clearly
violated DOCS' policies and procedures, which never
involve a group of high-ranking officials (such as a
deputy superintendent, captain, and sergeant) meeting to
plan a strategy regarding an inmate, but which involve
merely letting a disciplinary charge be filed and decided
by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s
Response].)

   *18  I agree with Defendants largely for the reasons
stated, and based upon the cases cited, in their
memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.'
Mem. of Law].) Plaintiff's attempted conspiracy claim,
which is asserted under 42 U.S.C. § 1983, should actually
be asserted under 42 U.S.C. § 1985. See Webb v. Goord,

340 F.3d 105, 110 (2d. Cir.2003) (construing Section
1983 claim styled as "Conspiracy to Violate Civil Rights"
as Section 1985 claim). To maintain an action under
Section 1985, a plaintiff "must provide some factual basis
supporting a meeting of the minds, such that defendants
entered into an agreement, express or tacit, to achieve the
unlawful end." Webb, 340 F.3d at 110 [internal quotation
marks and citations omitted]. Where a plaintiff does
not provide such a factual basis, but only conclusory,
vague or general allegations, such a conspiracy claim
fails. Id. (dismissing conclusory allegation "that any such
meeting of the minds occurred among any or all of
the defendants"); Boddie v. Schneider, 105 F.3d 857,
862 (2d. Cir.1997) (dismissal of "conclusory, vague or
general allegations of conspiracy to deprive a person of
constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and
general. It is uncontroverted that, at some point between
August 5, 2002, and August 31, 2002, a meeting took
place between Defendant Woods and Defendant Belarge,
and a meeting took place between Defendant Belarge
and Defendant O'Donnell, and that the purpose of both
meetings was to discuss Plaintiff. (See, supra, Statement
of Fact Nos. 25-26.) The issue is whether the purpose of that
meeting was "to achieve an unlawful end" or to simply
investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting
was to lawfully investigate Plaintiff, and Plaintiff has
offered no evidence to the contrary. Plaintiff merely
argues that DOCS' policies and procedures would never
involve a group of high-ranking officials (such as a
deputy superintendent, captain, and sergeant) meeting to
discuss a Plaintiff. Even if Plaintiff had made this assertion
in an affidavit or declaration rather than in a memorandum
of law, I would have difficulty imagining how Plaintiff
(despite his legal training and considerable experience as
an inmate) could possibly have personal knowledge of
such a fact. Furthermore, as a matter of common sense,
it seems to me that where (as here) an inmate has made
a mysterious representation to a deputy superintendent
implying that he has possession of a deceased inmate's
legal materials, it would be entirely conceivable (and
appropriate) for the deputy superintendent to initiate an
investigation of the matter, which investigation would
involve lawful meetings with subordinates.

2006 WL 1133247

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112]

Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]     *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]     *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 41 of 126
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*") [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED*.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,

v.

G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)

|

Signed January 9, 2016

|

Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]

[1]     In light of the procedural posture of the case, the
following recitation is derived from the record now
before the court, with all inferences drawn and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at 73-72.

## II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

[2]     Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

## III. DISCUSSION

A. Legal Standard Governing Summary Judgment
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies
**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing Exhaustion Under the PLRA

Case 9:18-cv-01161-AMN-TWD Document 36 Filed 05/21/19 Page 48 of 126
Eleby v. Smith, Not Reported in Fed. Supp. (2017)
2017 WL 986123

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, ––– Fed.Appx. –––, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts

a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

[4]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

[5]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the

2017 WL 986123

superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

[6] According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

[7] Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.*, Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

[8] In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly

filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

[9]     In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

**Eleby v. Smith, Not Reported in Fed. Supp. (2017)**

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 51 of 126

2017 WL 986123

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[10]   If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2017 WL 986123

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 52 of 126

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

[1]    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the

record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 53 of 126

*Mena v. City of New York, Not Reported in Fed. Supp. (2016)*
2016 WL 3948100

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

## B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

2016 WL 3948100

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 55 of 126

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 56 of 126

Mena v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 3948100

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred

for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3736791
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher BERKLEY, Plaintiff,

v.

H. WARE, Defendant.

No. 9:16-CV-1326 (LEK/CFH)
|
Signed 07/06/2018

**Attorneys and Law Firms**

Christopher Berkley, 15-R-1631, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, pro se

Attorney General for the State of New York, OF COUNSEL: HELENA O. PEDERSON, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Christopher Berkley ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") brings this action pursuant to 42 U.S.C. § 1983, alleging that corrections officer ("C.O.") Helen Ware—who, at all relevant times, was employed at Franklin Correctional Facility ("Franklin")—violated his constitutional rights under the Eighth Amendment. See Dkt. No. 1 ("Compl."). Presently pending before the Court is defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 21. Plaintiff did not oppose the motion. For the following reasons, it is recommended that defendant's motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.B. infra. Plaintiff contends that on May 20, 2016, he injured his right hand playing basketball. Compl. at 5. The infirmary nurses issued him a hand brace to prevent further injury. Id. On May 25, 2016, plaintiff's vocational teacher informed him that he could not attend the class because he had a hand brace on, and that he could not participate in any activities. Id. The teacher sent plaintiff into the hallway to return to his dorm. Id. On entering the hallway, C.O. Ware questioned plaintiff as to why he was not in class. Id. at 5-6. Plaintiff informed C.O. Ware that he could not participate in class due to his sprained wrist, and C.O. Ware instructed him to return to class. Id. at 6. Plaintiff complied, and the vocational teacher again "kicked [plaintiff] out of the classroom." Id. Once in the hallway, C.O. Ware instructed plaintiff to return to class. Id. Plaintiff informed his teacher that C.O. Ware ordered his return, and that he "didn't want any problems[.]" Id. Plaintiff asked his teacher if he could speak with C.O. Ware, but the teacher told him to leave the classroom. Id.

After plaintiff entered the hallway for the third time, C.O. Ware "threw [him] against the wall" and "bumped [his right] hand against the wall[.]" Compl. at 6. Plaintiff informed C.O. Ware that his hand hurt, and she "grabbed [his] hand and slammed it against the wall," stating, "I said to keep your fucking hands on the wall" and "shut the fuck up." Id. She further stated, "as a matter of fact [sic] give me this fucking brace [sic] there's nothing wrong with your fucking hand." Id. C.O. Ware removed plaintiff's brace and handcuffed him, further injuring his hand. Id. at 7. On June 9, 2016, plaintiff received a hard cast for his right hand. Id. at 7.

### B. Defendant's Recitation of the Facts

In support of this motion, defendant filed a Statement of Material Facts. [2] On May 20, 2016, plaintiff injured his right hand and wrist while playing basketball. Dkt. No. 21-3 ¶ 4. Plaintiff informed the Franklin medical staff that he heard a "popping sound" after he ran into the wall and

"rolled" his wrist. Id. ¶ 7. The medical staff noted that plaintiff had limited range of motion and could not make a complete fist. Id. Plaintiff was referred to the Emergency Room at Alice Hyde Memorial Center ("AHMC") for further evaluation. Id. ¶ 8. X-ray results indicated that plaintiff did not sustain a fracture or dislocation to his hand or wrist, and that he only suffered a sprain. Id. ¶ 10. Plaintiff received a splint, a soft sleeve with a hard insert at the underside of the wrist—also known as a brace—as well as ibuprofen, and was discharged. Id. ¶¶ 11, 12. Plaintiff also received a work release form, which indicated that he would be able to return to programming on May 24, 2016. Id. ¶ 12. A follow-up appointment was recommended with an orthopedist to rule out any hidden fractures or ligamentous injuries to plaintiff's hand and/or wrist. Id. ¶ 13.

[2]    Local Rule 7.1(a)(3) states:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
>
> N.D.N.Y. L.R. 7.1(a)(3).

**\*2** On his return to Franklin, the medical staff prescribed plaintiff a medical pass excusing him from work. Dkt. No. 21-3 ¶ 14. The pass expired on May 25, 2016. Id. On May 25, 2016, plaintiff went to the commissary before reporting to the Vocational School, which caused him to be late for his Building Maintenance class. Id. ¶ 23. Plaintiff had previously been late for class, and had been

given direct orders to be on time in the future. Id. ¶ 24. When he reported to class plaintiff was wearing a brace on his right hand/wrist, but did not have a valid medical excuse pass. Id. ¶ 25. Because he did not have a valid medical excuse pass, C.O. Ware instructed plaintiff that he had to attend class even if he could not participate. Id. ¶ 26. Plaintiff refused to remain in the classroom; instead, he asked to go to the infirmary to renew his medical excuse pass. Id. ¶¶ 27, 28. C.O. Ware called the infirmary regarding plaintiff's medical excuse pass, and the nurse on duty informed her that plaintiff could attend class even though he could not participate. Id. ¶¶ 29, 30. The nurse also stated that because plaintiff only had a sprain, the situation was not an emergency and plaintiff did not need to visit the infirmary. Id. ¶ 30. C.O. Ware relayed this information to plaintiff. Id. ¶ 31.

Later that day, plaintiff's vocational class instructor informed C.O. Ware that plaintiff wanted to go to emergency sick call. Dkt. No. 21-3 ¶ 32. As nothing had changed since the first time plaintiff attempted to leave the classroom, C.O. Ware did not believe that this was an emergency situation. Id. C.O. Ware called the infirmary to explain that plaintiff felt it was an emergency. Id. The nurse stated that because this was not an emergency and did not require urgent care, plaintiff would be written up for abusing emergency sick call if he went just to get a new medical excuse pass. Id. ¶ 33. C.O. Ware reiterated this information to plaintiff, but he insisted on going to the infirmary. Id. ¶¶ 34, 35. Pursuant to DOCCS Directive 4910, C.O. Ware pat-frisked plaintiff before allowing him to leave the Vocational School. Id. ¶ 36. C.O. Ware pat-frisked plaintiff in the hallway outside of the Building Maintenance classroom. Id. ¶ 37. C.O. Ware directed plaintiff to put his hands against the wall and spread his feet apart. Id. ¶ 38. She patted down his neck, chest, back, arms, and legs on the outside of his clothing. Id. C.O. Ware did not remove plaintiff's brace, nor did she throw plaintiff against the wall or attempt to choke him. Id. ¶¶ 39, 40. C.O. Ware did not "slam" plaintiff's right hand and/or wrist against the wall during the pat-frisk. Id. ¶ 41. C.O. Ware did not yell at plaintiff, threaten him, use racial slurs, or handcuff plaintiff during the pat-frisk. Id. ¶¶ 42, 43. During the pat-frisk, C.O. Ware informed plaintiff that if he went to emergency sick call to ask for a new permit, he would be written up as that did not qualify as an emergency. Id. ¶ 44. C.O. Ware sent plaintiff to the infirmary after the pat-frisk. Id. ¶ 45.

At the infirmary, the medical staff observed that plaintiff only had minimal swelling, and that his splint was still in place. Dkt. No. 21-3 ¶ 46. The medical staff informed plaintiff that there was "nothing wrong" with his hand and/or wrist, and that he could attend class. Id. ¶ 47. As such, the medical staff did not treat plaintiff at that time. Id. ¶ 48. On May 31, 2016, Franklin medical staff examined plaintiff in conjunction with a grievance he filed concerning the alleged May 25, 2016 incident. Id. ¶ 50. Plaintiff reported pain in his right thumb, but the medical staff did not observe swelling or bruising. Id. ¶ 51. Plaintiff did not request pain medication. Id. ¶ 52. On June 9, 2016, plaintiff attended a follow-up appointment with nonparty orthopedist Dr. Macelaru, who confirmed that plaintiff suffered a sprain, and that there were no hidden fractures or torn ligaments. Id. ¶¶ 15, 16. Dr. Cahill, Facility Health Services Director at Franklin, determined that the sprain diagnosed on June 9, 2016 was the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to plaintiff's right hand and/or wrist. Id. ¶ 17. As a result of plaintiff's appointment with Dr. Macelaru, plaintiff's right hand and wrist were placed in a hard cast to prevent further injury and allow for quicker healing. Id. ¶¶ 18, 19. Plaintiff's cast was removed on or around July 15, 2016.

## II. Discussion [3]

[3]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Failure to Respond

**\*3** Plaintiff failed to oppose defendant's Motion for Summary Judgment. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 23. Given this notice, plaintiff was adequately apprised of the pendency of defendant's motion and the consequences of failing to respond. "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding *pro se*." Jackson v. Onondaga Cty., 549 F.Supp.2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However, if "the

district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit." Id. at 210. "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." Id. Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Id. Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 9. Therefore, as plaintiff's complaint is verified, [4] the undersigned will accept plaintiff's complaint as an affidavit to the extent that the statements are based on plaintiff's personal knowledge or are supported by the record. See Berry v. Marchinkowski, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

[4]     The fact that plaintiff's complaint is not notarized is immaterial under 28 U.S.C. § 1746. See Hameed v. Pundt, 964 F.Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

### B. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law"....

**\*4** Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## C. Exhaustion

As a threshold matter, defendant argues that plaintiff has failed to exhaust his administrative remedies prior to filing this lawsuit. See Dkt. No. 21-1 ("Def. Mem. of Law") at 9-11. On May 27, 2016, plaintiff filed a grievance (FKN-12752-16) alleging that C.O. Ware assaulted him during the May 25, 2016 pat-frisk and injured his right hand. Dkt. No. 21-3 ¶¶ 49, 64; Dkt. No. 21-5 at 20-21. On June 3, 2016, the Superintendent denied plaintiff's grievance. Id. ¶ 65; Dkt. No. 21-5 at 17. Plaintiff appealed the Superintendent's determination on or about June 8, 2016. Id. ¶ 66; Dkt. No. 21-5 at 7. The Central Office Review Committee ("CORC") mailed the determination of plaintiff's grievance to Franklin on November 2, 2016. Id. ¶ 67. Plaintiff filed the complaint in the underlying action on October 27, 2016. Id. ¶ 68.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of

2018 WL 3736791

the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [5]

[5]    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies? [6]

[6]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the

superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*5** It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at \*2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at \*3 (N.D.N.Y. June 19, 2014) ("In the event the defendant establishes that the inmate plaintiff failed to fully complete [ ] the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal.") (internal citation and quotation marks omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at \*3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

Here, the record is clear that plaintiff filed this action on October 27, 2016, and at that time CORC had yet to issue a decision on plaintiff's appeal. [7] DOCCS IGP Assistant Director Rachael Seguin declared that based on her review of DOCCS records, CORC mailed their determination on plaintiff's grievance to the Franklin Inmate Grievance Review Committee ("IGRC"), for transmittal to plaintiff, on November 2, 2016—six days after plaintiff commenced this action. Dkt. No. 21-11 ("Seguin Decl.") ¶¶ 15, 16. Moreover, plaintiff's complaint makes clear on two occasions that he was aware he had not fully exhausted his administrative remedies prior to commencing suit: (1) "my grievance was denied by Superintendent D. LaClair and

now my appeal to the CORC is pending"; and (2) "[t]hus I am still waiting for a result from the C.O.R.C. in this matter[.]" Compl. at 8. Thus, plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit because CORC's decision was outstanding. See Peoples, 212 F.Supp.2d at 142; McMillian, 2017 WL 8894737, at *2; Couvertier, 2014 WL 2781011, at *3; White, 2011 WL 4478988, at * 3.

7        Plaintiff's complaint is considered filed as of the date
         it was given to the prison official for forwarding.
         See Johnson v. Coombe, 156 F.Supp.2d 273, 277
         (S.D.N.Y. 2001). "Although it is not clear when
         the plaintiff gave his complaint to prison officials,
         [a]bsent evidence to the contrary, the Court assumes
         that [the prisoner] gave his petition to prison officials
         for mailing on the date he signed it." Id. (internal
         quotation marks and citation omitted). Because
         plaintiff signed his complaint on October 27, 2016, the
         undersigned deems that the date of filing. See Compl.

### 2. Availability of Administrative Remedies

Read broadly, plaintiff seems to suggest that the grievance process was unavailable to him because of CORC's "absurd" delay in rendering their final determination. See Dkt. No. 1-1 at 27 (setting forth a memorandum from IGP Director Karen Bellamy regarding receipt of plaintiff's appeal). First, although plaintiff claims that CORC did not receive his appeal until September 14, 2016, the plain text of the memorandum seems to suggest that CORC received the appeal on June 14, 2016; rather, the memorandum sent to plaintiff was dated September 14, 2016. See id. ("Your grievance FNK-12752-16 entitled Assaulted by C.O. was rec'd by CORC on 6/14/2016.").

Second, courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did

not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination").

*6 Here, there is no dispute that plaintiff filed a grievance with the Franklin IGRC on May 27, 2016; received the Superintendent's determination on June 3, 2016; and appealed that determination to CORC on or about June 8, 2016. See Dkt. No. 21-5 at 2-7. CORC received plaintiff's appeal on June 14, 2016; sent him a receipt of that appeal on September 14, 2016; and ultimately issued their determination on November 2, 2016. See id. at 1; Dkt. No. 1-1 at 27. Plaintiff has not proffered evidence that he wrote to the Franklin IGRC or CORC inquiring as to the status of his appeal. The letters plaintiff does provide predate plaintiff's appeal to CORC and do not reference any unavailability in the grievance process. See Dkt. No. 1-1 at 18-26; see also 7 N.Y.C.R.R § 701.5(d) (3)(i) ("If a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."). Thus, the undersigned finds that CORC's approximately five month delay in rendering a decision did not excuse plaintiff from the exhaustion requirement. Cf. Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

Thus, as plaintiff failed to exhaust his administrative remedies prior to commencing this action, it is recommended that defendant's motion be granted. [8]

2018 WL 3736791

8   "Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint." Brown v. Napoli, 687 F.Supp.2d 295, 298 (W.D.N.Y. 2009); see also Morales v. Mackalm, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). However, because the undersigned recommends that plaintiff's Eighth Amendment claim against defendant be dismissed on the merits, the dismissal is with prejudice. See Ferrer v. Racette, No. 9:14-CV-1370 (GTS/DJS), 2017 WL 6459525, at *13 n.18 (N.D.N.Y. Dec. 18, 2017) ("Because there is an alternative basis for dismissing the claims against these Defendants that cannot be overcome by allowing Plaintiff a chance to exhaust his administrative remedies, the dismissal is with prejudice.").

### D. Eighth Amendment

Alternatively, C.O. Ware argues that plaintiff's Eighth Amendment claim must be dismissed "because there is no evidence in the record to suggest that [she] used excessive force against [p]laintiff." Def. Mem. of Law at 11. C.O. Ware also argues that to the extent that any force was used, it was de minimis. See id. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

*7   The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

As to the objective element, plaintiff has failed to demonstrate that the his injury was "sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9, 112 S.Ct. 995 (1992) (internal citations omitted). Plaintiff fails to establish, and there is no indication in the record, that the injury to his right wrist/hand changed or worsened as a result of May 25, 2016 pat-frisk; nor is there any support for his claim that he broke and/or fractured his right hand and/or wrist as a result of the alleged assault. See Compl. at 9; Dkt. No. 1-1 at 10. The record is clear that on May 20, 2016 plaintiff sustained a sprain to his right wrist/hand while playing basketball. See Compl. at 5; Dkt. No. 21-3 ¶ 4. Plaintiff's medical records from May 20, 2016 indicate that there were "[n]o signs of fracture or dislocation," and state that plaintiff suffered a right wrist sprain. Dkt. No. 22 ("Pl. Medical Rec.") at 68-69, 97.9 Plaintiff contends that on May 25, 2016, C.O. Ware "threw [him] against the wall" and "grabbed [his] hand and slammed it against the wall." Compl. at 6. Affording plaintiff special solicitude, even

if the undersigned were to credit plaintiff's allegations, [10] his medical records show that immediately after the pat-frisk, plaintiff exhibited only "minimal swelling" and that his splint was still in place. Pl. Medical Rec. at 63. Non-party Dr. Cahill declared that on May 25, 2016, plaintiff reported "[n]o new injuries" to the medical staff after the alleged assault, and, therefore, it was unnecessary for the medical staff to provide treatment. Dkt. No. 21-10 ("Cahill Decl.") ¶ 18. Medical staff examined plaintiff again on May 31, 2016 following the filing of his grievance. See Pl. Medical Rec. at 60. Although plaintiff reported pain in his right thumb, the medical records note that there was no swelling or bruising. Id. On June 9, 2016, non-party orthopedist Dr. Macelaru confirmed that plaintiff had sustained a sprain, and that there were no other fractures or torn ligaments. Id. at 59. [11] Dr. Cahill declared that in his professional medical opinion, "the sprain diagnosed on June 9, 2016 was from the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to [plaintiff's] right hand and/or wrist between May 20, 2016 and June 9, 2016." Cahill Decl. ¶ 22. Further, Dr. Cahill stated that plaintiff's hand and wrist were placed in a hard cast "to fully immobilize and protect the wrist. Because it is hard and cannot be removed by the wearer, a cast is better than a splint to prevent further injury and allow for quicker healing." Id. ¶ 25. Moreover, plaintiff's medical records reference the May 20, 2016 basketball injury as the source of plaintiff's hand/wrist injury. See Pl. Medical Rec. at 60 (detailing May 31, 2016 appointment: "Inmate has a splint for rt wrist that he received for a wrist sprain on 5/[20] from AHMC."); 95 (detailing June 9, 2016 orthopedic appointment: "Inmate injured [rt] wrist when he fell while playing basketball."). Thus, as defendant has proffered evidence that any injury plaintiff sustained to his right hand/wrist occurred as a result of the May 20, 2016 basketball injury, and plaintiff has not provided evidence to the contrary, the undersigned finds that plaintiff has failed to demonstrate a sufficiently serious injury attributable to C.O. Ware's pat-frisk for the purposes of an Eighth Amendment analysis. See Henry v. Brown, No.14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) ("[W]here undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening.") (internal citation and quotation marks omitted).

9  AHMC documents incorrectly note that plaintiff sprained his left wrist. See Pl. Medical Rec. at 97.

10  C.O. Ware maintains that she did not use excessive force during the pat-frisk, nor did she use force maliciously or sadistically to cause plaintiff harm. See Dkt. No. 21-8 ("Ware Decl.") ¶¶ 32, 38.

11  Dr. Cahill declared that, in his professional opinion, it was reasonable to schedule plaintiff's follow-up appointment with the orthopedist for two to three weeks of from the date of the injury, instead of the two to three days recommended on his discharge papers, as "the [AHMC] radiology department indicated that [plaintiff] did not sustain any fractures or tears." Cahill Decl. ¶ 21 n.5.

**\*8** To the extent that plaintiff's discomfort or swelling can be attributed to the May 25, 2016 pat-frisk, it has been held that a plaintiff's minor injuries or discomfort are de minimis and do not constitute a sufficiently serious injury under the objective element of the analysis. See White v. Williams, No. 9:12-CV-1775 NAM/DJS, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) ("Reviewing the record as a whole, and drawing all inferences in favor of Plaintiff, the Court finds that the de minimis use of force alleged by Plaintiff, and the resultant minor injuries or discomfort, are insufficient as a matter of law to satisfy the objective prong of an excessive force claim."); James v. Phillips, No. 05 Civ. 1539(PKC)(KNF), 2008 WL 1700125, at *4 (S.D.N.Y. Apr. 9, 2008) ("True, plaintiff need not show a significant injury but he must come forward with more than a de minimis use of force. In this case, there was nothing more than a shove of an inmate who was not then handcuffed. The swelling to the chin did not amount to much.").

As to the subjective element, there is no indication in the record that C.O. Ware acted "maliciously and sadistically to cause harm." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). Absent his conclusory allegations, plaintiff has failed to proffer evidence as to C.O. Ware's mental state sufficient to demonstrate that she maliciously or sadistically caused him harm. See id. C.O. Ware declared that she pat-frisked plaintiff pursuant to DOCCS Directive 4910, which allows for an inmate to be pat-frisked when going to and from program areas like the Vocational School. Ware Decl. ¶ 23. C.O. Ware further declared that because plaintiff had repeatedly refused to return to class, she performed the pat-frisk before allowing

him to leave for the infirmary in an effort to "maintain order and control." Id. ¶ 25.

Thus, in viewing the record in a light most favorable to plaintiff, the lack of evidence with respect to C.O. Ware's conduct, coupled with the absence of any injury attributable to the May 25, 2016 pat-frisk, fails to present a triable issue of fact for a jury to resolve. Accordingly, the undersigned recommends that defendant's Motion for Summary Judgment on this ground be granted. See Applegate v. Annucci, No. 9:02-CV-0276 (LEK/DEP), 2008 WL 2725087, at *18 (N.D.N.Y. July 10, 2008) (awarding summary judgment on excessive force claim where the plaintiff failed to file any response to the defendant's motion and the record lacked any evidence from which a reasonable juror could conclude that the defendant used excessive force).

**E. Qualified Immunity**

Defendants argue that, even if plaintiff's Eighth Amendment claim is substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 17-19. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F.Supp.2d 211, 230 (N.D.N.Y. 2002).

*9 Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.D supra, at 16-21. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F.Supp.2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

**III. Conclusion**

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 21) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [12]

[12]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

2018 WL 3736791

**All Citations**

Slip Copy, 2018 WL 3736791

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2018 WL 7361009
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rahson STAPLES, Plaintiff,

v.

Joe PATANE; Colleen Coppolla;
Patrick Collver, Defendants.

9:17-cv-0703 (TJM/TWD)
|
Signed 12/07/2018

**Attorneys and Law Firms**

RAHSON STAPLES, a/k/a Rashon Staples, Plaintiff, pro se, 681 Albany Avenue, Brooklyn, NY 11203

BARBARA D. UNDERWOOD, Attorney General for the State of New York, OF COUNSEL: SHANNAN C. KRASNOKUTSKI, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

Thérèse Wiley Dancks, United States Magistrate Judge

## I. INTRODUCTION

**\*1** *Pro se* Plaintiff Rahson Staples, a former inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), has commenced this action under 42 U.S.C. § 1983 alleging violations of his constitutional rights while incarcerated at Marcy Correctional Facility ("Marcy"). (Dkt. Nos. 1, 24.) Remaining Defendants in this action are Joe Patane, a custodial maintenance instructor; Colleen Coppolla, a nurse administrator; and Patrick Collver, a senior counselor in the Residential Substance Abuse Treatment ("RSAT") program. (Dkt. No. 27.) Plaintiff's remaining claims are for Eighth Amendment conditions of confinement against Patane and Coppolla and First Amendment retaliation against Patane and Collver. (Dkt. Nos. 24, 27.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust his administrative remedies. (Dkt. Nos. 46, 46-2.) Plaintiff, who is no longer

incarcerated, has failed to respond to the motion despite having been cautioned by the Court that his failure to respond may result in the motion being granted, and having been granted an unsolicited extension of time to respond by the undersigned. (Dkt. Nos. 47, 48. [1]) For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

[1]    According to Defendants' declaration of service, on August 8, 2018, the motion papers were mailed to Plaintiff at the address he had provided to the Clerk for service, 681 Albany Avenue, Brooklyn, New York, 11203. (Dkt. No. 46-8 at 1; Dkt. No. 41.) The Clerk's Office mailed a notice to Plaintiff on August 9, 2018. (Dkt. No. 47.) On September 18, 2018, after Plaintiff had failed to file papers responding to the summary judgment motion, the Clerk's Office mailed this Court's September 18, 2018, Text Order to Plaintiff giving him additional time to respond to Defendants' summary judgment motion. (Dkt. No. 48.) On November 13, 2018, the Text Order (Dkt. No. 48) and notice of motion (Dkt. No. 47) were returned to the Clerk's Office as undeliverable. (Dkt. Nos. 49, 50.) The Court notes Plaintiff has been advised of his obligation to "promptly notify the Clerk's Office and all parties or their counsel of any change in his address [and that] failure to do will result in the dismissal of this action." (Dkt. No. 27 at 31.) Accordingly, **Plaintiff is hereby directed to update his mailing address in accordance with L.R. 10.1(c)(2) within fourteen (14) days from the date of this Order and Report-Recommendation. Failure to file the change of address will result in a recommendation that the case be dismissed for failure to prosecute, failure to follow Local Rules, and failure to follow a Court order.**

## II. BACKGROUND

Plaintiff commenced this action on June 29, 2017. (Dkt. No. 1.) The initial complaint was dismissed without prejudice on October 17, 2017, following the District Court's initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915(A)(b). (Dkt. No. 14.) Plaintiff's amended complaint, filed on January 3, 2018, is the operative pleading. (Dkt. No. 24.) Following the District Court's initial review of the amended complaint, only the following First and Eighth Amendment claims remain:

**\*2** (1) Plaintiff alleges that in approximately March 2015, Patane forced Plaintiff to work in the custodial maintenance program, despite Plaintiff's possession

of a valid medical permit. Plaintiff alleges Patane took this action in retaliation for Plaintiff's filing of a prior grievance against Patane. (Dkt. No. 24 at 4-9. [2] )

(2) Plaintiff alleges that in approximately March 2015, at the request of Patane, Coppolla wrongfully "discontinued" Plaintiff's medical permit. *Id.* at 6-7.

(3) Plaintiff alleges that on or about July 24, 2016, Collver removed Plaintiff from the RSAT program in retaliation for Plaintiff's filing of a grievance against another RSAT staff member. *Id.* at 54-60; *see also* Dkt. No. 24-1 at 25, 43, 47.

(Dkt. No. 27 at 5-7, 22-23, 25-26.) Defendants argue summary judgment must be granted because Plaintiff has failed to exhaust his administrative remedies. (Dkt. No. 46-6 at 6-11.)

[2]     Page references to documents identified by docket number are to the numbers assigned by the CM/ ECF docketing system maintained by the Clerk's Office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

### III. LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations,

conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [3] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

[3]     The Court finds Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 24-4.)

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006). [4] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

[4]     The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*3** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at \*3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO RESPOND

Plaintiff's failure to oppose Defendants' summary judgment motion does not mean the motion is to be granted automatically. *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citations and internal quotation marks omitted). An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Id.* at 486; *see also Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (where "the nonmoving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.' ")

Where, as in this case, a party has failed to respond to the movant's statement of material facts as required by L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [5] *Champion*, 76 F.3d at 486. In light of Plaintiff's failure to oppose Defendants' motion, the facts set forth in Defendants' statement of material facts pursuant to L.R. 7.1(a)(3) (Dkt. No. 46-7) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified amended complaint, will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293,

at \*3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at \*3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) ..., supplemented by Plaintiff's verified complaint ..., as true.").

[5]      *See supra* Section I, fn. 1.

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

**\*4** Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (quotation marks omitted).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). 7 N.Y.C.R.R. § 701.5. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1), (b)(1). An adverse decision of the IGRC may be appealed to the superintendent of the facility. *Id.* § 701.5(c)(1). If the grievant wishes to appeal to the superintendent, "he or she must complete and sign the appeal section on the IGRC response form (form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response." *Id.* Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC") within seven days of receipt. *Id.* at § 701.5(d)(1). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d) (3)(ii). During the grievance process, "matters not decided within the time limits may be appealed to the next step." *Id.* § 701.6(g)(2).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted) ). In the PLRA context, the Supreme Court has determined "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

**\*5** The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at \*4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95; *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). Plaintiff must then demonstrate the DOCCS IGP was unavailable. *See Jones*, 549 U.S. at 216.

### A. Defendants Patane and Coppolla

Plaintiff alleges that in March 2015, Patane retaliated against him in violation of the First Amendment and that Patane and Coppolla subjected Plaintiff to unsafe or medically inappropriate working conditions in violation of the Eighth Amendment. (Dkt. No. 24 at 4-9.)

Rachel Seguin, Assistant Director of the DOCCS IGP, states in her declaration that she is the custodian of records maintained by CORC. (Dkt. No. 46-2 at ¶¶ 1, 2.) DOCCS records reflect that Plaintiff was incarcerated at Marcy during the time period relevant to this action, which had a fully functioning inmate grievance process available to inmates. *Id.* at ¶ 13. Seguin conducted a search of CORC records for determinations upon grievance appeals brought by Plaintiff. *Id.* at ¶ 12. A copy of the computer printout from the CORC database reflecting the results of that search is attached to her declaration as Exhibit A. (Dkt. No. 46-3.) Based on her review of CORC records, Plaintiff did not appeal any grievances to CORC in 2015. (Dkt. No. 46-2 at ¶ 14.) Specifically, Seguin explains Plaintiff filed no grievance appeals regarding the alleged conduct of Patane and/or Coppolla in February 2015. *Id.* Therefore, Defendants contend Plaintiff's First Amendment retaliation claim against Patane and Eighth Amendment condition of confinement claims against Patane and Coppolla should be dismissed for failure to exhaust administrative remedies. (Dkt. No. 46-6 at 10.)

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits.") (quotations and citations omitted) ); *see Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002) (holding exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision); *Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

**\*6** In this case, however, Plaintiff states in his verified amended complaint that he immediately filed a grievance after his February 27, 2015, medical permit was "discontinued" on March 3, 2015, which was assigned grievance number MCY-19016-15. *Id.* at 7. Attached as Exhibit B to Plaintiff's amended complaint is the IGRC's March 12, 2015, response to MCY-19016-15: "The Committee agrees with the inmate. Inmate's valid medical conditions and restriction must be followed by all

staff without interference with medical staff." (Dkt. No. 24-1 at 4.) Plaintiff claims "[d]espite this ... order, Patane ... contacted and disputed with grievance staff, and ... ordered Plaintiff to continue 'physical participation' in his class/program[.]" (Dkt. No. 24 at 8.) Plaintiff "further appealed to Superintendent and CORC with no resonses [sic] (staff at Marcy ultimately work together/collusion)." *Id.*

Unfortunately, MCY-19016-15 is not a part of the summary judgment record and Defendants have submitted no evidence whatsoever to refute Plaintiff's claims regarding the grievance he filed at the facility level in March 2015. Further, Defendants' memorandum of law is silent as to exhaustion of administrative remedies when an inmate receives a *favorable* decision at the facility level. "As the Second Circuit has explained, 'it would be counterintuitive to require inmates who win during the grievance process to appeal their victories.' " *Phillip v. Schriro*, No. 12-cv-839-RA, 2014 WL 4184816, at *8 (S.D.N.Y. Aug. 22, 2014) (quoting *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (citing *Sulton v. Wright*, 265 F. Supp. 2d 292, 298-99 (S.D.N.Y. 2003) ("If a prisoner had to grieve non-compliance with favorable decisions under the PLRA, prison officials could keep prisoners out of court indefinitely by saying 'yes' to their grievances and 'no' in practice.") ) ).

Arguably, if Plaintiff's version of the above events is credited, Plaintiff *may* have demonstrated unavailability under *Ross* as to his First Amendment retaliation claim against Patane and Eighth Amendment conditions of confinement claims against Patane and Coppolla. Alternatively, a more developed summary judgment record *may* demonstrate Plaintiff failed to avail himself of available administrative remedies. Simply put, based on the existing record, the Court finds a material question of fact as to whether Plaintiff exhausted his administrative remedies regarding his claims against Patane and Coppolla.

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied as to Patane and Coppolla without prejudice and with the opportunity to renew by way of a second motion for summary judgment or exhaustion hearing.

### B. Defendant Collver

Plaintiff claims that on July 24, 2016, Collver removed him from the RSAT program in retaliation for Plaintiff's filing of a grievance against another RSAT staff member. (Dkt. No. 24 at 54-60.) Then in September 2016, Plaintiff claims he was arbitrarily deprived of good time credits because he was removed from the RSAT program. *Id.* at 58-60. Defendants argue Plaintiff's removal from the RSAT program by Collver was never the source of a filed grievance by Plaintiff and, therefore, remains unexhausted. (Dkt. No. 46-6 at 10-11.)

Based on her review of CORC records, Seguin states Plaintiff filed six grievance appeals to CORC in 2016, two of which appear to relate to the RSAT program. (Dkt. No. 46-2 at ¶ 15.) Copies of the grievance packages for grievance appeal MCY-20615-16, titled "Unfair RSAT Practice" and MCY-21185-16, titled "Restore Good Time" are attached as Exhibits B and C to Seguin's declaration, respectively. (Dkt. Nos. 46-4, 46-5.)

On June 22, 2016, Plaintiff filed a grievance claiming "Counselor (RSAT) Violating HIPPA [sic] & Confidentially." (Dkt. No. 46-4 at 4.) The grievance was designated MCY-20615-16, and titled "Unfair RSAT Practice." *Id.* The grievance challenged certain conduct by RSAT counselor Williamson.[6] *Id.* On December 14, 2016, CORC issued its decision. *Id.* at 1. Defendants argue Plaintiff's June 22, 2016, grievance "did not challenge Defendant Collver's alleged conduct in removing Plaintiff from the RSAT program—nor could it have, since Plaintiff alleges that his removal from the RSAT program occurred on or about July 24, 2016." (Dkt. No. 46-6 at 10.) The Court agrees.

[6]   Plaintiff's claims against Williamson were dismissed on initial review without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 1915A(b)(1). (Dkt. No. 27.)

**\*7** However, Plaintiff also filed a grievance on November 20, 2016, designated MCY-21185-16, claiming "Retaliation: Good Time Loss." (Dkt. No. 46-5 at 4.) In relevant part, Plaintiff states:

> Previously there was some very inappropriate issues I was subjected to in RSAT (F-2) which I believed was resolved (amicably). This allegation stems from prior incidents of discrimination, harassment, and malfeasance by counselors' illegal interest in my confidential/private medical issue. **Furthermore, I**

**was "capriciously" terminated from Program (July 2016) only for simply stating my legal awareness of constitutional right regarding medical confidentiality**. Civilian (non-medical) counselor were even "at odds" with security regarding this matter! I was Senior Leader of the Program (4 months). No infractions, issues or violations and was deprived of my due process rights before and after my unwarranted termination & never supplied with a reason why! Now I received notification they have taken all my good time.

*Id.* (emphasis added). As part of the investigation, Collver submitted a report dated December 2, 2016, explaining:

> [Plaintiff] was removed from RSAT according to Program Manual Guidelines. As a result, [Time Allowance Committee ("TAC") ] is withholding his good time until he completes RSAT. This is also in accordance with published guidelines. [Plaintiff] may apply for withheld good time upon completion of recommended programs.

*Id.* at 6; *see also id.* at 3, 17. On December 6, 2016, the IGRC issued its decision:

> After receiving and reviewing the investigation report which states that grievant can apply for withheld good time once he has completed recommended programs. The Committee advises grievant that he may do so upon completion of those said programs. **However grievant feels that he was wrongfully removed from his RSAT program which was the cause of the grievant good time being withheld.** Therefore Committee is at a Deadlock on this issue and passes it through for further review.

*Id.* at 12 (emphasis added). On December 12, 2016, the Superintendent denied Plaintiff's grievance:

> Subject states that his Good Time has been unfairly taken from him. Grievant is requesting that his Good Time be restored. **Investigation returned by [Collver] reveals that the grievant was removed from RSAT according to Program Manual guidelines.** As a result, TAC is withholding his Good Time until he completes RSAT.

*Id.* at 5 (emphasis added). Plaintiff appealed to CORC on December 14, 2016. *Id.* On November 1, 2017, CORC issued its decision:

**Grievant Request Unanimously Accepted in Part**

Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

**CORC notes that the grievant was removed from RSAT on 7/24/16 for poor participation and programming, and that his Good Time was subsequently withheld. CORC also notes that his Good Time was restored on 12/30/16, he completed RSAT on 1/8/17, and was released to Community Supervision on 1/9/17.** It is further noted that the medical confidentiality issue was addressed in MCY-20615-16, which was answered by CORC on 12/14/16.

**\*8** With respect to grievant's appeal, CORC asserts that the instant complaint was properly investigated and finds insufficient evidence of malfeasance by staff or a violation of his rights.

*Id.* at 1 (emphasis added).

According to Defendants, MCY-21185-16 *only* challenged the Time Allowance Committee's decision to withhold Plaintiff's good time based upon his failure to complete the RSAT program. (Dkt. No. 46-2 at ¶ 17.) The Court disagrees and finds the information contained in this grievance was sufficient to place Marcy officials on notice of Plaintiff's claims regarding his removal from the RSAT program.

The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524-25. In this regard, exhaustion serves two major purposes. *Woodford*, 548 U.S. at 89. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Id.* Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.* Such is the case here.

Turning to Defendants' next argument, Defendants contend this "grievance did not challenge Defendant Collver's alleged conduct in removing him from the RSAT program—nor could it have, since a grievance based upon Defendant Collver's alleged conduct in July 2016[,] would have been untimely in November 2016[,] under DOCCS Directive 4040." (Dkt. No. 46-6 at 10-11.) The Court finds Defendants' untimeliness argument unpersuasive. *See Hill v. Curcione*, 657 F.3d 116, 125 (2d Cir. 2011) ("[T]he exhaustion requirement of the PLRA is satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority."); *see, e.g., Povoski v. Lacy*, No. 9:14-CV-0097 (BKS/CFH), 2017 WL 9511094, at *13 (N.D.N.Y. Dec. 13, 2017) (finding post *Ross* that the plaintiff properly exhausted his administrative remedies despite filing his grievance thirteen days past the initial time limitation because it "was not so egregious as to constitute an unreasonable attempt to avail himself of the grievance process, as the IGRC accepted the grievance, and both the Superintendent and CORC issued decisions on the merits"), *report-recommendation adopted by* 2018 WL 547392, at *1 (N.D.N.Y. Jan. 17, 2018).

Nonetheless, Plaintiff filed his original complaint on June 29, 2017, four months *before* CORC issued its decision on MCY-21185-16. (Dkt. No. 1.) Pursuant to the PLRA, a prisoner must exhaust available administrative remedies before he files a lawsuit. *Neal*, 267 F.3d at 121-22. Indeed, it is well settled that "[r]eceiving a determination from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and that any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." *Id.*; *Berkley v. Ware*, No. 9:16-CV-1326 (LEK/CFH), 2018 WL 3736791, at *5 (N.D.N.Y. July 6, 2018) (plaintiff must exhaust administrative remedies, including receipt of a response from CORC, prior to filing a federal lawsuit); *Couvertier v. Jackson*, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *4 (N.D.N.Y. June 19, 2014) (dismissing the case because the plaintiff inmate received response from CORC after commencing the suit); *White v. Drake*, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

**\*9** The record demonstrates CORC failed to respond to Plaintiff's December 14, 2016, appeal until November 1, 2017, more than ten months beyond the thirty days required under the IGP. 7 NYCRR § 701.8(i). Courts in this Circuit have been split as to whether a delay by CORC in responding to an appeal constitutes unavailability that would excuse a plaintiff's failure to exhaust. *Compare Berkley*, 2018 WL 3736791, at *6 (finding five month delay by CORC in rendering decision on appeal did not excuse the plaintiff from exhaustion requirement); *Couvertier*, 2014 WL 2781011, at *5 (holding that waiting five months for a decision from CORC does not constitute a special circumstance that would justify the plaintiff filing a lawsuit before fully exhausting all available remedies); *Loccenitt v. Labrake*, No. 14-CV-6703-FPG, 2018 WL 826850, at *3 (W.D.N.Y. Feb. 12, 2018) (finding that a delay by CORC in rendering a decision on a plaintiff's appeal is not a defense to the exhaustion requirement) *with Henderson Annucci*, No. 14OCV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance, ... such an administrative remedy is no longer available to him for

purposes of exhaustion under the PLRA."). *But see Rossi v. Fischer*, No. 13-CV-3167 (PKC) (DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) (finding administrative remedies not available where CORC did not decide the plaintiff's appeal until more than four months after it was filed).

In this case, CORC's response was late by more than ten months, significantly more than the five month delay found insufficient for a finding of unavailability in *Berkley*, 2018 WL 3736791, at *6, but far less than the two years which resulted in a finding of unavailability in *Henderson*, 2016 WL 3039687, at *1. Furthermore, Plaintiff has not proffered evidence that he wrote to CORC or contacted the facility inquiring as to the status of his appeal before commencing this lawsuit. *See Berkley*, 2018 WL 3736791, at *6. Given the foregoing, the Court finds that the delay by CORC in issuing its decision to Plaintiff's appeal does not excuse Plaintiff's failure to exhaust before commencing this action. Therefore, the Court recommends granting summary judgment to Collver on exhaustion grounds.

This Circuit has recognized that failure to exhaust administrative remedies is usually a "curable, procedural flaw" that can be fixed by exhausting those remedies and then reinstituting the suit. *Neal*, 267 F.3d at 123 (quoting *Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999) ). Requiring Plaintiff to initiate a new suit may seem judicially inefficient. However, the Second Circuit has specifically stated that allowing this type of suit to move forward "undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court." *Neal*, 267 F.3d at 123; *see also Rodriguez v. Rosner*, No. 9:12-CV-958 (TJM/ATB), 2012 WL 7160117, at *4-5 (N.D.N.Y. Dec. 5, 2012), *report and recommendation adopted by*, 2013 WL 614360 (N.D.N.Y. Feb. 19, 2013).

## VI. CONCLUSION

Based upon the foregoing, the Court recommends that Patane and Coppola be denied summary judgment and that Collver be granted summary judgment.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff shall file a change of address in accordance with L.R. 10.1(c)(2) within fourteen (14) days from the date of this Order and Report-Recommendation;

**failure to file the change of address will result in a recommendation that the case be dismissed for failure to prosecute, failure to follow Local Rules, and failure to follow a Court order**; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment for failure to exhaust administrative remedies (Dkt. No. 46) be **GRANTED in part and DENIED in part** as follows: (1) **DENIED** as to Defendants Patane and Coppolla without prejudice and with the opportunity to renew by way of a second summary judgment motion or exhaustion hearing and (2) **GRANTED** as to Defendant Collver and that Plaintiff's First Amendment retaliation claim against Collver be dismissed without prejudice; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*10** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[7]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 7361009

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 757937
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rahson STAPLES, Plaintiff,

v.

Joe PATANE, Colleen Coppolla,
and Patrick Collver, Defendants.

9:17-cv-0703 (TJM/TWD)
|
Signed 02/20/2019

**Attorneys and Law Firms**

Rahson Staples, Brooklyn, NY, pro se.

Shannan Collier Krasnokutski, New York State Attorney
General, Albany, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**\*1** Plaintiff Rahson Staples, a former inmate in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS"),
commenced this *pro se* civil rights action pursuant to 42
U.S.C. § 1983. He alleges violations of his constitutional
rights while incarcerated at Marcy Correctional Facility.
Dkt. Nos. 1, 24. Remaining Defendants in this action
are Joe Patane, a custodial maintenance instructor;
Colleen Coppolla, a nurse administrator; and Patrick
Collver, a senior counselor in the Residential Substance
Abuse Treatment program. Dkt. No. 27. Plaintiff's
remaining claims are for Eighth Amendment conditions
of confinement against Patane and Coppolla, and First
Amendment retaliation against Patane and Collver. Dkt.
Nos. 24, 27.

The case was referred to the Hon. Thérèse Wiley
Dancks, United States Magistrate Judge, for a report and
recommendation pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c). On August 8, 2018, Defendants moved for
summary judgment, asserting that the remaining claims
must be dismissed because Plaintiff failed to exhaust
his administrative remedies with regard to these claims.
Dkt. No. 46. Plaintiff had until September 4, 2018

to respond to the motion, but failed to submit any
opposition. Magistrate Judge Dancks then *sua sponte*
extended Plaintiff's time to file a response to the motion
until October 2, 2018, Dkt. No. 48 (Text Order), but again
he failed to submit any opposition.

After reviewing the unopposed summary judgment
motion, Magistrate Judge Dancks recommends that it
be granted in part and denied in part. Ord. & Rep.-
Rec., Dkt. No. 51, at 19. In this regard, Magistrate
Judge Dancks recommends that Defendants' motion
for summary judgment be denied as to Plaintiff's
claims against Defendants Patane and Coppolla without
prejudice and with the opportunity to renew by way of
a second motion for summary judgment or exhaustion
hearing, *id.* at 11, 19, and be granted as to Plaintiff's
First Amendment retaliation claim against Defendant
Collver with the claim being dismissed without prejudice.
*Id.* at 18, 19. No objections to the Order and Report-
Recommendation have been filed, and the time to do so
has expired. But, as the Court learned on February 19,
2019, Plaintiff apparently passed away on November 5,
2018. *See* Suggestion of Death, Dkt. No. 53.

While the Court understands that it has the authority to
substitute a "proper party" for Plaintiff if a timely motion
is made "by any party or by the decedent's successor
or representative," Fed. R. Civ. P. 25(a)(1), the Court
will exercise its discretion and review this matter as if
a general objection has been lodged to the Order and
Report-Recommendation. Under such circumstances, the
Court reviews the summary judgment motion *de novo.*
See 28 U.S.C. § 636(b)(1). The reasons for proceeding
in this manner are twofold. First, Plaintiff apparently
passed away a month after his time to respond to the
motion expired but he submitted no opposition, providing
some indication that he abandoned the claims still in
issue in this case. Second, substitution under Rule 25(a)
(1) is possible only if at least one of Plaintiff's claims
is "not extinguished." Fed. R. Civ. P. 25(a)(1). A ruling
on the pending motion provides a basis to determine
whether Rule 25(a)(1) substitution is possible, and, if it is,
provides a basis for a potential substitute party to make
an informed decision about entry into the case.

**\*2** Having considered the record *de novo*, the
Court **ACCEPTS** and **ADOPTS** the recommendations
contained in the Order and Report-Recommendation
(Dkt. No. 51) for the reasons stated therein. It is therefore

2019 WL 757937

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED in part and DENIED in part** as follows: (1) it is **DENIED** as to claims against Defendants Patane and Coppolla without prejudice and with the opportunity to renew by way of a second summary judgment motion or exhaustion hearing, and (2) it is **GRANTED** as to Plaintiff's First Amendment retaliation claim against Defendant Collver, which is **DISMISSED without prejudice**.

The Court Clerk may terminate Defendant Collver from this action. The matter is referred to Magistrate Judge

Dancks to determine whether the action should proceed under Rule 25(a)(1). *See* Fed. R. Civ. P. 25(a)(1) ("If [a motion for substitution] is not made within 90 days after service of a statement noting the death, the action by ... the decedent must be dismissed.").

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2019 WL 757937

---

**End of Document**  <span style="float:right">© 2019 Thomson Reuters. No claim to original U.S. Government Works.</span>

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 78 of 126
Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

2016 WL 3039687
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Thomas Adam HENDERSON, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

14-CV-445A
|
Signed 03/14/2016

**Attorneys and Law Firms**

Thomas Adam Henderson, Alden, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### REPORT, RECOMMENDATION AND ORDER

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [23].[1] Plaintiff Thomas Adam Henderson brought this action pursuant to 42 U.S.C. § 1983 claiming that his civil rights were violated when the defendants allegedly assaulted him on September 10, 2013, October 22, 2013 and May 16, 2014. Complaint [1], pp. 11,13. Before me are defendants' motion to dismiss [22], plaintiff's motion to amend the complaint [31], and plaintiff's motion for appointment of counsel [32].

[1]    Bracketed references are to the CM/ECF docket entries.

For the reasons stated below, I recommend that defendants' motion to dismiss be granted in part and denied in part, the plaintiff's motion to amend be granted in part and denied in part, and that plaintiff's motion for the appointment of counsel be denied.

### BACKGROUND

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Attica Correctional Facility, Correction Officer Dunford sexually assaulted him during a frisking on September 10, 2013. He asserts that after being cut down from a suicide attempt, Officer Dunford pulled up the waistband of his underwear so as to give him a "wedgie", and then swiped his fingers between plaintiff's butt cheeks "roughly pressing" against his anus. Complaint [1], p. 11. After complaining about this conduct, plaintiff states that he was informed that this procedure is known as a "credit card check", performed to determine if an inmate is hiding weapons. Id. at 11, 13, 14, 17. Plaintiff argues that the procedure constitutes a sexual assault.

He also asserts that the "credit card check" procedure was performed on him twice during a pat frisk on October 22, 2013 by Corrections Officer J. Hoinski.[2] Id. at p. 13. Finally, plaintiff alleges that Correction Officer B. Naab performed the "credit card check" on him on May 16, 2014. Id. at pp. 16-17.

[2]    The allegations in the plaintiff's original complaint attribute this conduct to "John Doe Number 1". Id. at 13. John Doe Number 1 was later identified as Officer Hoinski. See Decision & Order of Hon. Elizabeth A. Wolford dated December 29, 2014 [11].

Plaintiff claims that he complained to New York State Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci, DOCCS Chief Inspector General Vernon J. Fonda, Attica Correctional Facility Superintendent Mark L. Bradt, and others about the conduct which he considered to be sexual assaults. Id. at pp. 12, 15. He argues that these supervisory defendants failed to properly investigate and respond to his complaints in violation of his Eighth Amendment rights. Id. at 12.[3]

[3]    Plaintiff's original complaint asserted various other claims against numerous defendants which did not survive the initial screening in this case. Plaintiff's claims that defendants failed to comply with the requirements of the Prison Rape Elimination Act of 2003 ("PREA") were dismissed because PREA does not create a private right of action. Decision and Order of Hon. Richard J. Arcara filed November 17, 2014 ("November 17, 2014 Decision & Order") [7], p. 7. Also, plaintiff's claims based upon a failure to investigate, failure to intercede, harassment,

retaliation, and failure to provide medical treatment against defendants Superintendent Dale Artus, Capt. Brown Lieut.Kaczmarek, Sgt.Olles, Sgt. Brown, Sgt.Diehl, Officer Higgins, Officer Andrews, Officer Sippel, and Nurse Kekich were all dismissed. Id. at pp. 11-19.

**\*2** In his original complaint, plaintiff stated that he did not file a grievance as to any of the incidents because he did not believe he had to file a grievance. Instead, he contended that he complied with DOCCS Directive 4028A. Id. at pp. 5, 19. The defendants move to dismiss on the grounds that plaintiff failed to exhaust his administrative remedies. Motion to Dismiss [22-1], p. 4. Subsequently, the plaintiff sought leave to amend his Complaint to allege that he did, in fact, file a grievance regarding one of the three "credit card check" incidents. Plaintiff's Motion to Amend [31], p.3. The defendants oppose that motion.

## DISCUSSION

### A. Standard of Review
The defendants move to dismiss the claims in the Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure. The court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. See Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck, 463 F.2d 620 (2d Cir. 1972). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. Yoder v. Orthomolecular Nutrition Institute, 751 F.2d 555, 558 (2d Cir. 1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient". Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Supreme Court has clarified the pleading standard required to withstand a motion to dismiss. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". Ashcroft v.

Iqbal, 556 U.S. 662, 679 (2009) (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief". Id.; see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565-66 (2007) (factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)). Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. Iqbal, 556 U.S. at 680-81. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth' ". Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). The court must then consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. Iqbal, 556 U.S. at 681; see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

Thus, while the pleading standard under Fed. R. Civ. P. ("Rule") 8 does not require detailed factual allegations, it demands more than unadorned, conclusory accusations. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is not sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Iqbal, 556 U.S. at 681.

### B. Exhaustion of Administrative Remedies
**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states in relevant part, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about

2016 WL 3039687

prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong". Porter v. Nussle, 534 U.S. 516, 532 (2002).

"Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case". Nussle, 534 U.S. at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" (id. at 528), and clarify the contours of the controversy once it is litigated. Id. at 525. In Woodford v. Ngo, 548 U.S. 81, 83-84, 90, 126 (2006), the Court held that the exhaustion requirement of the PLRA cannot be satisfied by an "untimely or otherwise procedurally defective administrative grievance or appeal", and that the PLRA requires "proper exhaustion", which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)".

Although exhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement, see Jones v. Bock, 549 U.S. 199, 211 (2007), a demonstrated failure to exhaust warrants dismissal of the plaintiff's claims. Jones, 549 U.S. at 216; see also Wilson v. Yussuff, 2015 WL 77433, *5 (E.D.N.Y. 2015) (holding that court must dismiss action where inmate did not exhaust administrative remedies).

However, the exhaustion requirement may be excused under the following circumstances: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement". Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

**C. Available Grievance Procedure**
DOCCS maintains a three-tiered administrative review and appeals system for prisoner grievances. See N.Y. Comp. Codes R. & Regs. § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCCS system must exhaust all three levels. See Porter, 534 U.S.

at 524. First, an inmate may file an inmate grievance complaint form or a written grievance (if forms are not available) with the Inmate Grievance Resolution Committee ("IGRC"). See 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Id., § 701.5(c). Finally, DOCCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). Id., § 701.5(d).

On May 15, 2014, DOCCS amended Directive 4040, relating to sexual abuse and sexual harassment complaints. As revised, Directive 4040 states:

> "The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below."

**\*4** See DOCCS Directive 4040, Plaintiff's Opposition to Motion to Dismiss, [27], Exhibit B, p.1.

Under the revised procedure, an allegation of sexual abuse shall be deemed exhausted for purposes of the PLRA "if official documentation confirms that:

> (1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or

> (2) A third-party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation."

Id.

**D. Plaintiff's Efforts to Exhaust as to Defendants Dunford, Hoinski and Nabb**

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 81 of 126

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

The defendants' motion to dismiss is based entirely on the argument that plaintiff failed to exhaust his administrative remedies by filing grievances relating to the three "credit card check" incidents set forth in the complaint. Defendants' Motion to Dismiss [22]. As noted above, plaintiff's original complaint states that he did not utilize the three-tiered administrative grievance procedure to complain about the September 10, 2013, October 22, 2013 and May 16, 2014 incidents. Complaint [1], pp. 5, 19. Instead, plaintiff argued that he was not required to utilize the grievance procedure because of Directive 4028A. Id. In response to the motion to dismiss, plaintiff also points to the revised language of Directive 4040 as eliminating the need to follow the inmate grievance procedure. Plaintiff's Opposition to Motion to Dismiss [27], p. 5.

Directive 4028A addresses sexual abuse prevention and intervention (staff on inmate). The argument that Directive 4028A eliminated the need to utilize the inmate grievance procedure was asserted, but rejected, in Omaro v. Annucci, 68 F. Supp.3d 359 (W.D.N.Y. 2014).[4] In that case, Omaro's claim that he was sexually assaulted in connection with the pat-frisk procedure was remarkably similar to the claims asserted in this case. Id. at p. 361. In response to the defendant's motion that plaintiff failed to exhaust his administrative remedies, Omaro argued that pursuant to PREA and Directive 4028A, he was not required to utilize the grievance procedure with respect to his sexual assault claim. Id. at 364-65. The court held that nothing in the text or legislative history of PREA suggested that it was intended to abrogate the PLRA's exhaustion requirement. Id. at 364 citing Porter v. Howard, 531 Fed. Appx. 792, 793 (9th Cir. 2013) (plaintiff provides no support for his contention that he was excused from the requirement that he file an administrative grievance by operation of PREA).

[4]    The plaintiff in Omaro was an Attica inmate Derrick R. Omaro, 92A0608. Omaro, 68 F. Supp. 3d. at 359. Henderson, identifies inmate Omaro as one of his witnesses in this case. Complaint [1], p. 19.

Similarly, the court in Omaro determined that nothing in the text of Directive 4028A suggested that it was intended to limit or abrogate the administrative remedies available to an inmate who alleged sexual misconduct by a staff member. Omaro, 68 F. Supp. 3d at 365. The court found that Directive 4028A addressed the manner in which a complaint of staff-on-inmate sexual misconduct may be initiated and obligations of the staff following

such a complaint, but did not establish or address an inmate's administrative remedies once such a complaint has been made. Id. at p. 366.[5] Thus, the court held that the plaintiff's unexhausted claims were precluded by the PLRA. Id. at p. 368.

[5]    Plaintiff argues that because claims of sexual abuse are sensitive and should be dealt with confidentially, he should be excused from the exhaustion requirement. Plaintiff's Memorandum of Law [27], pp. 4-6. He provides no authority in support of this proposition. While the interests of confidentiality may have motivated the revision of Directive 4040, as discussed in Omaro, prior to the May 15, 2014 revision the plaintiff was required to utilize the inmate grievance process. Omaro, 68 F. Supp. 3d. at 367.

*5   Unlike Omaro, however, this case involves the application of the revised language in Directive 4040, and to that extent, appears to be a case of first impression. Omaro did not discuss the revised language of Directive 4040, which was raised for the first time in this case by the plaintiff in response to the defendants' motion to dismiss. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Neither party has presented authority interpreting the revised language of Directive 4040. In their reply, defendants do not dispute that Directive 4040, as revised, alleviates an inmate's need to exhaust the normal grievance procedure with respect to sexual assault and sexual harassment claims. Instead, the defendants argue that the revised language of Directive 4040 does not apply here because the plaintiff's allegations are insufficient to constitute a sexual assault under PREA. Defendants Reply in support of Motion to Dismiss [28], pp. 3-4. Defendants construe plaintiff's claims as merely challenging the "pat-frisk" procedure, and argue that such a claim would have to be pursued in the inmate grievance process through exhaustion to satisfy the PLRA. Id. at pp. 5-6.

Plaintiff's claims relating to the "credit card check" procedure as set forth in the complaint, however, are presented as sexual assault claims. For example, plaintiff alleges that "Defendant Dunford's sexual abuse cause[d] me pain, suffering and mental distress". Complaint [1], p. 11, ¶ 2. He claims that he complained to defendant Annucci and others regarding the "sexual misconduct of staff-on-inmate sexual abuse". Id. at p. 12, ¶6. Plaintiff characterizes the defendants' conduct as constituting

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 82 of 126

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

sexual assault or sexual abuse throughout his complaint. Id. at p. 13, ¶¶10, 13, 14, 15; p. 14, ¶¶ 16, 17, 18, 19, 21; p. 15, ¶¶ 22, 23, 24, 26, 27; p. 16, ¶¶ 29, 30, 31; p. 18, ¶¶ 43, 44, 45, 46. The conduct being challenged involves corrections staff contacting plaintiff's genitals, which, depending upon the manner in which performed, could arguably fall within the scope of conduct that can be construed as "sexual" in nature.

Whether these allegations by plaintiff are sufficient to establish a "sexual assault" or "sexual harassment" under PREA (or the Fourth and Eighth Amendments) is not currently before me. The defendants' motion to dismiss raised solely the issue of whether plaintiff had exhausted the inmate grievance procedure. Defendants' Motion to Dismiss [22]. The defendants did not put plaintiff on notice that their argument in support of dismissal was based upon the fact that plaintiff's allegations were insufficient to constitute sexual conduct under PREA. In any event, while I take no position as to whether the plaintiff's allegations allege sexual conduct sufficient to state a claim under the Fourth or Eighth Amendments, [6] inasmuch as they are presented as "sexual assault" claims, the revised language of Directive 4040 applies. [7] An inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure. [8] Here, plaintiff presented his claims as sexual assault claims. Although the sufficiency of those claims is uncertain, the language in Directive 4040 clearly states that an inmate need not utilize the grievance procedure to exhaust such claims prior to bringing a federal court action for redress.

[6]    With respect to the plaintiff's pat-frisk claims, Judge Arcara dismissed the claims to the extent that they were asserted under PREA, but allowed them to proceed as asserted under the Fourth and Eighth Amendments. November 17, 2014 Decision & Order [7], p. 7. The defendants are free to file a motion to dismiss or for summary judgment challenging the sufficiency of the plaintiff's allegations with respect to any surviving Fourth and Eighth Amendment claims.

[7]    Although the revised language in Directive 4040 refers to PREA, assuming notice was provided as set forth in the directive, Directive 4040 states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment

to satisfy [the PLRA] exhaustion requirement ... before bringing a lawsuit regarding an allegation of sexual abuse". Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Thus, this language applies to sexual assault claims brought by an inmate under the Fourth and Eighth Amendments.

[8]    It is likely that by the time there was a resolution, either administrative or judicial, as to whether the plaintiff's claims qualify as a "sexual assault" under PREA, an inmate's time to commence the typical grievance process would have passed.

**\*6** Directive 4040 was revised with respect to sexual assault claims on May 15, 2014. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Although the defendants note that the amendment has not been incorporated into the New York Code, Rules and Regulations (see 7 N.Y.C.R.R. 701, et seq.), they do not argue that the revision is not in effect. Indeed, defendants acknowledge that if the revised language of Directive 4040 applies, plaintiff's claim against defendant Nabb involving the May 16, 2014 incident has been exhausted. Defendants' Reply in Support of Motion to Dismiss [28], p. 6. Because plaintiff reported the May 16, 2014 incident involving defendant Nabb to the facility staff in a letter dated May 19, 2014 (Complaint [1], Exhibit P), this claim is deemed exhausted pursuant to Directive 4040.

Because the September 10, 2013 and October 22, 2013 incidents preceded the revision of Directive 4040, plaintiff was required to exhaust the typical inmate grievance process with respect to those incidents. [9] Plaintiff makes no attempt to argue that he exhausted the inmate grievance process with respect to his September 10, 2013 claim. That claim against defendant Dunford should be dismissed with prejudice. [10] In his motion to amend the complaint [31], plaintiff asserts that he did, in fact, exhaust the inmate grievance process with respect to his claim relating to the October 22, 2013 involving defendant Hoinski. As discussed below, the plaintiff will be allowed to amend the complaint to assert the exhaustion of that claim.

[9]    The plaintiff argues that the revision of Directive 4040 eliminated the deadline for reporting sexual abuse, and therefore, he can cure the failure to exhaust his claims by reporting the incidents now under the terms of the directive. Plaintiff's Opposition to Motion to Dismiss [27], p.11. As discussed more fully below, plaintiff has presented no authority suggesting that

the revisions in Directive 4040 apply retroactively to incidents prior to the effective date. To the contrary, the case law suggests that Directive 4040 is applied as it was in effect at the time of the incident at issue. *See* Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (referring to the version of Directive 4040 that was in effect at the time in question); Goodson v. Silver, 2012 WL 4449937, *8 (N.D.N.Y. 2012) (court decision based upon the version of DOCCS' Directive 4040 in effect during the time in question).

10      Plaintiff asserts, generally, that his failure to exhaust any of his claims can be cured. Plaintiff's Reply in Support of Motion to Amend [37], p. 9. However, plaintiff's time to file a grievance relating to the September 10, 2013 incident has long passed. Although plaintiff cites to Bridgeforth v. Barlett, 686 F. Supp.2d 238 (W.D.N.Y. 2010) in support of his right to cure, that case actually supports the dismissal of plaintiff's claim with prejudice. Bridgeforth, 686 F. Supp.2d, at 240 ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice").

**E. Failure to Exhaust as to Defendants Annucci, Fonda, Bradt and Hughes**

Defendants also seek to dismiss the claims against defendants Annucci, Fonda, Bradt and Hughes because plaintiff has not exhausted administrative remedies by naming those defendants in any grievance relating to the "credit card check" incidents. Defendants' Reply in Support of Motion to Dismiss [28], p.8-10. These claims survived the initial screening only to the extent that they alleged that the defendants "were made aware of the sexually assaultive pat-frisks but failed to remedy them or take any corrective action". November 17, 2014 Decision & Order [7], pp. 10, 22. [11]

11      Judge Arcara cited Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995) for the proposition that a prison official who is made aware of a violation but fails to remedy the wrong may be determined to be "personally involved" and subject to § 1983 liability. However, he noted that "[r]eceiving *post hoc* notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those

circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member". November 17, 2014 Decision & Order [7], p.10 citing Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). Given the preliminary stage of the litigation, Judge Arcara allowed these claims to proceed to service. Id. at p. 11. The plaintiff's exhaustion of these claims was not addressed in that decision.

*7   The plaintiff does not argue that he has exhausted his claims against defendants Annucci, Fonda, Bradt or Hughes by naming them in any grievance. In response to the motion to dismiss, plaintiff asserts generally that, because the revisions to Directive 4040 stated that a "sexual abuse or sexual harassment complaint may be submitted at any time", he can cure any failure to exhaust by now filing a complaint under Directive 4040. Plaintiff's Opposition to Motion to Dismiss [27], p. 11. Initially, it is not clear that the revised procedure set forth in Directive 4040, which eliminates the need to follow the typical inmate grievance procedure with respect to sexual assault and sexual harassment claims, applies to claims against supervisory officials for failing to remedy or take corrective action regarding such a claim.

In any event, as noted above, plaintiff has not cited, and I have not found, any authority supporting the retroactive application of a revised DOCCS directive. Instead, although not discussed in depth, the courts in Smith and Goodson expressly applied the version of Directive 4040 which was in effect at the time of the incidents in question in those cases.

As a general rule, a new statutory provision does not apply retroactively to conduct that occurred prior to the provision's enactment. As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" Landgraf v. USI Film Products, 511 U.S. 244, 265, (1994). For example, the revision of § 1997e(a) which instituted the mandatory exhaustion requirement of the PLRA, was not applied retroactively. Shariff v. Coombe, 2002 WL 1392164, *3 (S.D.N.Y. 2002).

This is not a case where the revision of Directive 4040 merely clarified ambiguous language of the prior

regulation. *See* Leshinsky v. Telvent GIT, S.A., 873 F. Supp.2d 582 (S.D.N.Y. 2012). Instead, the revision of Directive 4040 sets forth a new procedure relating to the reporting and processing of sexual abuse and sexual harassment claims. The new procedure bypasses the previously required inmate grievance procedure altogether and institutes an expedited process for the lodging and investigation of a sexual abuse or sexual harassment claim. The revised language does not expressly or indirectly suggest that it is to be applied in a retroactive manner to incidents predating the revision. The parties have submitted no authority suggesting that DOCCS intended the revision to apply retroactively to conduct occurring years earlier.

Since the record does not reflect any intention that the revision of Directive 4040 be applied retroactively, I find that it does not apply to incidents predating the date of the revision. With respect to the post-revision "credit card check" incident of May 16, 2014, the plaintiff's letters dated May 19, 2014 and May 20, 2014 (Complaint [1], Exhibits P and Q) relating to this incident do not name or discuss the conduct of defendants Annucci, Fonda, Bradt or Hughes. Thus, even if the procedure set forth in Directive 4040, as revised, applied to claims against supervisory officials, it was not utilized by plaintiff to complain of conduct by these defendants.

Because plaintiff has failed to exhaust his administrative remedies with respect to defendants Annucci, Fonda, Bradt and Hughes, the claims against these defendants should be dismissed with prejudice.

### F. Motion to Amend Complaint

Plaintiff moves to amend his complaint, principally to modify the assertion in his original complaint that he did not exhaust his administrative remedies. Plaintiff's Motion to Amend [31], p. 3. He states that because he had been transferred between facilities and or prison cells several times since the underlying incidents, he misplaced or lost various legal documents. *Id.* at p. 4. Further, he asserts that because he was reprocessed at one point and provided with a new inmate number, some of the documentation related to these claims was filed under a previous inmate number. *Id.* Thus, plaintiff seeks to amend the complaint to assert that he has administratively exhausted the grievance process with respect to the October 22, 2013 incident and his claim against Hoinski. *Id.* at pp. 3-4. Attached as exhibits to plaintiff's motion are

documents supporting plaintiff's utilization of the inmate grievance process with respect to the October 22, 2013 incident. *Id.*, Exhibits A-D.

**\*8**    Plaintiff's proposed amended complaint is substantively identical to his original complaint except that he has modified his allegations regarding the exhaustion of administrative remedies and has removed some of the allegations and claims previously dismissed by Judge Arcara. [12]

[12]    Plaintiff's proposed amended complaint is type-written, as opposed to the original hand written complaint. Proposed Amended Complaint [37-1]. Under the heading "Defendant's Information", plaintiff did not include information relating to the previously dismissed defendants with the exception of Dale Artus., *Id.*, p.2. The proposed amended complaint eliminated ¶5 of the original complaint, making the paragraph numbers of the proposed amended complaint one off from those in the original complaint. Paragraph numbers between the two documents re-synchronized at ¶42 after plaintiff split the substance of the original ¶40 into two paragraphs (¶¶40-41) of the proposed amended complaint. Plaintiff's amended complaint identified the "John Doe" defendant as Hoinski (¶¶ 10-14, 20, 24, 29, 30, 35-36). Plaintiff's amended complaint also occasionally included expanded or enhanced allegations without changing the substance of his claims (*see* i.e. ¶ 30).

Rule 15(a) provides that leave to amend should be "freely given when justice so requires". New York State National Organization for Women v. Cuomo, 182 F.R.D. 30, 36 (S.D.N.Y. 1998); *see also* Forbes & Wallace, Inc. v. Chase Manhattan Bank, 79 F.R.D. 563, 565 (S.D.N.Y. 1978). It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " Harrison v. Enventure Capital Group, Inc., 666 F. Supp. 473, 479 (W.D.N.Y. 1987). For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead". Stern v. General Electric Co., 924 F.2d 472, 477 (2d Cir. 1991). Leave to amend a pleading need not be granted, however, if it would be futile to do so. *See* O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).

Defendants oppose the motion to amend on several grounds. Defendants' Opposition to Motion to Amend [34]. First, defendants argue that plaintiff's motion should

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 85 of 126

be denied because he failed to attach a proposed amended complaint to the motion papers. Defendant's Opposition to Motion to Amend [34] p., 2. "A movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend". Murray v. New York, 604 F.Supp.2d 581, 588 (W.D.N.Y. 2009) (citing LaBarbara v. Ferran Enterprises Inc., 2009 WL 367611, *3 (E.D.N.Y. 2009) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the court and the opposing party can understand the exact changes sought.")). Where, however, "the movant's papers adequately explain the basis for, and nature of, the proposed amendment, ... the failure to attach a proposed amended complaint to the motion is not necessarily fatal". Murray, 604 F.Supp.2d at 588.

The determination whether to deny a motion to amend based upon such a failure the subject to the discretion of the court. Id. Here, plaintiff's motion papers sufficiently articulated the basis for his motion to amend such that the defendants were able to respond to the substance of the proposed changes. Moreover, plaintiff attached a proposed amended complaint to his Memorandum of Law in reply to defendant's opposition. See Proposed Amended Complaint attached to Plaintiff's Reply in Support of Motion to Amend [37-1]. Under these circumstances, plaintiff's failure to attach a proposed amended complaint to his initial motion papers is not fatal to the motion.

**\*9** Defendants also argue that plaintiff's motion to amend the complaint should be denied based upon "futility, bad-faith, undue delay or undue prejudice to the opposing party". Defendants' Opposition to Motion to Amend [34], p. 3. [13] Defendants state that they made the motion to dismiss based upon plaintiff's affirmative statements in the complaint that he had not exhausted the inmate grievance process with respect to his claims. Defendants claim that they would not have filed a motion to dismiss "[h]ad plaintiff not made these affirmative statements in his complaint" and that allowing plaintiff to amend the complaint would prejudice the defendants because they would be required to bring another motion to dismiss. Id. Defendants allege that the "striking reversal" as to exhaustion by the plaintiff "suggests the possibility of bad-faith". Id.

[13]    Although defendants mention "futility" in their opposition, they do not assert the insufficiency of the plaintiff's allegations of sexual assault as a basis to deny the proposed amended complaint. Defendants' Opposition to Motion to Amend [34].

The prejudice alleged by the defendants is insufficient to warrant denial of plaintiff's motion to amend the complaint. Initially, it should be noted that defendants had access to plaintiff's inmate grievance records, and could have checked those records prior to filing any motions regarding exhaustion in this case. The plaintiff has asserted that he had lost or misplaced much of the documentation relating to his claims due to a series of transfers between correctional facilities or jail cells. Defendants have not rebutted this contention, which plaintiff offers as his explanation as to why his original complaint contained an "erroneous statement" regarding exhaustion. Plaintiff's Motion to Amend [31], p. 3-4. Defendants have not articulated a sufficient basis to conclude that the plaintiff's allegations in the original complaint were made in bad faith. Finally, defendants' claim of prejudice is undermined by the fact that this motion to dismiss will result in my recommendation that several of plaintiff's claims is dismissed.

Defendants also argue that plaintiff's motion to amend should not be granted because plaintiff has not alleged that he has received a final decision from the Central Office Review Committee ("CORC") with respect to his grievance relating to the October 22, 2013 incident. Defendants Opposition to Motion to Amend [34], p. 4-5. This argument is also unpersuasive. Plaintiff has submitted documentation from the Director of the Inmate Grievance Program, dated January 24, 2014, stating that his grievance was still pending before CORC. Plaintiff's Motion to Amend [31], Exhibit D. This correspondence was in response to plaintiff's January 20, 2014 letter noting that his grievance had already been pending before CORC for more than 60 days without a decision. Id., Exhibit C.

It appears by this documentation, the validity of which has not been challenged by the defendant, that plaintiff has been waiting for more than *two years* for a decision from CORC with respect to this grievance. Defendants cannot rely upon CORC's refusal to render a decision with respect to plaintiff's grievance for two years as support for an argument that plaintiff has failed to exhaust his administrative remedy because he has not been provided

Case 9:18-cv-01161-AMN-TWD Document 36 Filed 05/21/19 Page 86 of 126

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

with a final decision. As discussed in Rossi v. Fishcer, 2015 WL 769551, *4-5 (S.D.N.Y. 2015):

"A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion.... While the Second Circuit has not directly addressed this issue, it has treated [cases holding that such a failure renders the administrative remedy unavailable] favorably. See [Hemphill v. New York],380 F.3d 680, 686 n. 6 (2004) (noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004) (citing favorably to [Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)] and [Foulk v. Carrier, 262 F.3d 687, 698 (8th Cir. 2001] with regard to availability of administrative remedies)). The Second Circuit in [Abney v. McGinnis, 380 F.3d 663, 668 (2nd Cir. 2004)] cited to Hemphill for the proposition that 'exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance'. 380 F.3d at 667."

 **10**  See also Peoples v. Fischer, 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination"); Dimick v. Baruffo, 2003 WL 660826, *4 (S.D.N.Y. 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). [14]

14    But see Bennett v. Wesley, 2013 WL 1798001, *6 (S.D.N.Y. 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability.") (*quoting* Mateo v. O'Connor., 2012 WL 1075830, *7 (S.D.N.Y. 2012); Rivera v. Anna M. Kross Ctr., 2012 WL 383941, *4–5 (S.D.N.Y. 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response

from prison authorities within the prescribed time limits.). Also, some courts have questioned whether the equitable exclusions from exhaustion set forth in Hemphill remain viable after the Supreme Court's decision in Woodford. The Second Circuit has declined to address this question. See Amador et al. v. Andrews et al., 655 F.3d 89, 102-03 (2nd Cir. 2011). In Woodford, plaintiff's grievance was administratively rejected because it was filed beyond the 15-day limitations period. The district court granted summary judgement on the grounds that plaintiff failed to exhaust his administrative remedies. The Ninth Circuit reversed finding that plaintiff had exhausted his remedies because no such remedies remained available to him. The Supreme Court vacated that decision, holding that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings". Woodford, 548 U.S. at 90-91. Here, unlike Woodford, the failure to achieve complete exhaustion is due to the inaction by the prison grievance officials, not because of any failure on the part of plaintiff. In any event, I do not believe that Woodford stands for the proposition that CORC can frustrate or unduly delay an inmate's ability to bring a federal claim to address an alleged constitutional violation by refusing to issue a final decision for several years so as to preclude exhaustion under the PLRA.

Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA. Plaintiff's motion to amend the complaint is granted to the extent plaintiff seeks to assert allegations that he exhausted his administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski. Plaintiff's motion to amend is denied to the extent the amended complaint seeks to reassert claims against Dale Artus (or any other defendants) which were previously dismissed by Judge Arcara.

In light of the age of this case, and to expedite further proceedings in this matter, I direct that the Clerk of the Court separately file the Proposed Amended Complaint [37-1] as the Amended Complaint in this matter. The Amended Complaint does not add any new claims or parties. All of the defendants in this case are represented

Case 9:18-cv-01161-AMN-TWD    Document 36    Filed 05/21/19    Page 87 of 126

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

by counsel. By virtue of its attachment to the plaintiff's motion papers, and by the filing directed above, the defendants will have received a copy of the Amended Complaint. The defendants shall answer, or otherwise respond, to the Amended Complaint within 30 days of the date it is filed by the Clerk of the Court as directed above.

## G. Motion for Appointment of Counsel

 *11 Plaintiff also moves for the appointment of counsel [32]. There is no constitutional right to appointed counsel in civil cases. However, under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc., 865 F.2d 22, 23 (2d Cir. 1988).* Assignment of counsel in this matter is clearly within the judge's discretion. In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include the following: (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997).

In considering a motion for the appointment of counsel, the court may also consider the merits of the plaintiff's claim. The Second Circuit has held that "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Therefore, the court must first look to the "likelihood of merit" of the underlying dispute, Cooper, 877 F.2d at 174, and "even though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the ... claim are thin and his chances of prevailing are therefore poor." Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). See also Smolen v. Corcoran, 2013 WL 4054596 (W.D.N.Y.,2013) (In deciding whether to grant a request to appoint pro bono counsel, district courts should evaluate several factors, including the merits of the claim, the factual issues

and complexity of the case, plaintiff's ability to present the case, and plaintiff's inability to obtain counsel.).

I have reviewed the facts presented herein in light of the factors required by law as discussed above. At this time, it does not appear the legal issues presented are unduly complex. Plaintiff's filings in this case reflect that he understands the issues presented and can adequately articulate his factual and legal arguments. Plaintiff's motion for appointment of counsel is denied at this time without prejudice, subject to renewal at a later date. It is plaintiff's responsibility to retain an attorney or press forward with this lawsuit *pro se.* 28 U.S.C. § 1654.

## CONCLUSION

For these reasons, I recommend that defendant's motion to dismiss [22] be granted in part and denied in part as follows: the motion should be granted as to plaintiff's claim against defendant Dunford relating to the September 10, 2013 incident, and plaintiff's supervisory claims against defendants Annucci, Fonda, Bradt and Hughes, but denied as to plaintiff's claims against defendants Nabb and Hoinski. Also, plaintiff's motion [31] to amend the complaint is granted in part and denied in part such that plaintiff may amend the complaint to assert that he has exhausted administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski, but may not reassert previously dismissed claims and is otherwise denied. Plaintiff's motion for appointment of counsel [32] is denied.

 *12 Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 31, 2016 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch

2016 WL 3039687

Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3039687

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 769551

2015 WL 769551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Randolph ROSSI, Plaintiff,
v.
Brian FISHCER, et al., Defendants.

No. 13–cv–3167 (PKC)(DF).
|
Signed Feb. 24, 2015.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

**\*1** Plaintiff Randolph Rossi, proceeding *pro se,* brings this action against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his Amended Complaint, plaintiff alleges that defendants violated, and continue to violate, his constitutional rights by denying him the right to freely practice his Rastafarian faith while incarcerated. He brings an action asserting violations of the First and Fourteenth Amendments and affirmatively disaffirms any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants move to dismiss the Amended Complaint for failure to exhaust claims under the Prisoner Litigation Reform Act ("PLRA"), failure to state a claim under the Free Exercise Clause, failure to meet the standards for injunctive relief, lack of personal involvement of certain defendants, and qualified immunity.

For the reasons stated below, the motion to dismiss is granted in part and denied in part. Plaintiff exhausted his administrative remedies as to certain claims and exhaustion is excused as to others. Certain allegations state a claim for relief, but plaintiff fails to plausibly allege a violation under the Free Exercise Clause, Establishment Clause, or Equal Protection Clause with regard to other claims. Defendants' motion to dismiss for lack of personal involvement fails. Finally, defendants have not demonstrated entitlement to qualified immunity at the pleading stage.

## BACKGROUND

Plaintiff Rossi is a practicing Nyahbinghi Rastafarian currently incarcerated at the Woodbourne Correctional Facility, maintained by DOCCS. (*See* Amended Complaint ("Am.Compl."), ¶ 3.) He brings this action against the following employees of DOCCS: Brian Fischer,[1] Commissioner of DOCCS; Catherine Jacobsen, Acting Deputy Commissioner for Program Services; Jeff McKoy,[2] Deputy Commissioner for Program Services; Cheryl Morris, Director for Ministerial, Family, and Volunteer Services; Mark Leonard, Director of Ministerial Family and Volunteer Services; Robert Cunningham, Superintendent for the Woodbourne Correctional Facility; Moses Santiago, Coordinating Chaplain; and Dorothy Davis, Drug Counselor at Woodbourne. (*Id.* ¶ ¶ 4–11.) Plaintiff asserts that defendants Fischer, Jacobsen, McKoy, Morris, Leonard, and Cunningham "are responsible for all rules, policies, regulations, and directives governing the religious rights of prisoners under their care and custody." (*Id.* ¶ 13.) He claims that "[d]efendants have denied plaintiff his right to practice his faith in accordance with the traditions, customs, and tenets of Rastafari." (*Id.*)

[1] The defendant's last name is spelled "Fishcer" on the docket in this case.

[2] The defendant's last name is spelled "McCoy" on the docket and in the parties' briefs.

First, plaintiff claims that he has been denied his right to celebrate, in a manner consistent with his faith, the holy days of April 21, May 25, August 17, and October 7. (*Id.* ¶ ¶ 15–18.) Specifically, plaintiff requests that these four Rastafari holy days be added to the religious calendar with designations that permit plaintiff to (a) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community.[3] (*Id.;* Hearing before Magistrate Judge Debra Freeman, July 8–9, 2014 ("July Tr."), pp. 82–83.) Plaintiff further requests that April 21 and August 17 be designated as "family events."[4] (Am. Compl., ¶ 16; July Tr., p. 82.) During the pendency of plaintiff's motion, DOCCS added all of the holy days at issue to its "Religious Holy Day Calendar," with varying limitations regarding how each day may be observed. (Religious Holy Day Calendar, Revised July 29, 2014 ("Revised Calendar"), p. 25 (Dkt.82–1).) The revised

2015 WL 769551

DOCCS calendar, which was submitted to Magistrate Judge Freeman on the preliminary injunction motion, allows members of the Rastafari faith to be exempt from work and programming, attend a worship service, and share a holy day meal on August 17 and October 7. (*Id.*) For April 21, DOCCS only permits a congregate worship service and for May 25, DOCCS does not authorize any of these three designations. (*Id.*) The revised calendar does not designate any of the four holy days at issue as "family events." (*Id.*)

[3]  Plaintiff's Amended Complaint requests that the holy days at issue be added to the calendar with the designations of "Off Work Program (OWP), Meal Consideration (MC), and Special Consideration (SC)." (Am.Compl., ¶ 16.) In the hearings before Magistrate Judge Debra Freeman, plaintiff clarified that these designations would allow him to (1) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. (July Tr., pp. 82–83.)

[4]  While the plaintiff in his Amended Complaint only requests that August 17 be designated as a "family event," he makes clear in the hearings before Magistrate Judge Freeman that he is asking for this designation to be added to both April 21 and August 17. (July Tr., p. 82.)

**\*2**  Second, plaintiff claims that defendants have denied him the right to add food items to the holy day meal menu, giving the "Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community," in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 27, A.9.)

Third, plaintiff alleges that Rastafarians at Woodbourne are forced to hold congregate worship services on Wednesdays instead of Fridays, the day of worship Rastafarians traditionally observe. (*Id.* ¶ 26.) Defendant Cunningham denied plaintiff's grievance on the basis that "there was no room available for Rastafarians to conduct congregate worship on Fridays." (*Id.*)

Fourth, plaintiff claims that defendants have denied him the right to wear the Rastafarian religious turban brought to him by his wife.[5] (*Id.* ¶¶ 20–22.) After wearing the turban his wife sent him for two months, a correction sergeant told plaintiff that he was no longer permitted to wear the headgear. (*Id.* ¶ 20.) The sergeant told plaintiff that according to defendant Santiago, the Coordinating Chaplain, the only religious headgear for Rastafarians was a Tsalot Kob. (*Id.* ¶ 21.) Plaintiff asserts that the Tsalot Kob is "restricted to members of the Ba Beta Kristiyan Church of Haile Selassie I (a Christianized House or Mansion within Rastafari)," and does not apply to the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion." (*Id.* ¶¶ 3; 20–21.) At no time did defendant Santiago speak to plaintiff to determine the religious significance of his turban. (*Id.* ¶ 22.) Plaintiff complied with the sergeant's order to mail home his turban, and subsequently filed a grievance that was denied by defendant Cunningham. (*Id.* ¶¶ 21–22.)

[5]  In the October 2014 declaration of Colonel Dennis W. Bradford, the DOCCS Director of Correction Emergency Response Team Operations, DOCCS consented to alter its policy regarding religious headgear. (Bradford Declaration (Dkt.98).) Colonel Bradford declared that plaintiff would be allowed to wear a turban that conforms to his religious beliefs as long as it complies with mandated color restrictions. (*Id.* ("[A]s long as plaintiff's turban is of an appropriate color DOCCS will accommodate his request to wear it within Woodbourne Correctional Facility.")) Thus, plaintiff's claim regarding the right to wear his turban may be moot. The Court will decide this question at a later stage after the parties have briefed the issue.

Fifth, plaintiff challenges Directive 4760, which requires religious groups engaging in fundraising activities to apply for Special Purpose Organization ("SPO") status. (*Id.* ¶ 23.) He explains that SPO status subjects religious groups to the same mandates as non-religious inmate organizations, including the requirement that each organization surrender half of the funds it raises to the Inmate Occupational Therapy Fund ("IOTF") for the benefit of the general inmate population. (*Id.*) Plaintiff challenges this requirement, as it applies to Rastafarians, because he claims it has "the effect of a tax on religion" and burdens the Rastafarians' ability to purchase necessary materials for congregate services, religious classes, and holy day celebrations. (*Id.* ¶ 24.)

Sixth, plaintiff claims that defendants violated his First and Fourteenth Amendment rights when they denied his request to gain access to spiritual and religious advisers

Rossi v. Fischer, Not Reported in F.Supp.3d (2015)
2015 WL 769551
Case 9:18-cv-01161-AMN-TWD Document 36 Filed 05/21/19 Page 91 of 126

(*Id.* ¶ ¶ 19, A(7) .) Defendant Morris denied plaintiff's request for advisers on security grounds, and defendant McKoy upheld Morris's determination after plaintiff sent McKoy a letter seeking intervention. (*Id.* ¶ 19.) Plaintiff claims that "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (*Id.*)

**\*3** Finally, plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (*Id.* ¶ 28.) Davis asked plaintiff in an interview about the "ritual use of marijuana within the Rastafarian faith." (*Id.*) "When plaintiff responded to defendant's request, defendant Davis put in her report that plaintiff admitted using marijuana for religious rituals only," despite the fact that plaintiff claims he "denied ever using substances whatsoever," including marijuana. (*Id.*)

Plaintiff seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages. (*Id.* ¶ ¶ A–C.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on May 8, 2013 (Dkt.2), and filed an Amended Complaint on November 19, 2013. (Dkt.11.) Plaintiff moved for a preliminary injunction to enjoin defendants "from continuing to enforce the policies being challenged in this proceeding." (Dkt.17.) Magistrate Judge Debra Freeman, to whom the preliminary injunction motion was referred to hear and report, bifurcated plaintiff's motion on the basis of the temporal proximity of the relief sought. Magistrate Judge Freeman issued a Report and Recommendation ("R & R") as to plaintiff's ability to celebrate April 21 as a holy day (Dkt.27), and a Supplemental R & R, reexamining some of the issues regarding April 21 and addressing the remaining claims raised by plaintiff's motion. (Dkt.89.) The Court adopted both the R & R (Dkt.37) and the Supplemental R & R (Dkt.103.) Plaintiff's motion was granted, to the extent that defendants were mandatorily enjoined, pending judgment on the merits, to: (1) permit plaintiff to wear a Rastafari religious turban; (2) allow plaintiff to observe all four of the Rastafari holy days at issue in his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafarian inmates; and (3) provide space for Rastafari

Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of the case on its merits, to provide an alternative accommodation for such services on Friday evenings. (Order Adopting Supp. R & R.)

Defendants now move to dismiss plaintiff's Amended Complaint in its entirety. (Dkt.56.)

## LEGAL STANDARD FOR MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555). In considering a Rule 12(b) (6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 678–79, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's *pro se* pleadings are given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

## DISCUSSION

### I. Exhaustion of Administrative Remedies

**\*4** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory before an action is commenced. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. The Second Circuit indicated in *Neal,* that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA. *Id.*

While the PLRA's exhaustion requirement is "mandatory," *Woodford v. Ngo,* 548 U.S. 81, 85 (2006), certain caveats apply. *See Hemphill v. N.Y.,*

380 F.3d 680, 686 (2d Cir.2004). A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not available; (2) defendants forfeited their affirmative defense of non-exhaustion by failing to raise or preserve it or are estopped from raising non-exhaustion because their own actions inhibited the inmate from exhausting his claims; or (3) "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with the exhaustion requirements.[6] *Id.*

6  The Second Circuit had concluded that "special circumstances" may exist where the plaintiff reasonably misinterprets the prison's grievance regulations. *Hemphill,* 380 F.3d at 690. However, in *Woodford,* the Supreme Court held that untimely or otherwise procedurally defective grievances do not satisfy the PLRA's exhaustion requirement. 548 U.S. at 93. The Second Circuit has not yet determined whether the special circumstances exception to the exhaustion requirement survives *Woodford. See Chavis v. Goord,* 333 F. App'x 641, 643 (2d Cir.2009). The Court need not reach this issue in this case.

"A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (alterations omitted) (quoting *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999)). Courts must look at the applicable set of grievance procedures when determining the availability of an administrative remedy. *Id.* Plaintiff, as an inmates of a New York State correctional facility, is subject to a three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.Codes R. & Reg. ("N.Y.C .R.R.") § 701.5. The first step in the IGP is to file a grievance with the Inmate Grievance Resolution Committee (the "IGRC"). *Id.* § 701.5(b). After receiving a response from the IGRC, an inmate has seven calendar days in which to appeal to the superintendent. *Id.* § 701.5(c). Within seven calendar days of receiving a response from the superintendent, the inmate then must appeal to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The CORC is required to render a decision on each appeal and transmit its decision within 30 calendar days from the time the appeal was received. *Id.*

A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative

remedy unavailable for purposes of exhaustion. *See Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998). While the Second Circuit has not directly addressed this issue, it has treated the decision cited above favorably. *See Hemphill,* 380 F.3d at 686 n. 6 (citing to the cases above and noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (citing favorably to *Underwood* and *Foulk* with regard to availability of administrative remedies). The Second Circuit in *Abney* cited to *Hemphill* for the proposition that "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance ." 380 F.3d at 667.

**\*5** Judges in this district, including the undersigned, have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance. *See Peoples v. Fischer,* 11–cv–2694 (SAS), 2012 WL 1575302, at *6 (S.D.N.Y. May 3, 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y.2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination." (alterations, internal quotation marks, and citation omitted)); *Manos v. Decker,* 03–cv–2370 (PKC), 2005 WL 545215, at *4 (S.D.N.Y. Mar. 7, 2005) (asserting that *Abney* "held in part that administrative remedies are unavailable when prison officials fail to respond to grievances within the time period prescribed by regulation"); *Dimick v. Baruffo,* 02–cv–2151 (LMM), 2003 WL 660826, at *4 (S.D.N.Y. Feb. 28, 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). *But see Bennett v. Wesley,* 11–cv–8715 (JMF), 2013 WL 1798001, at *6 (S.D.N.Y. Apr. 29, 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability." (alterations omitted) (quoting *Mateo v. O'Connor,* 10–cv–8426 (LAP), 2012 WL 1075830, at *7 (S.D.N.Y. Mar. 29, 2012))); *Rivera v. Anna M. Kross Ctr.,*

10–cv–8696 (RJH), 2012 WL 383941, at *4–5 (S.D.N.Y. Feb. 7, 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.)

Here, defendants argue that some of plaintiff's claims were not exhausted before plaintiff brought this action. (Def. Memo in Support of Motion to Dismiss ("Def.MTD"), pp. 46.) Defendants show that CORC's decision regarding plaintiff's appeal of his May 2013 grievance was issued after the filing of both the original Compliant and the Amended Complaint. (Id. at 5.) The original Complaint was filed on May 8, 2013, the Amended Complaint was filed on November 19, 2013, and CORC's decision regarding plaintiff's appeal was not issued until December 18, 2013. (Id.) Defendants, however, overlook two important points. First, plaintiff exhausted some of his claims through grievances filed prior to his May 2013 grievance. Second, in regard to the May 2013 grievance, the CORC failed to issue a decision within the 30 day limit set by the IGP, rendering the administrative remedies unavailable to plaintiff.

Plaintiff's original Complaint sought to enjoin defendants from (1) prohibiting the wearing of his religious turban, (2) prohibiting his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) collecting half of the funds raised by the Rastafari inmate organization. Each of these claims was properly raised and exhausted through grievances filed on June 17, 2009, September 12, 2011, and March 14, 2012. (See Hehenberger Decl. Ex. B & D (Dkt.58).) The CORC issued a decision regarding the June 2009 grievance on August 5, 2009, ruled on the September 2011 grievance on January 4, 2012, and rendered a decision on the March 2012 grievance on September 5, 2012. (Id.) The original Complaint was filed eight months after the resolution of the lattermost grievance at issue.

**\*6** Plaintiff's Amended Complaint, filed on November 19, 2013, seeks additional relief, including: (1) the addition of October 7 to the religious calendar with various designations; (2) that Rastafari congregate worship be moved to Fridays; (3) that defendants be prohibited from making the menu for holy day meals mandatory; (4) that defendants' failure to provide plaintiff with access to Rastafarian advisers be deemed a constitutional violation; and (5) for the removal of information

regarding marijuana use from plaintiff's institutional records. Plaintiff filed a grievance that included these additional claims on May 29, 2013. (Id. at Ex. C .) After receiving a response from both the IGRC and the superintendent, plaintiff appealed the superintendent's decision to CORC on July 26, 2013. (Id.) More than four months passed between the appeal and CORC's decision, issued on December 18, 2013, which is far longer than the 30 day deadline explicitly set forth in the IGP process. (Id.) Had the CORC provided a timely response to plaintiff's appeal, plaintiff would have received a response prior to filing the Amended Complaint. Plaintiff "should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief." [7] Peoples, 2012 WL 1575302, at *9 n. 125. Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate. Defendants' motion to dismiss on this ground is denied.

[7]     This case is distinguishable from cases where the CORC never renders a decision on the plaintiff's appeal. Under those circumstances, district courts in this Circuit have tended to hold that a motion to dismiss or for summary judgment for failure to exhaust should be granted without prejudice, allowing the plaintiff to refile his complaint once the CORC responds. See Fuentes v. Furco, 13–cv–6846 (AJN), 2014 WL 4792110, at *3 (S.D.N.Y. Sept. 25, 2014) (collecting cases). This approach "balance[s] the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him." Id. This logic, however, does not extend to the case at bar because the CORC has denied plaintiff's appeal, and thus has already been given the first opportunity to consider the grievance. See Peoples, 2012 WL 1575302, at *9.

## II. The Free Exercise Clause

### 1. Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir.2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). A prisoner's right to exercise his religion is not absolute and must be balanced

against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)). Accordingly, free exercise claims of prisoners are judged " 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 F .3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."[8] *Salahuddin,* 467 F.3d at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

[8]  The Second Circuit has noted that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (internal quotation marks omitted). However, the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise. *See Ford,* 352 F.3d at 592 (applying the substantial burden test where the parties did not brief the issue and the plaintiff did not argue otherwise); *see also Salahuddin,* 467 F.3d at 275 n. 5 (declining to decide whether the substantial burden test applied where resolution of the issue was unnecessary for purposes of the appeal); *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step). Here, the Court will apply the substantial burden test as neither party has argued against employing this standard.

**\*7** A substantial burden on religious exercise exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416,

at *4 (S.D.N.Y. Aug. 29, 2014) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)) (alterations and internal quotation marks omitted). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Even if a challenged policy substantially burdens the plaintiff's sincerely held religious beliefs, it is nevertheless valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *see also Ford,* 352 F.3d at 595. When evaluating whether a regulation or official action is reasonable, courts are guided by four factors: (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective;" (2) "whether prisoners have alternative means of exercising the burdened right;" (3) "the impact on guards, inmates, and prison resources of accommodating the right;" and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 89–91).

### 2. Analysis

#### A. Substantial Burden

On this motion, defendants do not challenge that plaintiff has alleged sincerely held religious beliefs; rather defendants argue that plaintiff fails to allege facts that show that his religious beliefs were substantially burdened. (Def.MTD, pp. 6, 9.) The Court concludes that plaintiff has plausibly alleged that defendants have substantially burdened his right to freely exercise his religion as to some but not all of the religious practices he wishes to engage in.

##### i. Claims Involving the Religious Calendar

As noted above, DOCCS has added all of the holy days at issue to the religious calendar, but with varying limitations regarding how each day may be celebrated. (Revised Calendar, p. 25.) The requests that were accommodated are moot. The Court must address whether plaintiff states a claim with respect to those requests which have

not be voluntarily accommodated, which include: (1) exemption from work and the provision of a shared meal on April 21 and May 25; (2) permission for a congregate worship service on May 25; and (3) the designation of April 21 and August 17 as "family events." Plaintiff has plausibly alleged a substantial burden on his free exercise of religion with regard to all of the contested holy day restrictions, with the exception that plaintiff cannot reach this threshold burden on his claim concerning "family events."

**\*8** Plaintiff has shown that celebrating the four holy days at issue by refraining from work and programming, attending a congregate worship service, and sharing a holy day meal is "central or important" to his faith. *See Ford,* 352 F.3d at 593–94. In the telephone conferences and hearings before Magistrate Judge Freeman, plaintiff explained why the holy days are sacred, stating that April 21 is "the day that Emperor Selassie came to Jamaica" (July Tr., p. 13), May 25 is African Liberation Day (Telephone Conference before Magistrate Judge Freeman, March 18, 2014 ("March Tr.'), p. 19), August 17 is the birthday of the Rastafari prophet Marcus Mosiah Garvey, (July Tr., p. 24.) and October 7 "respects the day that Emperor Haile Selassie was named heir apparent prior to his coronation." [9] (March Tr., p. 19.) He testified that each holy day at issue should be celebrated in the same manner, by coming together with other Rastafari observers for a congregate service called a "reasoning" and a shared meal, and by refraining from work. (July Tr., pp. 13, 20, 25–26.) The Court concludes that plaintiff has plausibly alleged a substantial burden on his religious beliefs to the extent that plaintiff alleges defendants continue to deny him an exemption from work and provision of a shared meal on April 21 and May 25 and have failed to permit a congregate worship service on May 25. *See Ford,* 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his practice of religion); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .").

[9] In the Amended Complaint plaintiff identifies, but does not allege the significance of, certain holy days that defendants have denied him the right to celebrate. In the conferences and hearings before

Magistrate Judge Freeman, plaintiff explained the religious significance of each holy day at issue and described how the days must be observed according to his faith. The Court deems these statements to be incorporated into plaintiff's pleadings. Considering these statements on the present motion to dismiss comports with the special solicitude afforded *pro se* litigants.

Plaintiff fails, however, to plausibly allege that his free exercise rights are substantially burdened by the denial of his request to designate April 21 and August 17 as "family events." He asserts, "Rastafari family is the center of Rasta society," (Am. Compl., ¶ 16 n. 1) and that "[d]uring holy days' celebrations, it is necessary for the family to celebrate together, representing the unity established by Emperor Haile Selassie I, Empress Menen, and the Royal Children." (Pl. Objection to Magistrate Judge's R & R ("Pl.Objection"), p. 1.) These conclusory allegations fail to adequately explain the religious significance of the "family event." Nor does plaintiff explain why celebration with family carries religious significance for the holy days of April 21 and August 17, but not for the other holy days at issue. Plaintiff fails to show that celebration with family is "central or important" to his religious beliefs, and thus cannot state a claim under the Free Exercise Clause as to this request.

### ii. Holy Day Menus

It has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.")

**\*9** Plaintiff has failed to plausibly allege that DOCCS's policy prohibiting inmates from adding items to the holy day menu substantially burdens his religious exercise. (Am.Compl., ¶ 27.) He does not allege that the holy day meals are inconsistent with his religious beliefs nor does he explain how his ability to add certain items to the meals is "central or important" to his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left

to the prison's management which can provide from the food supplies available within budgetary limitations"). Accordingly, plaintiff does not plausibly allege a Free Exercise Clause claim as to the so-called "mandatory menu" provided by DOCCS for holy day meals.

### iii. Friday Worship

Plaintiff asserts that he has "been forced to have congregate worship on Wednesdays instead of the traditional Fridays." (Am.Compl., ¶ 26.) Plaintiff has plausibly alleged that this restriction substantially burdens his right to free exercise. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d at 308; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."). In *Lloyd v. City of New York,* 12–cv–03303 (CM), 2014 WL 4229936, at *5–6 (S.D.N.Y. Aug. 4, 2014), the court held that Muslim inmates plausibly alleged a substantial burden on their religious exercise where they were unable to conduct religious services in a manner that complied with their religious beliefs. The plaintiffs in *Lloyd,* for example, were forced to conduct religious services in a chapel where the pews prevented them from kneeling for prayer. *Id.* Here, plaintiff has plausibly alleged that defendants have substantially burdened his ability to participate in religious services in a manner consistent with the practices of his religion. Plaintiff alleges that he is forced to conduct services on Wednesdays, but he asserts that Friday is the traditional day of worship. (*See* Am. Compl., ¶ 26.) He explains that the appropriate day for Rastafari congregate worship is Friday because it "carries the Rastafarian Community into the Sabbath," which begins on Friday at sundown. (*Id.*) Plaintiff plausibly alleges that his inability to hold Friday Sabbath services substantially burdens his free exercise of religion.

### iv. Turban

Plaintiff has plausibly alleged that defendants substantially burden his right to free exercise by denying him the right to wear his religious turban. *See Singh v. Goord,* 520 F.Supp.2d 487, 502–03 (S.D.N.Y.2007) (holding that defendants substantially burdened plaintiff's

religious exercise where plaintiff was prohibited from wearing the type of turban required by his religion); *Morgan v. City of New York.,* 12–cv–704 (WFK), 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) ("Plaintiff has shown that the removal of his turban substantially burdens his sincerely held religious beliefs.") Plaintiff has explained the significance of wearing a turban in the Rastafari religion, testifying that the "Nya[h]binghi Rastaman's head must be covered" and that wearing a turban represents "the complete discipline of the Rastaman in terms of a priestly life." [10] (July Tr., p. 37–39.) Plaintiff alleges that the only headgear Rastafari males are permitted to wear at Woodbourne is the Tsalot Kob, which is a type of headgear restricted to members of the Ba Beta Kristiyan Church and does not align with plaintiff's sincerely held religious beliefs. (*Id.* at 38–42; Am. Compl., ¶ ¶ 20–21.) Plaintiff does not provide a full explanation of the how the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion," is distinct from the Ba Beta Kristiyan Church, nor does he elaborate on why wearing a Tsalot Kob does not comport with his religious beliefs. Nevertheless, given the special solicitude afforded to *pro se* plaintiffs, the Court concludes that plaintiff has adequately pled that defendants' prohibition on the wearing of his religious turban substantially burdens his sincerely held religious beliefs. The issue may look different at the summary judgment stage.

[10]    In the Amended Complaint plaintiff alleges that the denial of his religious turban violates his First Amendment rights, but he fails to allege the significance of the turban to his religious beliefs. In the hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of wearing his turban. The Court deems these statements to be incorporated into plaintiff's pleadings.

### v. Fundraising Proceeds

**\*10** Plaintiff challenges defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds; however, he fails to adequately explain how this practice constitutes a substantial burden on his religious beliefs. Plaintiff explains that the collection of half of the organization's funds "creates a burden on [the Rastafari group's] ability to purchase necessary materials for congregate services, religious classes, and religious holy day celebrations." (Am.Compl., ¶ 24.) While forbidding or confiscating religious materials may in some instances support a free exercise claim, *see Breland v. Goord,* 94–

cv–3696 (HB), 1997 WL 139533, at *5–6 (S.D.N.Y. Mar. 27, 1997) (holding a claim regarding the confiscation of a prisoner's religious literature survives summary judgment), plaintiff does not assert that defendants have prohibited him from obtaining religious materials. Nowhere does plaintiff claim he is restricted from either buying the religious materials he desires with the funds the Rastafari group retains or obtaining the materials from another source. Plaintiff does not show how the deprivation of half of the funds constitutes a substantial burden on his religious beliefs. As plaintiff has failed to plausibly allege a substantial burden, his free exercise claim challenging defendants' collection of half of the funds raised by the Rastafari organization is dismissed.

### vi. Rastafarian advisers

Plaintiff alleges that defendants violated his rights when they denied his request to gain access to spiritual and religious advisers. (Am.Compl., ¶ 19.) Plaintiff fails, however, to plausibly allege that defendants' actions substantially burden his free exercise of religion. He makes no showing regarding how contact with advisers is "central or important" to the practice of his faith. Thus, his free exercise claim based on lack of access to advisers is dismissed.

### vi. Reporting of Marijuana Use

Plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (Am.Compl., ¶ 28.) He claims that defendant's false reporting was a result of "unconstitutional stereotyping of plaintiff based on his religious beliefs" and the ritual use of marijuana within the Rastafari faith. (Id.) Plaintiff, however, fails to explain how defendant's purported stereotyping burdened his free exercise of religion, nor does he show how being recommended for a drug treatment program has any effect on his religious practice. Thus, plaintiff does not state a claim under the Free Exercise Clause as to the alleged false reporting of marijuana use.

### B. Penological Interest

With regard to the claims for which plaintiff has plausibly alleged a substantial burden, defendants contend that they have proffered a legitimate penological interest which justifies not allowing the practice in question. (Def.MTD, p. 6.) Defendants cite "safety and security" concerns for their prohibition of plaintiff's turban and identify "spatial restrictions" as the reason for requiring Rastafari Sabbath services to be held on Wednesdays rather than Fridays. (Id. at 11, 13–14.) Defendants do not to offer a justification for their policy regarding plaintiff's religious calendar claims. (Id. at 8–9.)

*11 Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. See Ford, 352 F.3d at 596 (refusing to determine whether defendants' conduct was reasonably related to legitimate penological interests because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court cannot assess whether there is a "valid, rational connection" between defendants' actions and their purported concerns. See Turner, 482 U.S. at 89. Defendants state in a conclusory manner that the ban on plaintiff's religious turban is due to safety and security concerns, but fail to explain how plaintiff's turban presents a security problem or why concerns exist with respect to plaintiff's turban but not with the other types of permitted headgear. (See Def. MTD, pp. 13–14.) Next, while defendants explain that there is a lack of available space for Rastafarians to conduct congregate worship on Fridays (Id. at 11), the Court is unable to assess, based on the limited record, the impact accommodation would have on the guards, other inmates, and prison resources and whether there is an "absence of ready alternatives." See Turner, 482 U.S. at 90. The Court will not, at this stage, dismiss any of plaintiff's claims based on defendants' stated penological interests. The Court acknowledges that the case may look very different at the summary judgment stage.

To recap, the following free exercise claims survive defendant's motion to dismiss: (1) the denial of plaintiff's ability to observe all four of the Rastafari holy days at issue on his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafari inmates; (2) the denial of Friday Sabbath services; and (3) the prohibition on plaintiff's religious turban.

### III. The Establishment Clause and the Equal Protection Clause

While plaintiff asserts violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause, the parties only briefed the claims under the Free Exercise Clause. Where plaintiff has plausibly alleged a free exercise violation, the Court need not decide at this time whether plaintiff also states a claim under the Establishment Clause or the Equal Protection Clause. Because these claims have survived, the Court can make this determination at a later stage after the parties have briefed the issues. However, where plaintiff fails to state a claim under the Free Exercise Clause, the Court will determine whether the claim can nevertheless survive under the Establishment Clause or the Equal Protection Clause.

Plaintiff fails to plead any facts to support a claim under the Establishment Clause with respect to: (1) the designation of April 21 and August 17 as "family events;" (2) the denial of spiritual and religious advisers; and (3) the false reporting regarding plaintiff's marijuana use. Plaintiff fails to plead any facts to support an Equal Protection Clause claim as to: (1) the designation of "family events;" (2) the policy of collecting half of the Rastafari inmate organization's fundraising proceeds; and (3) the mandatory nature of holy day menus. As such, the claim regarding "family events" is dismissed, *see Iqbal, 556 U.S. at 678*, and the Court will analyze plaintiff's holy day menu and fundraising claims under the Establishment Clause and his religious adviser and false reporting claims under the Equal Protection Clause. For reasons to be explained, the Court dismisses each of these four claims.

#### 1. The Establishment Clause

**\*12** The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion." *U.S. Const. amend. I.* In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). *See Bronx Household of Faith v. Bd. of Educ. of City of New York,* 650 F.3d 30, 40 n. 9 (2d Cir.2011) ("Although the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."); *see also Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 355 (2d Cir.2007); *Kiryas Joel Alliance v. Vill. of Kiryas Joel,* 495 F. App'x 183, 190 (2d Cir.2012). Under *Lemon,* "government action which interacts with religion (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion." *Bronx Household of Faith,* 650 F.3d at 40 (alterations and internal quotation marks omitted) (citing *Lemon,* 403 U.S. at 612–13). "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner* ... which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Salahuddin v. Perez,* 99–cv–10431 (LTS), 2006 WL 266574, at \*9 (S.D.N.Y. Feb. 2, 2006) (internal quotation marks omitted)).

First, plaintiff claims that by denying him the ability to supplement holy day meals with additional food items, defendants have given the "New York State Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community." (*Id.*) Defendants counter that "a perfect accommodation of each inmate's preferential meal choices" would be "prohibitively expensive." (Def.MTD, p. 13.)

Plaintiff fails to state a claim under the Establishment Clause pursuant to the *Lemon* analysis. *See* 403 U.S at 612–13. First, the prison's policy has the permissible purpose of attempting to reasonably accommodate the inmates' religious dietary practices without subjecting the prison "to prohibitively expensive accommodations of religious dietary meal requests." (*Id.*) *See Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990) (asserting that prisoners have a right to receive diets consistent with their religious beliefs but that this right may be limited where accommodation is prohibitively expensive or administratively unfeasible). Second, plaintiff has failed to allege that DOCCS's policy regarding holy day menus has the primary effect of either advancing or inhibiting religion. Plaintiff does not claim that the holy day meals are inconsistent with his religious beliefs. Finally, DOCCS's policy does not foster excessive entanglement of government with religion. "In order to permit inmates

to freely exercise their religion, *some* entanglement is necessary." *Muhammad v. City of New York Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (emphasis in original) ("[I]n the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." (internal quotation marks omitted)). DOCCS developed a menu for holy day celebrations in order to accommodate inmates' free exercise right to receive a diet consistent with their religious beliefs. This does not constitute excessive government entanglement with religion. As such, plaintiff's claim regarding the holy day menus is dismissed.

**\*13** Next, plaintiff asserts that "the policy of requiring the Rastafarians to surrender 50% of their fundrais[ing proceeds] had the effect of a tax on religion." (Am.Compl., ¶ 24.) This allegation fails to plausibly allege a violation under the Establishment Clause. First, as plaintiff acknowledges, the policy has the secular purpose of providing funds to the Inmate Occupational Therapy Fund ("IOTF"), which is "for the benefit of the general population's use." (*Id.* ¶ 23.) The policy does not have the primary effect of advancing or inhibiting religion. The fundraising requirement is applied equally to religious and non-religious groups, and plaintiff does not adequately allege how the policy inhibits or burdens his religion. (*Id.*) Finally, the policy does not foster excessive government entanglement with religion. Thus, plaintiff's claim as to defendants' policy regarding fundraising proceeds is dismissed.

### 2. The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation, a plaintiff must plausibly allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Courts in the Second Circuit have emphasized that "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently ." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *see also Bishop v. Best Buy, Co. Inc.,* 08–cv–8427 (LBS), 2010 WL 4159566, at \*11 (S.D.N.Y. Oct. 13, 2010) ("Well-pled facts showing that the plaintiff has been treated differently from others

similarly situated, remains an essential component of [an equal protection] claim." (internal quotation marks omitted)). "While the *Turner* ... standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." (*Id.*)

Plaintiff's claim regarding defendant Davis's alleged false report fails to state a claim under the Equal Protection Clause because plaintiff fails to allege that he was treated differently than others. In *Bishop,* plaintiff's equal protection claim, alleging that he was discriminated against on the basis of his race, was dismissed because the plaintiff "failed 'to allege or identify a single similarly situated [individual] who was treated differently .' " 2010 WL 4159566, at \*12 (quoting *Sweeney v. City of New York,* 03–cv–4410 (JSR)(RLE), 2004 WL 744198, at \*5 (S.D.N.Y. Apr. 2, 2004) *subsequently aff'd,* 186 F. App'x 84 (2d Cir.2006)); *see also King v. New York State Div. of Parole,* 260 Fed. App'x. 375, 379–80 (2d Cir.2008) (affirming dismissal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Here, plaintiff makes no claim regarding how others were treated during their interviews for the drug treatment program. Thus, plaintiff's equal protection claim regarding religious stereotyping with regard to the alleged false report of his marijuana use is dismissed. As this is the only claim that implicates defendant Davis, she is dismissed from this case.

**\*14** Next, plaintiff alleges that being denied spiritual advisers for security reasons violates his equal protection rights because "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (Am.Compl., ¶ 19.) This allegation is conclusory and fails to identify any specific religious group that is being treated differently. *See Bishop,* 2010 WL 4159566, at \*11 ("Conclusory allegations of selective treatment are insufficient to state an equal protection claim."). Plaintiff's equal protection claim regarding spiritual advisers is dismissed.

### IV. Injunctive Relief

Defendants seek to dismiss plaintiff's claims for injunctive relief for lack of merit and mootness. (Def.MTD, pp. 17–20.) Defendants have not established that all of plaintiff's holy day claims are moot. Injunctive relief, however, may not be premised upon claims that this Court has dismissed.

Plaintiff asserts six claims for injunctive relief. (Am.Compl., ¶ B) First, plaintiff seeks to enjoin defendants from "continuing to deny plaintiff and other Rastafarians their holy days." (*Id.* ¶ B(1).) Second, plaintiff seeks injunctive relief to allow him to wear his turban. (*Id.* ¶ B(2).) Third, plaintiff seeks to enjoin defendants from enforcing the policy which mandates that the Rastafarian inmate organization surrender half of the funds it raises to the IOTF. (*Id.* ¶ B(3).) Fourth, plaintiff seeks an injunction enjoining defendants from retaliating against him. (*Id.* ¶ B(4).) Fifth, plaintiff seeks to direct defendant Davis to expunge the "stereotyped information from plaintiff's institutional records." (*Id.* ¶ B(5).) Sixth, plaintiff seeks to enjoin all defendants from "continuing to deny him his right to freely practice his faith." (*Id.* ¶ B(6).)

Defendants assert that none of plaintiff's claims for injunctive relief can be sustained as a matter of law. (Def.MTD, p. 17.) "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Defendants reason that because "Plaintiff is unable to succeed on the merits of his claims" permanent injunctive relief is not warranted. (Def.MTD, p. 18.) At the pleading stage, defendants are correct only with respect to some of plaintiff's claims. The Court has found that plaintiff has plausibly alleged a constitutional violation with respect to his claims regarding the observance of Rastafari holy days and the wearing of his turban. Accordingly, plaintiff's claims for injunctive relief regarding these rights may not properly be dismissed. However, the Court has determined that plaintiff's claims regarding the purported false report of plaintiff's marijuana use and defendants' policy of collecting half of the Rastafarian inmate organization's fundraising proceeds do not state a claim. Thus, plaintiff's claims to (1) expunge references to marijuana use from his institutional records and (2) enjoin defendants from requiring the Rastafarian organization to surrender half of their funds, are dismissed because the underlying claims upon which they are premised are dismissed.

**\*15** Plaintiff's claim that seeks to prevent future retaliation is also dismissed, as plaintiff fails to plead any facts whatsoever to show that defendants have or would retaliate against plaintiff. *See Iqbal,* 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *see also Reiter v. Metro. Transp. Auth. of N.Y.,* 01–cv–2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (denying plaintiff's request for a permanent injunction to prevent retaliation because there was no showing that plaintiff would be retaliated against in the future).

Next, defendants argue that injunctive relief is not appropriate concerning the religious calendar because "it is quite possible that this litigation could continue after Plaintiff's particular sect of Rastafarianism ceases to have followers that are inmates under DOCCS' supervision or custody" and "[a]s such, Plaintiff's request for injunctive relief would be moot." (Def.MTD, p. 19.) This argument lacks merit, as plaintiff brings his claims individually and he is currently an inmate at Woodbourne. "In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (internal quotation marks omitted). At this time, an actual controversy regarding the religious calendar exists as to the claims that defendants have not voluntarily accommodated. As such, not all of plaintiff's religious calendar claims are moot.

### V. Personal Involvement

Defendants contend that plaintiff has failed to allege the personal involvement of defendants Fischer, Jacobson, and Leonard, and as such, they should be dismissed from this suit. (Def.MTD, pp. 15–17.) The Court holds that plaintiff has plausibly alleged the personal involvement of the three defendants at issue.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Individual liability under section 1983 may not be anchored in a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (per curiam). "The bare fact that [a defendant] occupies a high position in

the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Further, "[c]onclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." *Kee v. Hasty,* 01–cv–2123 (KMW)(DF), 2004 WL 807071, at *12 (S.D.N.Y. Apr. 14, 2004).

In *Colon,* the Second Circuit held that the personal involvement of a supervisory defendant can be shown by evidence that:

> **\*16** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The continuing vitality of the supervisory liability test established in *Colon* has come into question after the Supreme Court's 2009 decision in *Iqbal. See Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012). There, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

The Second Circuit has not yet definitively addressed how *Iqbal* affects the *Colon* factors, nor have the district courts within this Circuit reached a clear consensus. *See Aguilar v. Immigration & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814 (S.D.N.Y.2011). Despite the lack of

agreement regarding the *Colon* factors, courts agree that the third factor, that defendant created a policy or custom under which unconstitutional practices occurred, has survived *Iqbal. Compare Bellamy v. Mount Vernon Hosp.,* 07–cv–1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.,* 387 F. App'x 55 (2d Cir.2010), *with Hodge v. Sidorowicz,* 10–cv–428 (PAC)(MHD), 2011 WL 6778524, at *16 (S.D.N.Y. Dec. 20, 2011) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."), *report and recommendation adopted sub nom. Hodge v. Wladyslaw,* 10–cv–428 (PAC)(MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). It is under this factor that plaintiff claims defendants Fischer, Jacobson, and Leonard were personally involved.

Plaintiff alleges that Brian Fischer, as the Commissioner of DOCCS, "has the statutory authority to promulgate rules, regulations, and policies governing the religious rights of prisoners within the department." (Am.Compl., ¶ 4.) Similarly he alleges that Catherine Jacobsen as Acting Deputy Commissioner for Program Services "had the authority to approve policies governing the religious programs in [DOCCS]," (*Id.* ¶ 5), and that Mark Leonard, as the Director of Ministerial, Family, and Volunteer Services "was responsible for the promulgation of policies affecting the religious rights of all Rastafarian prisoners within [DOCCS]." (*Id.* ¶ 8.) Plaintiff attributes DOCCS's policies on holy days and headgear to Fischer, Jacobsen, and Leonard, along with other defendants. (*Id.* ¶ A(1).) A defendant that creates a policy is considered personally involved in any unconstitutional practices that occur under the policy. *See Colon,* 58 F.3d at 873. In *Pugh v. Goord,* 571 F.Supp.2d 477, 485–86 (S.D.N.Y.2008), the plaintiff argued that certain defendants, by creating and continuing policies regarding the accommodation of Shi'ite Muslims, were personally involved in the deprivation of his right as a Shi'ite inmate to have a separate prayer service from the Sunni Muslims. The court agreed with the plaintiff and found that because plaintiff showed that defendants made "certain contributions to formulation of policy," he had adequately established personal involvement with regard to these defendants.

*Id.* at 513 (internal quotation marks omitted). Similarly, plaintiff has plausibly alleged that defendants Fischer, Jacobson, and Leonard were involved in creating policies under which his right to free exercise was substantially burdened. Thus, these defendants are not properly dismissed from this suit at this juncture.

**\*17** Plaintiff also alleges that defendant Fischer is personally involved in the alleged constitutional violations because he has written letters to defendant Fischer "complaining about the unconstitutional impediments to plaintiff's ability to practice his faith," but Fischer has always referred plaintiff's complaints to subordinates. (Am.Compl., ¶ 25.) Defendants are correct in stating that this allegation cannot demonstrate the requisite personal involvement of Fischer. (*See* Def. MTD, p. 16.) "If the supervisor fails to respond to [a prisoner's] letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor is not personally involved." *Lloyd,* 2014 WL 4229936, at \*9; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the inmate failed to produce sufficient evidence to establish personal involvement of the prison commissioner, where the commissioner referred plaintiff's appeal letter to a subordinate); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) *on reconsideration in part,* 04–cv–8850 (RWS), 2008 WL 591230 (S.D.N.Y. Mar. 3, 2008) (stating that defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest" sent by inmate). Nevertheless, because plaintiff has plausibly alleged Fischer's personal involvement in creating policies under which unconstitutional practices may have occurred, Fischer is not dismissed from this suit.

## VI. Qualified Immunity

Defendants argue that qualified immunity shields them from money damages. (Def.MTD, pp. 20–25.) On this motion to dismiss, the Court cannot conclude that defendants are entitled to qualified immunity as a matter of law. The case may look very different at the summary judgment phase.

Qualified immunity protects public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "if either (a) the

defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). In deciding whether defendants are entitled to qualified immunity, courts must look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis,* 352 F.3d 582, 59697 (2d Cir.2003) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam)) (internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes,* 699 F.3d 211, 220 (2d Cir.2012) (alterations and citation omitted). While a defendant may assert a qualified immunity defense on a motion to dismiss, "the defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

**\*18** Defendants have failed to show that restricting plaintiff from celebrating certain holy days in a manner consistent with his religious beliefs, requiring Friday Sabbath services to be held on Wednesdays, and prohibiting him from wearing a religious turban do not violate clearly established law. An inmate has a "clearly established right to be free of unjustified burdens upon free exercise rights." *Salahuddin v. Dalsheim,* 94–cv–8730 (RWS), 1996 WL 384898, at \*12 (S.D.N.Y. July 9, 1996) (citations omitted); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). In *Salahuddin v. Goord,* the Second Circuit held that because plaintiffs' "free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest," qualified immunity was not appropriate as "it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to religious exercise without some justification." 467 F.3d 263, 275–76 (2d Cir.2006). Similarly here, because the Court holds that plaintiff has plausibly alleged that defendants substantially burdened his free exercise rights and, at this time, have not established a legitimate penological justification, defendants are not entitled to

qualified immunity on the premise that their conduct did not violate clearly established law.

Whether defendants could have reasonably believed that they did not violate an established constitutional right depends, at this stage, "on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that [sic] [their actions] served a legitimate penological interest." *Diggs v. Marikah,* 11–cv–6382 (PAE), 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012) (denying defendants' motion to dismiss on the basis of qualified immunity, where plaintiff's religious beliefs were substantially burdened and the factual basis for whether defendants' actions were reasonably related to a legitimate penological interest was not yet developed). At this early stage, there is inadequate information to determine whether defendants were objectively reasonable in their beliefs regarding their proffered penological interests. *See Perez v. Westchester Cnty. Dep't of Corr.,* 05–cv–8120 (RMB), 2007 WL 1288579, at *6 (S.D.N.Y. Apr. 30, 2007). This determination is more appropriate for summary judgment. *See id.* at *6 ("It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6)." (alterations and citations omitted)). Thus, defendants are not entitled to qualified immunity at this stage.

CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims regarding (1) "family events," (2) holy day menus, (3) spiritual advisers, (4) fundraising proceeds, and (5) the reporting of plaintiff's marijuana use are dismissed in their entirety. Because the only claim plaintiff brought against defendant Davis is dismissed, Davis is also dismissed from this suit. Plaintiff's claims regarding (1) the religious calendar, excluding requests for "family events," (2) Friday worship, and (3) plaintiff's turban survive defendants' motion to dismiss.

**\*19** Counsel for defendants shall provide plaintiff with copies of all unreported decisions cited herein. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and *in forma pauperis* status is denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 769551

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01161-AMN-TWD   Document 36   Filed 05/21/19   Page 104 of 126

Rodriguez v. Reppert, Not Reported in Fed. Supp. (2016)

2016 WL 6993383

2016 WL 6993383
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Juan RODRIGUEZ, Plaintiff,
v.
C.O. REPPERT, C.O. Osbourne,
and C.O. Testani, Defendants.

14-CV-671-RJA-MJR
|
Signed 11/30/2016

**Attorneys and Law Firms**

Juan Rodriguez, Dannemora, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

## DECISION AND ORDER

HONORABLE RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE

**\*1** Magistrate Judge Roemer, to whom the Court referred this case for all pre-trial proceedings, filed a Report and Recommendation (Docket No. 19) recommending that the Court deny the Defendants' motion for summary judgment. *See* Docket No. 10. The Defendants have filed objections to that recommendation. Docket No. 20. Pursuant to 28 U.S.C. § 636(b)(1), the Court must review the Report and Recommendation *de novo.* Upon *de novo* review, and for the reasons stated below, the Court overrules the Defendants' objections and adopts the Report and Recommendation in its entirety.

## BACKGROUND

The Defendants argue that they are entitled to summary judgment because, they claim, the Plaintiff failed to exhaust his administrative remedies before bringing this case. It is undisputed that the New York State Department of Corrections and Community Supervision's (DOCCS) Central Office Review Committee (CORC)—the final level of review in DOCCS' internal grievance program—did not decide the Plaintiff's appeals of his administrative

grievances within the thirty-day period required by DOCCS' regulations. *See* 7 N.Y.C.R.R. § 701.5(d)(2)(ii). It is also undisputed that the Plaintiff filed his complaint in this case *before* the CORC decided his appeals. The CORC ultimately decided the Plaintiff's appeals two weeks after the Plaintiff filed his complaint in this case, but nearly two *months* after DOCCS' own regulations required the CORC to do so.

Relying primarily on the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), as well as the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118, Judge Roemer concluded that the CORC's failure to timely decide the Plaintiff's appeals, combined with the absence of any "mechanism to request the CORC to issue a decision after thirty days have elapsed," Docket No. 19 at 7, meant that the Plaintiff's administrative remedies were not "available" within the meaning of the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a). Thus, Judge Roemer concluded, the Plaintiff did exhaust his administrative remedies.

## DISCUSSION

The PLRA's exhaustion "edict contains one significant qualifier: the [administrative] remedies" a prisoner is required to exhaust "must ... be 'available' to the prisoner." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified several scenarios in which an administrative remedy might be "[un]available" within the meaning of the PLRA. *See id.* at 1859-60. Judge Roemer concluded that one of those scenarios applies in this case: the Plaintiff here encountered "an administrative scheme" that is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859.

The Second Circuit recently explained that this "opaqueness" exception to the PLRA's exhaustion requirement applies when "[t]he regulations simply do not contemplate the situation in which [the prisoner] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016). That is the case here: As Judge Roemer noted, "after the CORC neglected to decide Rodriguez's appeals within thirty days, administrative remedies were no longer available to him, and his only option was to file this action." Docket No. 19 at 7. In other words, there was simply nothing the Plaintiff

Rodriguez v. Reppert, Not Reported in Fed. Supp. (2016)

2016 WL 6993383

could do to force the CORC to follow its own deadline for deciding the Plaintiff's appeals.

**\*2** The Defendants now argue that the Plaintiff "could have contacted the IGP Supervisor in writing if he did not receive a written notice of receipt from CORC within 45 days of his appeal." Docket No. 27 at 2. Specifically, the Defendants point to DOCCS Directive 4040(d)(3)(i) (codified at 7 N.Y.C.R.R. § 701.5(d)(2)(i)), which provides that, "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to the CORC." *Id.* (citations omitted).

This argument, however, was made for the first time in the Defendants' reply brief before this Court; the Defendants did not raise the argument before Judge Roemer, nor did they raise it in their objections. [1] The Defendants have therefore waived the argument that § 701.5(d)(2)(i) provides a mechanism by which the Plaintiff could have prompted the CORC to decide his appeals. "The Court does not and will not make a practice of addressing the merits of issues first raised in a reply, as the opposing party is not afforded any opportunity to respond to new issues raised in a reply, which is ordinarily the last document submitted prior to the Court's ruling on a motion. Such sapience appears all the more prudent" where, as here, "the opposing party is proceeding *pro se*. *Peca v. Delta Air Lines, Inc.*, No. 97-CV-0882E(M), 2000 WL 914112, at \*2 (W.D.N.Y. July 7, 2000) (citations and quotation marks omitted). The Court will therefore not consider the Defendants' argument that § 701.5(d)(2)(i) makes Plaintiff's administrative remedies "available" within the meaning of the PLRA.

[1]     The Defendants state that they made this argument for the first time in their reply brief because "[i]n response to defendants' objections to the R&R, plaintiff—for the first time—argues that the grievance process was 'opaque' and 'incapable of use.' " Docket No. 27 at 2. The Defendants overlook that *Judge Roemer* concluded that the grievance process was opaque and incapable of use. Thus, the Defendants could—and should—have made this argument in their objections to Judge Roemer's Report and Recommendation.

The Defendants also identify several other reasons why they believe Judge Roemer's Report and Recommendation was incorrect. The Court addresses each argument each in turn.

First, the Defendants argue that the Plaintiff's conduct in a case in the New York Court of Claims shows that he "could not ... argue that the grievance process was unavailable to him, unknowable, incapable of use, inaccessible, or practically impossible to navigate." Docket No. 20 at 5. But this argument misinterprets the PLRA's opaqueness exception as interpreted by the Second Circuit in *Williams*: the question, according to the Second Circuit, is whether "[t]he regulations ... contemplate the situation in which [the prisoner] f[inds] himself." *Williams*, 829 F.3d at 124. This is an objective question: the regulations either provide an inmate with a procedural route to obtain administrative relief, or they do not. To be sure, an inmate's subjective understanding of the grievance procedure is one aspect of the opaqueness question; a procedural scheme that *does* provide a route to administrative relief is little better than *no* route if the administrative path the prisoner must follow is "so confusing that no reasonable prisoner can use them." *Ross*, 136 S. Ct. at 1869 (quotations and ellipsis omitted). *See also Williams*, 829 F.3d at 126 ("[T]he purported options for relief provided by defendants, to the extent they are even available to an inmate in [the plaintiff's] situation, only increase confusion regarding the avenues available to pursue an appeal.") Nothing in *Williams*, however, suggests that the opaqueness exception is categorically unavailable simply because, as here, the prisoner was familiar with his prison's grievance process.

**\*3** Second, the Defendants point to the Supreme Court's statement in *Ross* that, "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross*, 139 S. Ct. at 1859. Again, however, after *Williams*, the question in this case is whether an administrative option was even available to the Plaintiff in the first place—not whether the Plaintiff misunderstood a DOCCS regulation.

Third, the Defendants argue that Judge Roemer "chose ... to apply the minority [ ]view" on the question whether an untimely administrative decision renders the administrative process unavailable. But as Judge Roemer noted, the Defendants do not identify "any cases from the Second Circuit or the Western District of New York" supporting their position. Docket No. 19 at 8.

To the contrary, the most recent Second Circuit case on point—*Williams*—states that administrative remedies are opaque—and, therefore, unavailable—when those remedies do not address the situation in which a prisoner finds himself. That is the case here.

Fourth, the Defendants rely heavily on the Supreme Court's statement in *Ross* that the unavailability of administrative remedies "will not often arise." But in context, the Supreme Court's statement says something less forceful than the Defendants suggest: *Ross* states that, "[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." *Ross*, 136 S. Ct. at 1859. This suggests that remedies will typically not be unavailable under the PLRA because prisons have an obvious interest in resolving administrative grievances internally. This interest is best served by maintaining a grievance scheme that actually provides a route to administrative relief. *Ross*, in other words, assumes that administrative remedies will "not often" be unavailable because *Ross* also assumes that prisons will maintain remedial processes that provide prisoners with a path for obtaining administrative relief.

Finally, the Defendants argue that, "if Magistrate Judge Roemer's decision is adopted, inmates can file suit anytime the IGP, a Superintendent, or the CORC is late in rendering a decision. In fact, if adopted, inmates could wait until one day after the time periods stated in the NYCRR and file suit." Docket No. 20 at 15. This overstates Judge Roemer's conclusion. Nothing in Judge Roemer's Report and Recommendation suggests that a failure to timely decide an inmate grievance at a *lower level* of the grievance review process would permit a prisoner to immediately file a federal lawsuit. This is because DOCCS' regulations expressly contemplate such a situation: they provide that, absent an extension of time, "matters not decided within the time limits may be appealed to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). In other words, a failure to render a timely decision at a lower level in the grievance process gives a prisoner the option of appealing that inaction to the next level. A prisoner who does not avail himself of that option will almost certainly find his lawsuit dismissed for failure to exhaust. *See, e.g.*, *Morrison v. Stroman*, 12-CV-542(A)(M), 2014 WL 6685510, at *4 (W.D.N.Y. Nov. 26, 2014). But the CORC's failure to timely decide an appeal is fundamentally different than, for instance, a superintendent's failure to timely decide an

appeal, because the CORC is the final step in DOCCS' internal grievance program. A prisoner whose CORC appeal was not timely decided has no other administrative body to which he can appeal. Thus, the "regulations simply do not contemplate" what the prisoner should do to ensure his appeal is timely decided, "making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams*, 829 F.3d at 124. [2]

[2]    Because the Defendants have waived the argument, the Court does not address whether § 701.5(d)(2)(i) provides a mechanism for a prisoner to continue pursuing his grievance, thereby making his administrative remedies "available" under the PLRA. The Court notes, however, that this provision does not appear to address the situation in which the Plaintiff found himself. The Plaintiff does not suggest that he failed to exhaust because he was unsure whether the CORC received his appeal. Rather, he failed to exhaust because the CORC did not timely decide the Plaintiffs' appeals. Nothing in the record suggests that the CORC failed to comply with the receipt-and-notice provisions of § 701.5(d)(2)(i).

**\*4** Thus, upon *de novo* review, the Court overrules the Defendants' objections to Judge Roemer's Report and Recommendation.

Lastly, the Plaintiff objects to Judge Roemer's decision to "stay defendants' time to answer the complaint until the District Judge renders a decision" on the Defendants' motion for summary judgment. Docket No. 19 at 9. This non-dispositive order is neither clearly erroneous nor contrary to law. *See* 28 U.S.C. § 636(b)(1)(A). The Court therefore overrules the Plaintiff's objections.

## CONCLUSION

For the reasons stated above, the Court overrules both the Plaintiff's and the Defendants' objections to Judge Roemer's Report and Recommendation. As directed by Judge Roemer, the Defendants shall answer the complaint within 21 days of this Decision and Order. This case is remanded to Judge Roemer for further proceedings.

**SO ORDERED.**

**Rodriguez v. Reppert, Not Reported in Fed. Supp. (2016)**

2016 WL 6993383

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6993383

---

**End of Document**                                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3736794
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javon HIGH, Plaintiff,
v.
P.A. SWITZ, Defendant.

Civ. No. 9:17-CV-1067 (LEK/DJS)
|
Signed 07/09/2018

**Attorneys and Law Firms**

JAVON HIGH, 16-R-2525, Queensboro Correctional
Facility, 47-04 Van Dam Street, Long Island City, NY
11101, pro se.

HON. BARBARA D. UNDERWOOD, Attorney
General of the State of New York, OF COUNSEL: ERIK
BOULE PINSONNAULT, ESQ., The Capitol, Albany,
NY 12224, Attorney for Defendant.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** On September 25, 2017, *pro se* Plaintiff Javon High
commenced this action pursuant to 42 U.S.C. § 1983,
asserting claims arising from his confinement at both
Wyoming Correctional Facility and Ulster Correctional
Facility, while in the custody of the Department of
Corrections and Community Supervision ("DOCCS").
Dkt. No. 1, Compl. In his Complaint, Plaintiff alleges that
he suffers from chronic, severe pain, for which he was
prescribed certain medications. Compl. at p. 3. [1] Plaintiff
alleges that while at Ulster, he was seen by P.A. Switz,
who told Plaintiff that he would not be getting the physical
therapy or prescribed medications at Ulster, and that he
could attempt to when he got to his designated facility,
which would not be for a month or two. *Id.* at pp. 4-5.
Plaintiff then went thirty-five days with severe pain. *Id.* at
p. 6. Plaintiff alleges continuing issues related to his pain
and treatment after he was transferred to Wyoming. [2] *Id.*
at pp. 6-19. Remaining in this District are Plaintiff's claims
arising out of his confinement at Ulster, which are only
those against Defendant Genevieve Switz.

[1]    When referring to Plaintiff's submissions, the Court
will cite to the page numbers automatically assigned
by the Court's Case Management Electronic Case
Files ("CM/ECF") System because they are often
unnumbered or not numbered sequentially.

[2]    The claims regarding Plaintiff's treatment at
Wyoming were severed and transferred to the
Western District of New York upon initial review of
the Complaint. Dkt. No. 8.

Presently before the Court is Defendant's Motion to
Dismiss Plaintiff's Complaint on the basis that Plaintiff
failed to exhaust his administrative remedies before
filing this action. Dkt. No. 13, Def.'s Mot. to Dismiss.
Plaintiff has opposed the Motion. Dkt. No. 17, Pl.'s Opp.
Defendant has filed a reply. Dkt. No. 18, Def.'s Reply.
Plaintiff has filed an additional submission in opposition.
Dkt. No. 19, Pl.'s Supp. Opp. [3]

[3]    In his opposition filings, Plaintiff has included
allegations that were not included in his Complaint.
*See* Pl.'s Opp. at pp. 5-6. Federal Rule of Civil
Procedure 12(d) provides that if "matters outside
the pleadings are presented to and not excluded by
the court" on a motion to dismiss, "the motion
must be treated as one for summary judgment under
Rule 56." FED. R.CIV. P. 12(d). The Court agrees
with Defendant that Plaintiff's allegations that he
was prevented from filing grievances should not be
considered on a motion to dismiss as they are outside
the pleadings. *See* Def.'s Reply at p. 2. Because a
determination as to exhaustion can be made based
on the face of the Complaint, the Court declines to
convert the Motion to one for summary judgment,
and will exclude and not consider the extrinsic
evidence submitted by the parties.

The Court finds that Plaintiff failed to exhaust
his administrative remedies, but that Plaintiff has
demonstrated that the lack of exhaustion should
be excused. The Court therefore recommends that
Defendant's Motion be **denied**.

## I. LEGAL STANDARD

 **\*2** On a motion to dismiss, the allegations of the
complaint must be accepted as true. *See Cruz v. Beto*,
405 U.S. 319, 322 (1972). The trial court's function "is
merely to assess the legal feasibility of the complaint, not
to assay the weight of the evidence which might be offered

2018 WL 3736794

in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984) ).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, n.6 (1963). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged, or that the defendants have violated ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

Where, as here, the complaint was filed *pro se*, it must be construed liberally with "special solicitude" and interpreted "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted) (citation omitted). Nonetheless, a *pro se* complaint must state a "plausible claim for relief." *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (citing FED. R. CIV. P. 10(c) ).

## II. EXHAUSTION

### A. Exhaustion Procedure

**\*3** The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a

2018 WL 3736794

civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

**B. Plaintiff's Failure to Exhaust Administrative Remedies**

In this case, Plaintiff admits that the grievance procedure was not complete when he filed the Complaint because he had not received a response from CORC. Compl. at pp. 20-21. Plaintiff filed his initial grievance on January 20, 2017. Id. at p. 20. He received a response from IGRC on January 24, 2017, and forwarded his appeal to the Superintendent. *Id.* The Superintendent then issued a response on January 31, 2017. *Id.* On February 6, 2017, Plaintiff filed his appeal to CORC. *Id.* Per the regulations, CORC had thirty days to respond to the appeal. *Id.* On August 25, 2017, after not hearing from CORC, Plaintiff sent CORC a letter asserting that CORC had exceeded the timeline and that he had therefore exhausted his administrative remedies, and would be filing a claim in Court. *Id.* at pp. 20-21. When Plaintiff prepared his Complaint, on September 12, 2017, he had still not received any response from CORC. *Id.* Only after filing the Complaint did Plaintiff receive a final response from

CORC. Pl.'s Supp. Opp. at p. 3 & Def.'s Reply at pp. 1-2 (indicating response from CORC was received in February 2018).

It is clear from the face of Plaintiff's Complaint that he did not exhaust his administrative remedies. The fact that his CORC appeal was decided after the filing of his Complaint is insufficient to cure Plaintiff's failure to exhaust; filing an Amended Complaint at this time would also not correct this fundamental deficiency. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 3661434, at *13 ("It is well established that [r]eceiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (internal quotation marks omitted) (citations omitted).

**\*4** The Court will discuss below whether Plaintiff's contentions may state a valid excuse for his failure to exhaust his administrative remedies.

**C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused**

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

In his Complaint and opposition papers, Plaintiff's main contention is that administrative remedies were unavailable to him because he did not receive a response from CORC for over seven months, and that there are no instructions on how to proceed with a grievance if

2018 WL 3736794

no response is received from CORC. Pl.'s Opp. at p. 9 ("DOCCS policy has no re[c]ourse, does not inform nor direct what the next step would be if CORC does not render a decision. Leaving inmates to bel[ie]ve that if they receive no decision after the (30) thirty day period allowed in th[eir] own policy then they have exhausted remedies. Fac[t]ually and evident[i]ally, DOCCS simply does not state what we are to do after the thirty day timeline has expired. Certainly they cannot just leave the door open...."); *see also* Compl. at pp. 20-21; Pl.'s Supp. Opp. Defendant contends that an inmate must receive a response from CORC before filing a suit, and that a delay in receipt of a CORC decision beyond the thirty days proscribed by statute does not excuse an inmate's failure to exhaust his administrative remedies. Def.'s Reply.

Courts within the Second Circuit are split regarding whether a failure to respond by CORC constitutes unavailability excusing a plaintiff's failure to exhaust. *Compare Ford v. Smith*, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (finding plaintiff's failure to exhaust was not excused where CORC failed to issue a determination for six months) *and Lewis v. Hanson*, 2017 WL 4326084, at *3 (N.D.N.Y. Sept. 28, 2017) *with Rossi v. Fishcer*, 2015 WL 769551 (S.D.N.Y. Feb. 24, 2015) (collecting cases deeming administrative remedies unavailable when officials failed to timely respond to a grievance), *Peoples v. Fisher*, 2012 WL 1575302, at *6 (S.D.N.Y. May 3, 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in Federal Court simply because the final administrative decision maker has ... neglected ... to issue a final administrative determination."), *and Rodriguez v. Reppert*, 2016 WL 6993383 (W.D.N.Y. Nov. 30, 2016).

**\*5** Here, Plaintiff filed his grievance with the IGRC; upon receiving an unfavorable determination, he appealed it to the Superintendent, and then appealed the Superintendent's determination to CORC. Compl. at pp. 20-21. The final step of the grievance procedure provides that CORC shall review the appeal and render a determination within 30 days from the time the appeal was received. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(d)(2). At the preliminary stages of the procedure, the regulations provide an avenue for a grievant to further pursue a grievance that is not timely decided: "Absent [an] extension [on a time limit], matters not decided within the time limits may be appealed to the next step." *Id.*

at § 701.6(g). However, the third and final step in the grievance procedure is "appeal to the central office review committee." *Id.* at § 701.5(d). At this level, there is no instruction on what a grievant is to do if he or she has appealed to the CORC, the final step, and has not received a response. *Id.* at § 701.6(g)(1)(b)(ii). As such, these regulations "do not describe a mechanism" for appealing or advancing a grievance when a grievant does not receive a response from CORC, as there is no next step to which a grievant may appeal. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016).

In the case of *Williams v. Corr. Officer Priatno*, the plaintiff had submitted a grievance but never received a response; he then filed a lawsuit without taking any further formal action regarding his grievance, believing it had never actually been filed by the special housing unit correction officer. 829 F.3d at 120-21. The Second Circuit found the grievance procedure was unavailable under *Ross*, meaning that the "administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 123. The Court found that, even though the plaintiff could have "technically" appealed his grievance, "[t]he regulations simply do not contemplate the situation in which [the plaintiff] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* at 124. As such, the Second Circuit found that, under *Ross*, "the grievance procedures that were technically available to [plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* at 126 (quoting *Ross v. Blake*, 136 S. Ct. at 1859).

Similarly, here, while the regulations at the preliminary stages contemplate a next step for a grievant to take in the event he does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, "the regulations give no guidance whatsoever" regarding what a grievant should do in this circumstance. *Id.*

Defendant cites to *Gizewski* for the proposition that even if a grievant does not receive a response to a grievance from CORC, the failure to exhaust is not excusable. In *Gizewski*, however, there was an administrative error in filing the grievant's appeal with CORC and Plaintiff never received a receipt from filing with CORC; the regulations explicitly provide a mechanism for confirming that an appeal has been properly filed if a grievant does not receive

a receipt. As such, there was specific direction in the procedures for the grievant to follow. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 3661434, (N.D.N. Y July 5, 2016). As the Court there summarized:

> Although the Court is sympathetic to the fact that it was the inmate grievance office that failed to transmit Plaintiff's appeal to CORC until five months after he had filed it, Plaintiff is also at fault for not taking any further action during this time period. More specifically, 7 N.Y.C.R.R. § 701.5(d)(3)(i) states that "[i]f a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."

*Id.* at *13.

The Second Circuit Court of Appeals affirmed Chief Judge Suddaby's dismissal of Gizewski's Complaint. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision,* 692 Fed. Appx. 668 (2d Cir. 2017). In doing so, however, the Circuit noted that, "even if we assume arguendo that the long delay occasioned in part by clerical error constituted constructive denial," there was no genuine issue of material fact because the issues raised on that final administrative appeal to CORC pertained to requests for items that had already been provided to the plaintiff as part of a reasonable accommodation. *Id.* at 670. Therefore, the Second Circuit did not and has not decided the precise issue raised on this Motion—a claim of failure to exhaust where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal; and where CORC had only ultimately decided the appeal a year later, after the present Motion to Dismiss had been filed. In the Court's view, and under the hopefully unique facts of this case, Plaintiff's failure to exhaust aligns more with *Williams* than with *Gizewski.* "[A]fter the CORC neglected to decide [the

appeal], administrative remedies were no longer available" to Plaintiff. *Rodriguez v. Reppert*, 2016 WL 6993383, at *1.

**\*6** Accordingly, for the foregoing reasons, the Court recommends that Defendant's Motion be **denied** based upon a finding that Plaintiff's failure to exhaust is excused.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion to Dismiss (Dkt. No. 13) be **denied**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[4]     If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R.CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 3736794

---

     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3730175
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javon HIGH, Plaintiff,

v.

PA SWITZ, et al., Defendants.

9:17-CV-1067 (LEK/DJS)
|
Signed 08/06/2018

**Attorneys and Law Firms**

Javon High, Long Island City, NY, pro se.

Erik Boule Pinsonnault, Katie E. Valder, New York State
Attorney General, Albany, NY, for Defendants.

### ORDER

Lawrence E. kahn, U.S. District Judge

## I. INTRODUCTION

*1 This matter comes before the Court following a
report-recommendation filed on July 6, 2018, by the
Honorable Daniel J. Stewart, U.S. Magistrate Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt.
No. 24 ("Report-Recommendation"). Defendant timely
objected to the Report-Recommendation. Dkt. No. 23
("Objection").

## II. LEGAL STANDARD

Within fourteen days after a party has been served with
a copy of a magistrate judge's report-recommendation,
the party "may serve and file specific, written objections
to the proposed findings and recommendations." Fed. R.
Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or
if an objection is general, conclusory, perfunctory, or a
mere reiteration of an argument made to the magistrate
judge, a district court need review that aspect of a report-
recommendation only for clear error. Barnes v. Prack,
No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar.
18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07,
306 n.2 (N.D.N.Y. 2008), abrogated on other grounds
by Widomski v. State Univ. of N.Y. at Orange, 748
F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole,
No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y.

Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a
Report and Recommendation must be specific and clearly
aimed at particular findings in the magistrate's proposal,
such that no party be allowed a second bite at the apple
by simply relitigating a prior argument."). "A [district]
judge ... may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." § 636(b). Otherwise, a court "shall make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." Id.

## III. DISCUSSION

The Report-Recommendation analyzed whether Plaintiff
failed to exhaust his administrative remedies as required
under the Prisoner Litigation Reform Act ("PLRA"). R.
& R. at 6–12. Judge Hummel concluded that, although
Plaintiff failed to exhaust his administrative remedies, this
failure was excused because the Central Office Review
Committee ("CORC") of the New York Department of
Corrections and Supervision ("DOCCS") substantially
delayed in responding to Plaintiff's appeal of his prison
superintendent's denial of his grievance. Id.

Defendant objects to the Report-Recommendation,
asserting that CORC's delayed response to Plaintiff's
grievance did not excuse his failure to exhaust
administrative remedies. Obj. at 1. [1] However, Defendant
raised this argument in its memorandum in support of its
motion to dismiss, Dkt. No. 13-1 ("Memorandum") at 5,
and again its reply brief, Dkt. No. 18 ("Reply") at 1. [2]
Defendant's Objection is, therefore, "a mere reiteration of
an argument made to the magistrate judge." Barnes, 2013
WL 1121353, at *1. Accordingly, the Court reviews the
Report-Recommendation for clear error, and finds none.

[1]     The cited page numbers for this document refer to
        those generated by the Court's electronic filing system
        ("ECF").

[2]     The cited page numbers for this document refer to
        those generated by ECF.

## IV. CONCLUSION

*2 Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion to Dismiss (Dkt.
No. 13) is **DENIED**; and it is further

2018 WL 3730175

**ORDERED**, that the Clerk of the Court serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 3730175

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6506072
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Amar BELL, Plaintiff,
v.
J. NAPOLI et al., Defendants.

9:17-CV-850 (ATB)
|
Signed 12/11/2018

**Attorneys and Law Firms**

AMAR BELL, Plaintiff, pro se.

AIMEE M. COWAN, Asst. Attorney General, for defendants.

**MEMORANDUM DECISION and ORDER**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

*\*1* On April 10, 2018, this matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 38, 39). Plaintiff has filed this civil rights complaint alleging that on April 4, 2017, at Marcy Correctional Facility, defendants used excessive force against him in the course of extracting plaintiff from his cell. (Complaint ("Compl.") ¶ 6, Facts). Plaintiff originally named four corrections officers: J. Napoli, A. Farina, R. Rugari, and M. Music. (Compl. at 1). On September 18, 2017, defendant M. Music was dismissed by Order of District Court Judge David N. Hurd. (Dkt. No. 11).

Presently before the court is a motion for summary judgment filed by the remaining defendants, arguing only that plaintiff has failed to exhaust his administrative remedies. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 52, 54). Plaintiff filed an additional letter in support of his opposition. (Dkt. No. 55). For the following reasons, this court agrees with plaintiff and will deny the defendants' motion for summary judgment.

**DISCUSSION**

**I. Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

**II. Exhaustion of Administrative Remedies**

**1. Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ). Inmates

must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d).

There is a special section for complaints of "harassment." *Id.* § 701.8. Harassment grievances are defined in another section of the regulations as "those grievances that allege employee misconduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.2(e). Based on this definition, section 701.8 has been found applicable to claims of excessive force by staff. *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*7 n.7 (S.D.N.Y. Sept. 28, 2018) (citing *Torres v. Carry*, 691 F.Supp.2d 366, 369-70 (S.D.N.Y. 2009) ).

Complaints of harassment are handled by an ***expedited*** procedure which provides that such grievances are forwarded directly to the superintendent of the facility, [1]

after which the inmate must appeal any negative determination to the CORC by filing a form within seven calendar days of the inmate's receipt of the Superintendent's response. *Id.* §§ 701.8(h) & (i), 701.5. The regulations then provide that "unless otherwise stipulated in this section, all procedures, rights, and duties pertaining to the processing of other grievances as set forth in section 701.5 of this Part shall be followed." *Id.* § 701.8(i). Thus, if a procedure is not described in 701.8, the inmate must refer to section 701.5. [2]

[1] The regulation states that "[a]llegations of employee harassment are ***of particular concern to the administrators of department facilities***." 7 N.Y.C.R.R. § 701.8 (emphasis added).

[2] The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S.Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at \*2, 656 Fed.Appx. 577 (2d Cir. Sept. 1, 2016) (quoting *Ross*, —— U.S. at ——, 136 S.Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, —— U.S. ——, 136 S.Ct. at 1858. Courts

evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321, at *2, 656 Fed.Appx. 577. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ––– U.S. ––––, 136 S.Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ––– U.S. at ––––, 136 S.Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were "available" to him.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to

appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a Department of Corrections and Community Services ("DOCCS") regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g) (2) ).

The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [3] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[3]  My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

**2. Application**

**\*4**  In this case, unlike *Williams*, it is undisputed that plaintiff filed a grievance regarding the alleged incident of excessive force. Defense counsel has filed the Case History and Record of the excessive force grievance. (Cowan Decl. Ex. B) (Case History and Record) (Dkt. No. 48-4). The case history indicates that, on April 18, 2017, plaintiff filed his grievance, claiming that the defendants used excessive force against plaintiff. (*Id.*) The case history further indicates that, on the same day, the grievance was "passed through" to the Superintendent. (*Id.* at 2). On May 16, 2017 the grievance was "passed through" by the Superintendent to the CORC. (*Id.*) Under the heading "Appeal to CORC," the document states that "Grievant states he wishes to appeal as passed through to CORC." (*Id.*) This notation is dated May 18, 2017. (*Id.*)

Thus, plaintiff brought a grievance and expressed his desire to appeal the grievance to both the Superintendent and the CORC, even though it is clear that no investigation was done at either the IGRC or the

Superintendent level.[4] In fact, defendants have attached a letter from plaintiff to the Grievance Clerk of the IGRC, dated May 9, 2017, in which plaintiff observes that twenty days had passed without response by the Superintendent, and without an extension request from the Superintendent. Because of this, plaintiff stated that he wished to appeal his grievance to the CORC. (Cowan Decl. Ex. B at 3). The last line of plaintiff's letter specifically states "I want my appeal sent on to the CORC." The plaintiff's letter is stamped "received" by the IGRC on May 12, 2017, and defendants do not dispute this fact. The letter also contains the initials "JB," with May 18, 2017, written next to the initials. (*Id.*) May 18, 2017 is the date that the other facility documents, and the receipt that plaintiff was sent in June of 2018, indicate that the grievance was "passed through" to the CORC. (Cowan Decl. Ex. B at 2; Seguin Decl. Ex. B at 1). The CORC received plaintiff's appeal on May 26, 2017. (Seguin Decl. Ex. A at 2).

[4]      The court understands that the incident took place at Marcy, and at the time of the appeal, plaintiff was at Five Points. Additionally, as stated above, complaints of employee "harassment" are handled by an expedited process whereby the grievance is passed through the IGRC, directly to the Superintendent. However, in this case, the grievance was additionally passed through to the CORC.

It is also undisputed that the CORC had not rendered a decision when plaintiff filled this action on August 4, 2017, nor had the CORC rendered a decision by July 19, 2018, when Rachel Seguin signed her declaration, which has been filed as an exhibit in this case. (Seguin Decl. ¶ 10) (Dkt. No. 48-5). Rachel Seguin is the Assistant Director of the IGP, whose duties include being the custodian of records maintained by the CORC. (Seguin Decl. ¶¶ 1, 2). Although the CORC documents submitted by Rachel Seguin indicate that the "Sched Date" for the grievance was August 8, 2018, there is no indication, and defendants do not argue, that the grievance was ever addressed. (Seguin Decl. Ex. A at 1).

Thus, the CORC has failed to issue a decision or even investigate plaintiff's grievance from May 26, 2017 until at least August 8, 2018, and there is no indication that the CORC has ever addressed the grievance, even to the present day.[5] Although Assistant Director Seguin states that plaintiff was sent a "Receipt of Appeal" on July 6,

**2018,**[6] it is clear from that receipt, that plaintiff's appeal was passed through to the CORC on May 18, **2017**, and the CORC received plaintiff's appeal on May 26, **2017**. (Seguin Decl. Ex. B).

[5]      The court also notes that, though Assistant Director Seguin states that plaintiff's grievance was "denied," the grievance documents state that the grievance was "passed through" to the Superintendent and then "passed through" to the CORC. (Cowan Decl. Ex. B at 2). That notation is not a denial because the grievance was never investigated.

[6]      (Seguin Decl. ¶ 9).

**\*5** Defendants argue that plaintiff did not exhaust his administrative remedies because he filed this federal action before the CORC issued a decision on his administrative appeal. Plaintiff does not dispute that the CORC has failed to issue a decision. This court has recommended dismissal for failure to exhaust when a plaintiff files his federal lawsuit before the CORC has decided plaintiff's appeal. *See Scott v. Miller*, No. 9:17-CV-520 (MAD/ATB) (Dkt. No. 54) (Rep't Rec. (6/25/18) ) (adopted, Dkt. No. 56 (8/13/18) ). However, often, in such cases, the federal action was filed before the deadline for the CORC decision. *Id.* (Rep't Rec. at 9-10).

In this case, plaintiff waited from May 26, 2017 until August 4, 2017, with no response from the CORC, to file this action. The CORC has thirty days to decide an inmate's appeal or ask for an extension, which may only be granted with the "written consent of the grievant." 7 N.Y.C.R.R. §§ 701.5(d)(3); 701.6(g)(2). The regulations provide that if there is no timely response, for either the IGRC or the Superintendent's appeal, plaintiff may appeal to the "next step."[7] *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g) ). If the CORC received plaintiff's appeal on May 26, 2017, unless there was an extension of time, a decision should have been rendered by June 26, 2017. Although the regulations specifically discuss what the "next step" is in cases of IGRC and Superintendent's review, it is less clear whether the language applies to the CORC, and if so, what the "next step is."

[7]      Section 701.6(g)(2) specifically provides that, "[a]bsent [an] extension, matters not decided within the time limits may be appealed to the next step."

In *Williams*, the court found that the administrative remedies were "unavailable" because the regulations did not explain how an inmate should appeal a grievance that was never filed, because the time limits provided in the regulations for "appeal to the next step" did not apply when a grievance was never filed. In this case, there is no specific indication what the inmate must do if the CORC (the last step) received the appeal, but failed to render a timely decision, or any decision. The regulations do provide that if the plaintiff does not get a "receipt" from the CORC within 45 days of the date he filed his appeal, he should contact the IGP to make sure that his appeal was "received." 7 N.Y.C.R.R. § 701.5(d)(3)(i). Contacting the IGP could afford the CORC the opportunity to obtain plaintiff's appeal if the appeal had somehow failed to reach the CORC.

In *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-124, 2016 WL 3661434, at *13 (N.D.N.Y July 5, 2016), Chief U.S. District Judge Glenn Suddaby held that plaintiff did not exhaust his administrative remedies because he failed to take further action under section 701.5(d)(3)(i) when he did not receive written notice of receipt by the CORC within 45 days of filing his appeal. [8] In *Gizewski*, the CORC did not receive the plaintiff's appeal for five months due to a "clerical error." *Id.*

[8]    The court notes that, unlike this case, in *Gizewski*, if plaintiff had contacted the IGP after 45 days, it would have been determined that the CORC had not received the appeal, and the defendants would have had the opportunity to cure the problem.

Although the Second Circuit affirmed Judge Suddaby's dismissal of Gizewski's complaint, the Second Circuit did not specifically decide the issue of inordinate delay by the CORC. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 F. App'x 668 (2d Cir. 2017). The Second Circuit stated that "even if we assume arguendo that the long delay occasioned in part by clerical error constituted constructive denial," there was no genuine issue of material fact because the issues raised on that final administrative appeal to CORC pertained to requests for items that had already been provided to the plaintiff as part of a reasonable accommodation. *Id.* at 670.

***6** In *High v. Switz*, No. 9:17-CV-1067, 2018 WL 3736794 (N.D.N.Y. July 9, 2018), (Rep't-Rec.), adopted, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018), Magistrate

Judge Daniel Stewart distinguished *Gizewski* and cited a split in the Second Circuit regarding whether a failure to respond by the CORC constitutes unavailablity under *Ross v. Blake*. 2018 WL 3736794 at *4-5 (citing cases). Magistrate Judge Stewart cited *Williams* and found that

> [s]imilarly, here, while the regulations at the preliminary stages contemplate a next step for a grievant to take in the event he does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, "the regulations give no guidance whatsoever" regarding what a grievant should do in this circumstance.

*Id.* at *5 (quoting *Williams*, 829 F.3d at 126). Magistrate Judge Stewart found that High's failure to exhaust aligned more with *Williams* than with *Gizewski*, because High had taken all the steps that he could regarding the status of his appeal, the CORC continued to ignore him, and although the CORC ultimately decided the appeal, it was a year later, "after the motion to dismiss had been filed." *Id.* Judge Stewart made it clear that under "the hopefully unique facts of [that] case," plaintiff's failure to exhaust would be excused.

In *Rodriguez v. Reppert*, No. 14-CV-671, 2016 WL 6993383, at *2 (W.D.N.Y. Nov. 30, 2016), the court found that plaintiff's failure to exhaust should be excused in a situation somewhat similar to that in this case. In *Rodriguez*, plaintiff filed his appeal with the CORC, but the CORC did not decide the appeal within the thirty-day period required by DOCCS regulations. *Id.* at *1. Plaintiff in *Rodriguez* filed his complaint before the CORC issued a decision, and the CORC ultimately decided the plaintiff's appeal two weeks after the plaintiff filed his federal complaint, but nearly two months after the DOCCS regulations' requirement. *Id.* Magistrate Judge Roemer, recommended denying the motion for summary judgment, finding that the CORC's failure to decide the appeal, together with the absence of any mechanism to ask the CORC to issue a decision after thirty days elapsed, meant that the inmate's remedies were "unavailable." *Id.*

District Judge Richard Arcara adopted the Magistrate Judge Roemer's recommendation in *Rogriguez*, citing *Ross* and *Priatno*, stating that after the CORC neglected to decide Rodriguez's appeals within thirty days, administrative remedies were no longer available to him, and his only option was to file the federal action. *Id.* There was simply no more that the plaintiff could do to force the

CORC to follow its own deadline for deciding an appeal. *Id.* The defendants belatedly raised the argument that the plaintiff should have contacted the IGP supervisor if he did not receive written notice of the receipt of the appeal within 45 days. *Id.* at 2. The court did not consider the argument because it was not raised before the Magistrate Judge. [9] *Id.* The court cited *Williams's* holding that administrative remedies are "opaque," and therefore "unavailable - when those remedies do not address the situation in which a prisoner finds himself." *Id.* at 3. The regulations do not address a situation in which the CORC fails to render a decision within the deadline after receiving an appeal. [10]

[9]    The court must point out that defendants in this case argued only that plaintiff failed to exhaust because he did not wait for the CORC's decision. They did not raise the argument that plaintiff should have written to the IGP supervisor if he did not receive a receipt for his appeal.

[10]   Most of the cases cited by defendants predate *Ross*, and defendants' argument is based upon the absence of "special circumstances," which is no longer the appropriate analysis after *Ross*. However, defendants do cite a recent decision in their reply (Dkt. No. 54), written by Magistrate Judge Christian Hummel, in which he found that delay in the CORC decision does not constitute "unavailability." See *Berkley v. Ware*, No. 9:16-CV-1326, 2018 WL 3736791 (N.D.N.Y. July 6, 2018) (Rep't-Rec.), adopted 2018 WL 3730173 (N.D.N.Y. Aug. 6, 2018). The facts in *Berkley* are distinguishable from this case. Plaintiff in *Berkley* filed his federal action six days before the CORC ruled on his grievance, and the delay was five months. *Id.* at *6. Judge Hummel specifically distinguished a case in which the court held that administrative remedies were no longer "available" to a plaintiff who had been awaiting a decision from the CORC "for more than two years." *Id.* (citing *Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ). This facts in this case are more similar to *Henderson* than to *Berkley* in that the CORC has still not decided plaintiff Bell's grievance appeal more than 18 months after it received the appeal.

**\*7** In this case, there is no question that plaintiff's appeal was received by the CORC in May of 2017; however, it was neither investigated, nor decided. There is no evidence in the record of plaintiff contacting the IGP after 45 days, [11] although plaintiff testified at his deposition that

he wrote to the CORC "multiple times." (Pl.'s Dep. at 133). Contacting the IGP would not have changed the situation in this case because the response to plaintiff's inquiry would simply have been that the CORC did receive the appeal. The 30 days within which the CORC had to answer plaintiff's grievance would already have run without extension. That is essentially what happened in June of 2018 when plaintiff was told that the CORC received his appeal in May of 2017, and nothing further was done. Although according to the documents the grievance was "sched" for August 8, 2018, there is no indication that an extension was requested or consented to by the plaintiff. The regulations contain no instructions on how an inmate should proceed if the CORC continues to ignore him after he has been informed that his appeal was "received." [12]

[11]   Contacting the IGP to determine whether an appeal was received is not an "appeal." The IGP would only inform the plaintiff whether the appeal was received. If the appeal was not received, then presumably the plaintiff would resubmit his appeal. If the appeal was received, there is no further action contemplated.

[12]   Plaintiff's deposition on this subject was unclear. Plaintiff stated that he appealed to the CORC, but after he filed the lawsuit, he received the printout of his grievance history, indicating that the appeal was sent to the CORC on May 18, 2017. (Pl.'s Dep. at 131-32) (Dkt. No. 48-3). Plaintiff states that he never got a receipt for the appeal, and he speculated that an IGP employee "falsified it and said she sent it and never sent it." (*Id.* at 132). It is unclear what plaintiff means by that statement, but he then states that "a couple of weeks later ..., she sends me the appeal form from the Superintendent, with the current date on it. (*Id.*) Plaintiff was confused because the CORC was sent his appeal approximately one year earlier. (*Id.* at 133). Plaintiff also claims that he wrote to the CORC "multiple times," although there is no indication of any of these letters in the records. (*Id.* at 133). Defense counsel asked plaintiff if he filled out the appeal form that he was sent "in the last few weeks" before the deposition. (*Id.* at 134). Plaintiff first states that he filled out the appeal, but then hesitated, and wondered why he would fill out the form when the appeal was filed a year before with the CORC. (*Id.* at 135). It appears that DOCCS began sending plaintiff appeal forms, and "scheduling" the grievance after this lawsuit was filed. Although the court does not

find that anyone "falsified" documents, it is clear that plaintiff's appeal was ignored for whatever reason.

The "next step" after the CORC may be a federal action. However, if the "next step" language does not apply to the CORC's decision, an inmate who never receives a decision from the CORC, after the appeal is filed, will be unable to exhaust his administrative remedies. In addition by ignoring an inmate's appeal, as it appears to have done in this case, the CORC could delay a plaintiff's exhaustion indefinitely, making the remedy "unavailable" by thwarting plaintiff's attempt to exhaust. [13] *See Ross*, 136 S.Ct. at 1860 (administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of the grievance process by machination, misrepresentation, or intimidation"). In this case, unlike the plaintiff in *Williams*, plaintiff tried to appeal his grievance to the "next step," after the Superintendent level, but was not able to do so because the CORC appears to have ignored his grievance until after he filed the lawsuit, and it has apparently continued to ignore his grievance to this day. Thus, I find that plaintiff's failure to exhaust may be excused, and defendants' motion for summary judgment is denied.

[13] The court must point out that *Ross* uses the term "prison administrators" in its analysis of unavailability, clarifying that it does not have to be one of the defendants who prevents plaintiff from using or completing the grievance process. 136 S.Ct. at 1860.

**\*8** This court must point out that my finding that the administrative remedy was "unavailable," and that plaintiff's failure to exhaust should be excused, is based upon a review of the specific facts in this case.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the defendants' motion for summary judgment based on plaintiff's alleged failure to exhaust (Dkt. No. 48) is **DENIED**.

**All Citations**

Slip Copy, 2018 WL 6506072

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 409412
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael J. MONROE, Plaintiff,

v.

Scott KOCIENSKI, Corr. Officer, Franklin
Corr. Facility, f/k/a Officer K; and
Brian Tyo, Corr. Officer, Franklin Corr.
Facility, f/k/a Officer T., Defendants.

9:17-CV-1050 (GTS/DEP)
|
Signed 02/01/2019

**Attorneys and Law Firms**

MICHAEL J. MONROE, Plaintiff, Pro Se, 126 Halgren
Crescent, Haverstraw, New York 10927.

HON. LETITIA JAMES, Attorney General for the
State of New York, OF COUNSEL: ERIK BOULE
PINSONNAULT, ESQ., Assistant Attorney General,
The Capitol, Albany, New York 12224, Counsel for
Defendants.

## DECISION and ORDER

Hon. Glenn T. Suddaby, Chief United States District
Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Michael Monroe ("Plaintiff")
against the two above-captioned employees of the
New York State Department of Corrections and
Community Supervision ("Defendants"), are (1) Chief
United States Magistrate Judge David E. Peebles' Report-
Recommendation recommending that the Court deny
Defendants' motion to dismiss Plaintiff's Amended
Complaint for failure to state a claim, and (2)
Defendants' Objections to the Report-Recommendation.
(Dkt. Nos. 43, 44.) For the reasons set forth below, the
Report-Recommendation is accepted and adopted, and
Defendants' motion to dismiss is denied.

## I. RELEVANT BACKGROUND

### A. Magistrate Judge Peebles' Report-Recommendation

Generally, in his Report-Recommendation, Magistrate
Judge Peebles recommended that the Court deny
Defendants' motion to dismiss Plaintiff's Amended
Complaint for failure to state a claim for three reasons.
(Dkt. No. 43, Part III.)

First, found Magistrate Judge Peebles, although
Defendants have submitted documentation related to a
grievance in support of their motion (which is based
on Plaintiff's asserted failure to exhaust his available
administrative remedies before filing suit on September
15, 2017), the Court may not consider that documentation
on this motion, because (a) a motion to dismiss for
failure to state a claim tests only the sufficiency
of Plaintiff's Amended Complaint together with any
documents attached to or referenced in it, and (b) here,
the documentation was neither attached to nor sufficiently
referenced in Plaintiff's Amended Complaint. (*Id.*)

Second, found Magistrate Judge Peebles, based on the
factual allegations of Plaintiff's Amended Complaint, the
Court is unable to make an intelligent assessment as to
whether the Inmate Grievance Program was "available"
to Plaintiff for purposes of *Ross v. Blake*, 136 S. Ct.
1850, 1856 (2016), and *Williams v. Corr. Officer Priatno*,
829 F.3d 118, 123 (2d Cir. 2016), because (a) Plaintiff's
Amended Complaint (filed on June 13, 2018) provides no
information concerning how long his appeal to the Central
Office Review Committee or "CORC" (filed on July 10,
2017) had been pending before CORC as of September
15, 2017, and (b) *Williams* implies that, where (as here)
the regulations fail to address a grievant's particular
situation, DOCCS's regulatory scheme is so opaque and
so confusing that no reasonable prisoner can use it and it
is thus unavailable. (*Id.*)

Third, found Magistrate Judge Peebles, in any event,
granting Defendants' motion to dismiss would violate
Fed. R. Civ. P. 1's directive to construe, administer and
employ Fed. R. Civ. P. 12(b)(6) "to secure the just,
speedy and inexpensive determination of every action and
proceeding," because (a) granting the motion would result
in a dismissal of Plaintiff's Amended Complaint without
prejudice, (b) he would be entitled to file a new action
given that CORC issued its decision denying his appeal
on August 29, 2018, and he faces no statute-of-limitations
issues, and (c) thus the dismissal would be unjust, wasteful
of time, and expensive. (*Id.*)

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    1

### B. Defendants' Objection to the Report-Recommendation

**\*2** Generally, in their Objections, Defendants assert the following three arguments. (*See generally* Dkt. No. 44.)

First, argue Defendants, the Court may and should consider, on this motion to dismiss for failure to state a claim, the documentation related to Plaintiff's grievance because (a) he alleges that he filed the grievance, appealed the denial of it to the Superintendent, then appealed the denial by the Superintendent to CORC (causing the documents to be incorporated by reference in his Amended Complaint), and (b) Defendants have provided the documents as an exhibit to their motion. (*Id.*)

Second, argue Defendants, this action should be dismissed because (a) based on the documents currently before the Court (including the Amended Complaint), Plaintiff's appeal was pending at the time he filed this action, (b) many judges in this District have held that the length of time an appeal was pending before CORC is irrelevant in that CORC's failure to act within a required time frame does not justify a failure to exhaust before filing suit, (c) indeed, there is authority for the point of law that CORC's 30-day time limit to render a decision is not mandatory but "directory," and (d) the Second Circuit's decision in *Williams* is distinguishable in that in *Williams* the plaintiff never received a grievance number (while here Plaintiff did), the plaintiff was transferred between facilities two weeks after submitting his grievance (which here Plaintiff was not), and the legal issue regarded "extraordinary circumstances" (not the availability of remedies, as here). (*Id.*)

Third, argue Defendants, Fed. R. Civ. P. 1 does not weigh in favor of denying Defendants' motion because Magistrate Judge Peebles' application of that rule does not appear to consider the fact that, if Plaintiff were required to file a new action now, he would be required to either successfully request leave to proceed *in forma pauperis* or pay the Court's filing fee up front. (*Id.*)

### II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with

particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]    *See also* *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]    *See* *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying

plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

[3]   *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010)

(Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

[4]   *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully considering the issue, the Court accepts Defendants' first two arguments but rejects their third argument.

More specifically, the Court accepts Defendants' first argument for the reasons stated in their Objections. *See, supra,* Part I.B. of this Decision and Order. To those reasons, the Court would add only the following analysis.

If Defendants had moved to dismiss Plaintiff's action before he filed an Amended Complaint, the Court would have had trouble considering Plaintiff's grievance documents because they were not referenced in his original Complaint. (*See generally* Dkt. No. 1.) However, Defendants moved to dismiss Plaintiff's Amended Complaint, which expressly reference the documents. (Dkt. No. 26, at 5 ["I filed grievances shortly thereafter pertaining to these urinalysis tests and appealed them to the Superintendent of Franklin Correctional Facility and also to Albany. I never received an answer back from Commissioner Anucci [sic] or anyone from his office."].) Moreover, Plaintiff never filed an opposition memorandum of law (e.g., challenging the accuracy of the documents provided by Defendants in their memorandum of law), thus lightening Defendants' burden on this aspect of their motion (which burden Defendants have met for the reasons they state). (*See generally* Docket Sheet.) [5]

[5]   In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has

appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). The Court notes that Plaintiff was specifically advised of the consequences of failing to oppose Defendants' motion. (Dkt. No. 38 [Notice of Motion, advising Plaintiff of the consequences of failing to respond to the motion].)

**\*4** In the undersigned's estimation, the closest question presented by the documents exists with regard to CORC's denial of August 29, 2018, which post-dated the Amended Complaint (which was postmarked June 11, 2018) and thus could not have been referenced in it. However, because the Amended Complaint heavily relied on the express allegation that Plaintiff had not yet received a determination from CORC before September 15, 2017 (and thus suggested that no decision had been issued by CORC before September 15, 2017), and because the CORC denial of August 29, 2018, essentially confirms that suggestion, the Court will (whether as a concession to Defendants or out of special solicitude to Plaintiff) find that the CORC denial was integral to the Amended Complaint. *Cf. Ryan v. Cholakis*, 13-CV-1451, 2014 WL 803776, at *1 (N.D.N.Y. Feb. 25, 2014) (liberally construing *pro se* complaint as effectively supplemented by documents that post-dated his complaint because the documents were integral to the complaint and were provided by the plaintiff in response to a motion to dismiss).

Turning to Defendants' second argument, the Court also accepts this argument, albeit with some reluctance. The Court begins by noting the careful consideration given to this issue (i.e., whether CORC's failure to act within the 30-day period prescribed by regulation renders the grievant's administrative remedies effectively unavailable under *Ross v. Blake*, 136 S. Ct. 1850 [2016], and *Williams v. Corr. Officer Priatno*, 829 F.3d 118 [2d Cir. 2016] ) both by Magistrate Judge Peebles and by United States Magistrate Judge Daniel J. Stewart in the case cited by

Magistrate Judge Peebles: *High v. Switz*, 17-CV-1067, 2018 WL 3736794, at *4-5 (N.D.N.Y. July 9, 2018) (Stewart, M.J.), *report-recommendation adopted by* 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018) (Kahn, J.). In addition, the Court notes that it is disturbed at seeing a delay of longer than a year (specifically, one year, one month and 19 days) with regard to a CORC decision. The Court wonders what the rule would be were CORC (for whatever reason) to fail to *ever* render a decision: at what point in time would the inmate obtain the right to sue? DOCCS would do well to amend 7 N.Y.C.R.R. § 701.5(d)(2)(i),(ii) so as to specify a date after which the inmate may sue, lest the courts effectively do so for it. [6]

6    The Court notes that it has some trouble accepting Defendants' argument that 30-day time limit set forth in 7 N.Y.C.R.R. § 701.5(d)(2)(ii) (which expressly uses the word "shall") is not mandatory *for purposes of exhaustion.* In any event, even if the Court were to rely on the state court cases cited by Defendants, the Court would note that those cases recognize that a violation of the deadline, coupled with a showing of substantial prejudice by the inmate, results in the Department's being ousted of jurisdiction. *See, e.g., Matter of Sheppard v LeFevre*, 116 A.D.2d 867, 868 (N.Y. App. Div., 3d Dep't 1986) ("[S]ince the regulation simply provides for a time limit without any sort of limitation on action after the expiration thereof, such time limit must be construed as directory ... and the Department will be ousted of jurisdiction only where substantial prejudice is demonstrated.") (citation omitted).

Having said all of that, here, the Court need not wrestle with this thorny issue. This is because the delay between the date on which a decision by CORC was due (i.e., August 9, 2017) and the date on which Plaintiff signed and thus filed his original Complaint in this action (i.e., September 15, 2017) was only thirty-seven (37) days. This is shorter than the 80-day waiting period previously found to be insufficient (to warrant suit) by the Second Circuit. *See Gizewski v. New York State Dep't of Corr. & Cnty. Supervision*, 692 F. App'x 668, 670 (2d Cir. 2017) (finding that "Gizewski [made] no persuasive argument that administrative remedies were unavailable" where he filed his appeal to CORC on November 12, 2013, and had not yet received a decision from CORC by the time he filed his complaint 80 days later, on January 31, 2014). While it turned out that Plaintiff was correct to the extent he estimated in mid-September 2017 that no decision from CORC would be forthcoming, that fact is not relevant

to the issue of whether, based on the factual allegations set forth in his Amended Complaint, his administrative remedies had become unavailable to him only 37 days after the expiration of the 30-day deadline for CORC's determination: they had not.

**\*5** However, the Court must reject Defendants' third argument. Granted, Defendants are correct that Magistrate Judge Peebles did not expressly account for the fact that the grant of Defendants' motion under Fed. R. Civ. P. 12(b)(6) would place another obstacle before Plaintiff: the need to again request leave to proceed *in forma pauperis* or pay the Court's filing fee up front. However, Defendants themselves did not account for two considerations. [7]

[7]    For the sake of brevity, the Court will not rely on the special solicitude that ordinarily must be afforded to *pro se* litigants. Even *pro se* litigants must continue to apply for *in forma pauperis* status and comply with the Court's procedural rules, including Fed. R. Civ. P. 12(b)(6).

The first of these considerations is the fact that the record contains no reason to believe that Plaintiff's request to proceed *in forma pauperis* in a new action would meet with a result less favorable to him than did his request of November 4, 2017, in this action. (Dkt. Nos. 10, 11.) It is true that Plaintiff is currently not incarcerated. However, he was not incarcerated at the time of his prior request. (Dkt. No. 10, at ¶ 1.) Moreover, in his prior request, Plaintiff swore, *inter alia*, that his last job (before his incarceration in 2016) was in 2015 at a car wash, that he has no bank accounts, and that he owns no real estate, automobiles or other assets. (Dkt. No. 10, at ¶ 2.b, 4, 5.)

The second of these considerations is the fact that, if the blind application of Fed. R. Civ. P. 12(b)(6) and *Gizewski*

would result in the dismissal of Plaintiff's action, the Court would be inclined (due to the apparent unjustness of that result in light of the existence of the CORC determination of August 29, 2018) to convert Defendants' motion to one for summary judgment (on notice to the parties and a further opportunity to be heard) and take a close look at the reason for CORC's delay in rendering a determination with regard to Plaintiff's appeal. Simply stated, the fact that CORC knew of yet failed to rectify its failure to render a determination for some 349 days (i.e., from September 15, 2017, to August 31, 2018), coupled with the fact that when it did render a determination it relied solely on the fact that Plaintiff had been released 35 days before (i.e., on June 26, 2018), appears to raise an inference that CORC was unwilling to provide a determination until Plaintiff had been released (when inmates often abandon suit), effectively rendering Plaintiff's administrative remedy unavailable.

Should Defendants prefer to proceed along this route (which the Court respectfully assumes they would not, at least at this time), they are invited to move for reconsideration. Otherwise, their motion to dismiss is denied.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 43) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiff's Amended Complaint (Dkt. No. 38) is **DENIED**.

**All Citations**

Slip Copy, 2019 WL 409412

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.